Hiba Enayat
2700 Glengarry Drive
Lake Havasu City
AZ, 86404
(415) 940-0723
hiba.enayat@gmail.com

PLAINTIFF IN PRO SE

**FILED**

OCT 01 2021

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER ENAYAT, AN INDIVIDUAL, | CASE NO.: 3:21-CV-00634 |
| PLAINTIFF, | SECOND AMENDED COMPLAINT |
| v. | |
| THE ELECTRA OWNERS ASSOCIATION, A DOMESTIC NON-PROFIT CORPORATION, AND DOES 1 THROUGH 10, | |
| DEFENDANTS. | |

I, Hiba Enayat ("Heather") state, allege, and pray as follows:

## PRELIMINARY STATEMENT

(1) Heather brings this action against the Electra Owners Association, their agents, and appointees, (collectively, the "Electra") for violations of

1

1   the Fair Housing Act, 42 U.S.C. § 3601 et seq. (the "FHA"); and the

2   California Fair Employment and Housing Act, Cal. Gov. Code §12900 et

3   seq. ("FEHA").

5   (2) This is an action for declaratory judgment, seeking relief and money

6   damages against the Electra for their unreasonable, unlawful, and bad

7   faith actions that constitute a breach of their obligations to Heather

8   under the Declaration of Covenants, Conditions, and Restrictions of the

9   Electra, attached hereto as Exhibit "1."

10  (3) Heather owned a condominium within the Electra managed

11  property.

12  (4) Electra discriminated against Heather and took punitive actions in

13  retaliation for Heather's requests for a reasonable accommodation and

14  challenge to face mask policy from Heather to county, state, and local

15  officials. As a result, Heather has suffered significant emotional and

16  monetary damages.

17                              JURISDICTION

18  (5) This Court has jurisdiction over this action pursuant to 28 U.S.C. §§

19  1331 and 1343 in that this is an action arising under the FHA 42 U.S.C.

20  § 3601 et seq.

1                        VENUE

2   (6) Venue is proper in this district under 28 U.S.C. § 1391 for several

3   reasons. Heather resided in this district. A substantial part of the

5   events or omissions giving rise to the claim occurred in this district. All

6   defendants are subject to personal jurisdiction in this district with

7   respect to this action; and there is no other district in which this action

8   may otherwise be brought.

9                      PARTIES

10   (7) Heather is an individual who resided at her real property located at

11   700 West E Street, Unit 1305, San Diego, CA ("Property").

12   (8) Electra is a California Domestic Non-Profit Corporation with its

13   corporate office located at 15241 Laguna Canyon Rd, Irvine CA 92618.

14   Electra owns and operates the housing association where Property is

15   located and manages access to the public areas that surround the

16   Property.

17   (9) Heather sues fictitious defendants Does One through Ten, inclusive,

18   and each of them because their names and capacities or facts showing

19   them to be liable to Heather are not presently known.

20

1  (10) Heather sues Electra and Electra's agents individually and as the

2  agent and employee of every other defendant acting within the course

3  and scope of said agency with the knowledge and consent of the other.

5  (11) Heather believes Alicia ("Alicia") is an agent of Electra.

6  (12) Heather will seek leave to amend this complaint to reflect the true

7  names and capacities of such fictitious defendants when Heather knows

8  them.

9  ## FACTUAL ALLEGATIONS

10  (13) This action arises from the Electra Face Covering Policy and

11  practices in California that violate the FHA and FEHA and their breach

12  of the Agreement with Heather that requires Electra to maintain access

13  to her private dwelling and the public spaces of the Electra

14  condominium community.

15  (14) Electra recently adopted a rule that requires all residents to cover

16  their face in the Common Areas, with no exception for residents who

17  cannot cover their face for medical reasons (the Electra "Face Covering

18  Policy").

19

20

(15) Heather is a person with a disability who has several health conditions that substantially limit her breathing and her respiratory and nervous systems, which are major life functions.

(16) Heather cannot wear a face covering without experiencing shortness of breath, heart palpitations, and extreme anxiety.

(17) A medical health professional has advised that due to Heather's condition, she should not cover her face.

(18) Due to her disability, Heather is unable to use portions of her property not designated to accommodate for disabled persons who are not able to cover their face during their activities in the Common Areas.

(19) The Property is a place of lodging located within the complex with more than four dwelling units.

(20) On Apr. 8, 2020, Heather received a notice from Electra stating that all residents must wear a face covering in the Common Areas.

(21) Heather initially attempted to cover he face while in the Common Areas, but she quickly found, due to the physical symptoms of her disability, that she could not cover her face.

(22) On Jun. 29, 2020, the CDPH issued guidance for the use of face coverings ("Guidance"). The Guidance specifically states that persons

1  with a medical condition, mental health condition, difficulty breathing,

2  or have a disability are exempt from the Guidance.

3  (23) The County of San Diego, Health and Human Services Agency

5  ("SDHHS") issued Emergency Regulations ("Order") on Sep. 25, 2020,

6  requiring face coverings to be worn as described and required by CDPH

7  Guidance which include the exceptions.

8  (24) CDC recommendations clearly state that face coverings should

9  NOT be worn by a person with a disability who cannot wear a mask, or

10  cannot safely wear a mask, for reasons related to the disability,

11  however, the CDC exemptions are omitted from Electra's Face Covering

12  Policy.

13  (25) Electra's Face Covering Policy is in direct contradiction of the

14  guidelines published by the Centers for Disease Control ("CDC") and

15  the California Department of Public Health ("CDPH").

16  (26) On or about June of 2020 Alicia threatened to report and did report

17  Heather to the Electra board for refusing to cover her face.

18  (27) On or about June of 2020 Electra board notified Heather she must

19  attend an Electra board hearing on Jul. 22, 2020 via zoom due to state

20  emergency.

(28) At the Meeting, Heather complained about the Face Covering Policy, presented evidence of County and State exemptions and the notice from Heather's doctor that she had a disability that affected her ability to cover her face, and requested an accommodation.

(29) Electra found at the Meeting that the note was not specific enough to exempt Heather from the Electra Face Covering Policy and ordered Heather to cover her face in the Common Areas.

(30) The Meeting caused Heather stress and anxiety.

(31) Electra demanded Heather provide another note from her doctor, and Heather requested that Electra assist with her costs for her doctor to provide another note.

(32) Electra insisted Heather use a face covering as a reasonable accommodation or submit another proposal for a different reasonable accommodation.

(33) Heather submitted another, more detailed, doctor's note to Electra and proposed that she be more physically distant, avoid elevators with someone in it, try to take the stairs more often, limit checking mail to once a week, try to use the mailroom when no one else is there, and avoid the publicly accessed areas of the Common Areas.

(34) Electra accepted Heathers doctor's notice and proposal, and Heather believed that the controversy over the Electra Face Covering Policy had concluded.

(35) Electra's responded to Heather's objection of Electra's Face Covering Policy and denied Heather's second accommodation request because Heather had not provided information regarding the causal connection between her disability and her request to not wear a face covering.

(36) Alicia twice physically approached Heather on or about Sep. 7, 2020. Alicia maintained a physical distance to Heather of LESS THAN six feet.

(37) On Sep. 11, 2020, Alicia publicly challenged Heather's presence in an empty mail room. Residents and staff in the lobby witnessed this. Heather felt scared, irritated, embarrassed, and panicked. Heather's breathing rate increased, and she ran from the encounter.

(38) After this incident, on Sep. 11, 2020, Alicia sent out the weekly community update email, but this time specifically asked residents to call 211 or management to report mask non-compliance. This can be construed as retaliation to Heather's response to Electra that Alicia did

1 | not find satisfactory, since never before were such residents asked to

2 | report mask non-compliance to 211.

3 | (39) On or about Dec. 27, 2020, an unidentified neighbor accosted

5 | Heather in the elevators.

6 | (40) Because Heather was not wearing a mask, Heather waved off the

7 | elevator.  The neighbor invited Heather into the elevator.

8 | (41) Heather took the elevator and when the doors closed the neighbor

9 | asked her to wear a mask and she said she has a medical condition and

10 | then he started yelling at Heather.

11 | (42) By his own admission, he shouted that the board told him about

12 | Heather and that she is faking a medical condition and has a fake

13 | doctor's note.

14 | (43) The neighbor verbally abused and threatened to assault Heather

15 | and Heather became frightened for her safety and experienced a panic

16 | attack.

17 | (44) Heather reported the incident to the police. Electra made a report

18 | of the incident. Heather also submitted her report to security and held

19 | Electra responsible for this incident.

20 |

(45) The Electra board also presented an amendment to the Agreement that releases Electra from liability from their mandates and demands that all their residents cover their face at all times.

(46) Heather opposed the amendment.

(47) The Electra also found that all residents must wear a face covering in the Common Areas or face a $1,000 USD penalty.

(48) Electra unlawfully coerced, intimidated, threatened, or interfered with Heather in the exercise or enjoyment of her property when they informed others in her community that Heather refused to cover her face.

(49) Heather began having other encounters with neighbors who would yell at her when they see her getting off an elevator or across the hall for no apparent reason. This had never happened before.

(50) Heather has information and believes that Electra has discussed Heather's medical disability and the details of her private medical condition with Heather's neighbors.

(51) Heather has information and believes that Electra discussed her conditions with her neighbors in an attempt to harass Heather, which is retaliatory behavior.

1    (52) Electra's conduct included informing Heather's neighbors that

2    Heather was faking an illness.

3    (53) Electra injured Heather by sharing Heather's personal medical

5    information with other members of her community in retaliation.

6    (54) Electra's actions had a substantial discriminatory impact because

7    they affected both Heather and others like Heather who are unable to

8    cover their face for medical reasons.

9    (55) Electra's Face Covering Policy denies full and equal access to

10   Common Areas to residents who are unable to cover their face due to a

11   medical condition.

12   (56) The Electra Face Covering Policy caused Heather personal injury

13   in violation of the FEHA and FHA.

14   (57) By implementing and enforcing policies more stringent than those

15   required by California and federal guidelines and recommendations,

16   Electra has excluded disabled people from its Common Areas because

17   their disabilities prevent them from wearing face coverings.

18   (58) By enacting their Face Covering Policy more stringent than the

19   state and federal orders and guidelines, Electra cannot assert such

20

1 local, state, and federal guidelines and recommendations as a defense to

2 justify policies that violate the FHA and FEHA.

3 (59) Heather suffered damages from the embarrassment and

5 harassment of Electra by their flagrant violations of the FHA and

6 FEHA, including, without limitation, the infliction of emotional

7 distress, which has further exacerbated her medical disability that

8 prevents her from covering her face.

9 (60) Electra provides segregated accommodations and services that

10 relegates persons with disabilities to the status of second-class citizens.

11 (61) Electra's places of public accommodation provide people with

12 disabilities with services, facilities, privileges, advantages or

13 accommodations that are not equal to or are different or separate from

14 those provided to other individuals.

15 (62) The actions of the Electra, Electra's agents,' and unfriendly

16 neighbors have harmed Heather to the extent that Heather worried for

17 her safety and found alternate temporary residence since March 2021.

18 Heather currently no longer resides at Electra and has sold the Real

19 Property and relocated.

20

(63) Electra's actions violate the Agreement between Electra and Heather, specifically Articles 2.72, 3.2, and 3.3, which explains that Electra facilities are for Heather's "use and enjoyment".

(64) Electra's Face Covering Policy changes the terms of the Agreement without consideration of Heather's use and enjoyment of Property.

(65) Electra changed the terms of the Agreement without consideration of Heather's use and enjoyment of Property when Electra issued the Face Covering Policy.

## COUNT ONE

### Discrimination in Violation of the FHA, FEHA and CFEH

(66) Heather re-alleges and incorporates by reference the allegations set forth in all paragraphs above, as if fully set forth herein.

(67) Heather seeks damages for violations of the Fair Housing Act, 42 U.S.C. § 3601 et seq.; the California Fair Employment and Housing Act, Cal. Gov. Code §12900 et seq.

(68) Electra intentionally created and enforced their Face Covering Policy to discriminate against the use of the Common Areas by disabled members of the public.

(69) Electra violated 42 U.S. Code § 3604 3(b) because they refused to make reasonable accommodations in rules, policies, practices or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

(70) Heather has a disability within the scope of 42 U.S.C § 3602 (h). Electra knew of this medical condition and doctor's confirmation, as well as State and County exemptions on July 22, 2021. Heather requested exemption from the mask mandate as per State and County health guidelines. Since all governing and guiding bodies allow for mask exemptions for medical reasons, this request is reasonable. Electra continued to refuse to make this requested accommodation.

(71) Electra is in violation of the FHA because it discriminated against Heather on the basis of her disabilities in the full and equal enjoyment of the services, facilities, privileges, advantages or accommodations of the Common Areas and ultimately her own Property.

(72) Electra denied Heather the services, facilities, privileges, advantages and accommodations in the most integrated setting appropriate to Heather's needs because it refused to modify its policies

and procedures to allow access to and enjoyment of the Common Areas without wearing a face covering.

(73) Electra refused to engage in the interactive process and first denied Heather's request claiming that there are no exemptions, and then after Heather complained, provided doctors notes, and proposed alternate accommodations, Heather was denied and ordered to follow the Face Covering Policy or be fined.

(74) Heather did not pose an exigent threat to the health or safety of her neighbors.

(75) There was no significant risk to the health or safety of others if Electra modified its policies, practices and procedures to accommodate Heather.

(76) Social distancing, temperature checks and other safety precautions in the Common Areas were in place or Electra could have easily put them into place.

(77) Heather at no time had no signs or symptoms of any illness.

(78) Federal, state and county orders and guidelines all clearly state the need for a medical exemption from the requirement to wear a face covering.

(79) Electra refused to consider the need for an exemption to its face covering policies and procedures despite it having no basis to conclude that Heather was a direct threat to the health and safety of others.

(80) Electra made no individual professional assessments that considered Heather's actual abilities or disabilities, instead, Electra adopted a broad and discriminatory Face Covering Policy based on generalizations, stereotypes, and collectivist politics.

(81) As a result of Electra's unlawful discriminatory actions, Heather suffered irreparable harm including without limitation, emotional distress, loss of property value, added living costs, a deteriorated health condition, and the costs of bringing this action calculated in an amount not less than $200,000.

(82) Because Electra intentionally violated Heather's rights with malice and reckless indifference they are, liable for punitive damages.

COUNT TWO

Creating a Hostile Environment and Retaliation in Violation of the

FHA and FEHA

(83) Heather re-alleges and incorporates by reference the allegations set forth in all paragraphs above, as if fully set forth herein.

(84) Heather alleges as per 24 CFR § 100.600 Electra created hostile environment harassment by interfering with the use and enjoyment of dwelling.

(85) Electra refused Heather "reasonable accommodation", encouraged residents to call 211 or management to report mask non-compliance, spread rumors and misinformation about Heather's medical condition that resulted in multiple confrontations, verbal abuse, threat of physical assault and isolation from her neighbors.

(86) Heather alleges Electra used intimidation, harassment, or interference stop Heather from exercising her rights to challenge the Electra Face Covering Policy.

(87) Electra's retaliated against Heather by intimidating her, threatening her unequally and Heather alleges that Electra spreading of malicious rumors have forced Heather to flee from her Property and sell her Property.

(88) Less than two months after Heather complained of discrimination, Electra retaliated against Heather by proposing to enforce an amendment to their policy that if any one of the residents of the Electra did not follow the Face Covering Policy that they would be fined $1000.

1  (89) Electra's harassment, and illegal policies and fining Heather is

2  pretextual and baseless.

3  (90) Electra retaliated against Heather because she complained of

5  Electra's disability discrimination. Electra created an environment for

6  Heather at her Property and in the Common Areas that was so hostile

7  that was so pervasive that it interfered with the use and enjoyment of

8  her Property and the sale of her Property.

9  (91) As a result of Electra's unlawful discriminatory actions, Heather

10  suffered harm including without limitation, emotional distress, loss of

11  property value, a deteriorated health condition, and the costs of

12  bringing this action calculated in an amount not less than $200,000.

13  (92) Because Electra intentionally and negligently violated Heather's

14  rights with malice and reckless indifference they are liable for punitive

15  damages.

16                                COUNT THREE

17                Liability for Discriminatory Housing Practices

18  (93) Electra has direct responsibility for direct liability as per 24 CFR §

19  100.7(a) and vicarious liability as per 24 CFR § 100.7(b).

20

1 │ (94) Electra knew of Heather's disability and request for "reasonable
2 │ accommodation" since July 22, 2021.

3 │ (95) Electra failed to take prompt action to correct and end
5 │ discriminatory housing practices. They did not train their staff and
6 │ other residents about mask mandate exemptions, despite Heather
7 │ suggesting so in writing in October 2020, resulting in multiple staff and
8 │ resident encounters.

9 │ (96) Electra further exacerbated the situation by spreading
10 │ misinformation and rumors about Heather's disability being fake
11 │ leading to abusive encounters from other residents.

12 │ (97) Electra failed to take any corrective action even after such a drastic
13 │ encounter of assault on that led to Heather calling the police. Electra
14 │ also failed to respond to Heather about this discriminatory incident.

15 │ (98) Electra's negligence and practice has led Heather to be fearful of
16 │ her neighbors and flee in fear of her safety, as well as alienated her
17 │ from relationships with her neighbors.

18 │ (99) Electra's discriminatory practice has resulted in damages to
19 │ Heather, including without limitation, the inability of use and peaceful
20 │ enjoyment of the property, physical, emotional and mental distress, and

a deteriorated health condition calculated in an amount not less than $200,000.

## COUNT FOUR

### Breach of Contractual Duty

(100) Heather re-alleges and incorporates by reference the allegations set forth in all paragraphs above, as if fully set forth herein.

(101) Electra has a contractual duty in Agreement that enjoins the Electra from stopping Heather from traveling to and from her property without discrimination, harassment, and intimidation. Specifically Articles 2.72, 3.2, and 3.3, which explains that Electra facilities are for Heather's "use and enjoyment"

(102) Electra also has a duty to abide by all applicable Federal regulations and code under FHA and Title 24 of Housing and Urban Development codes. Electra breached 24 CFR § 100.600, by engaging in hostile environment harassment towards Heather.

(103) Electra's behavior has caused Heather to experience a loss of enjoyment and use of her Property because of the embarrassment and retaliation of the Electra.

(104) Electra's breach has resulted in damages to Heather, including without limitation, the inability of use and peaceful enjoyment of the property, physical, emotional and mental distress, and a deteriorated health condition calculated in an amount not less than $200,000.

COUNT FIVE

Negligence/Reckless Conduct

(105) Heather re-alleges and incorporates by reference the allegations set forth in all paragraphs above, as if fully set forth herein.

(106) Electra has a duty of care to Heather particularly after Electra, and specifically the board, informed Heather's neighbors of her medical conditions, which caused a danger to her health as set forth herein.

(107) The careless, negligent, and reckless conduct of Electra consisted of the following:

      a. Forcing Heather to cover her face in the Common Areas, contrary to CDC, State and local guidance and orders;

      b. Failing to have adequate policies and procedures in place to prevent employees from forcing disabled residents to cover their face when that might harm them;

    c. Ignoring the recommendations and guidelines of the CDPH, SDHHS and the CDC regarding the use of masks and face coverings;

    d. Failing to inform other residents' that there are medical exemption from mask for people with medical conditions as per CDPH, SDHHS and the CDC, so as to maintain their distance and avoid confrontations; and

    e. Failing to exercise due care and caution for the rights, safety and well-being of Heather, as well as acting with wanton, willful and reckless disregard for the safety of the Heather.

(108) As a direct and proximate result of the aforementioned incident, which was caused by the reckless, careless and negligent conduct of Electra, Heather has suffered the following injuries damages and losses:

a. Pain, suffering and inconvenience;

b. Hypertension;

c. Headaches;

d. Shortness of breath;

e. Exacerbation of underlying health issues;

f. Depression;

g. Loss of the ordinary pleasures of life; and

h. Anxiety, embarrassment, and humiliation.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

(1) Accept jurisdiction over this matter;

(2) Declare to Electra that persons who cannot wear a face covering due to medical reasons are exempt from the Electra Face Covering Policy;

(3) Declare that Electra must accommodate persons who cannot wear a face covering while traveling about the Common Areas due to a disability;

(4) Declare that the actions and omissions alleged herein are in multiple violations of the FHA and FEHA;

(5) Issue a preliminary and permanent injunction directing Electra to end their discriminatory practices;

(6) Order Electra to take appropriate affirmative action to ensure Electra and any of their agents, employees, or volunteers do not engage in the activities complained of above again;

1 (7) Retain jurisdiction over Electra until such time as the Court is

2 satisfied that Electra's unlawful policies, practices, acts and omissions

3 complained of herein cannot recur;

5 (8) Award to Plaintiff all appropriate damages, including actual;

6 declaratory statutory; treble damages; and exemplary and punitive

7 damages, according to proof in an amount not less than $200,000;

8 (9) Award to Plaintiff expert witness fees pursuant to Gov. Code 14

9 §12989.2(a);

10 (10) Award to Plaintiff costs of suit; and

11 (11) Such other and further relief as the Court deems just and proper.

12 ## JURY AND FACT-FINDER DEMANDS

13 Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff

14 hereby demands a trial by jury as to all issues. Plaintiff does not

15 consent to assignment of this matter to a magistrate judge and

16 requests assignment to a United States District Judge.

17 ## VERIFICATION

18 I, the undersigned Plaintiff, Hiba Enayat declare under penalty

19 of perjury that the foregoing is true and correct.

20 Executed on this Sept. 29, 2021, at Mohave County, Arizona.

Respectfully Submitted,
By: _____
Hiba Enayat
Plaintiff, in Pro Se.

**EXHIBIT 1**

RECORDING REQUESTED BY:
First American Title
909446-22
WHEN RECORDED MAIL TO:

Luce, Forward, Hamilton & Scripps LLP
600 West Broadway, Suite 2600
San Diego, CA 92101
Attn: Nancy T. Scull, Esq.

*F8
1040
2W
2con*

DOC # 2005-1036054



DEC 01, 2005    1:47 PM

OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:     325.00    WAYS:    2
PAGES:    104

2005-1036054

*16829*

## DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS

### OF

### THE ELECTRA

> **THIS DECLARATION CONTAINS A BINDING ARBITRATION PROVISION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT IN SECTION 17.4 HEREOF.**

Bosa / The Electra
CC&Rs
26343-00027 / 1911970.7

10/30/05

16830

## TABLE OF CONTENTS

**Page**

ARTICLE 1 RECITALS...................................................................................1
    1.1    PROPERTY OWNED BY DECLARANT ...............................1
    1.2    NATURE OF PROJECT .........................................................1
    1.3    DESCRIPTION OF PROJECT................................................1

ARTICLE 2 DEFINITIONS...........................................................................2
    2.1    ADDITIONAL CHARGES.....................................................2
    2.2    ARCHITECTURAL COMMITTEE ........................................2
    2.3    ARCHITECTURAL GUIDELINES .........................................2
    2.4    ARTICLES .............................................................................2
    2.5    ASSIGNED PARKING SPACES ............................................2
    2.6    ASSIGNED STORAGE SPACES............................................2
    2.7    ASSOCIATION ......................................................................3
    2.8    ASSOCIATION MAINTENANCE MANUAL ........................3
    2.9    ASSOCIATION PROPERTY ..................................................3
    2.10   ASSOCIATION RULES ........................................................3
    2.11   BOARD..................................................................................3
    2.12   BUDGET ...............................................................................3
    2.13   BUILDING............................................................................3
    2.14   BYLAWS...............................................................................3
    2.15   CAPITAL IMPROVEMENT ASSESSMENTS.......................3
    2.16   CITY .....................................................................................3
    2.17   COMMERCIAL COMMON AREA .......................................3
    2.18   COMMERCIAL CONDOMINIUM(S).....................................3
    2.19   COMMERCIAL MODULE ....................................................4
    2.20   COMMERCIAL OWNER(S)..................................................4
    2.21   COMMERCIAL UNIT ..........................................................4
    2.22   COMMON AREA ..................................................................4
    2.23   COMMON EXPENSES .........................................................4
    2.24   CONDOMINIUM...................................................................5
    2.25   CONDOMINIUM PLAN ........................................................5
    2.26   COUNTY...............................................................................5
    2.27   DECLARANT ........................................................................5
    2.28   DECLARATION ...................................................................5
    2.29   DESIGNATED EXCLUSIVE USE COMMON AREA, WALLS OR
             FLOORS ...............................................................................5
    2.30   DRE.......................................................................................6
    2.31   ELIGIBLE HOLDER ............................................................6
    2.32   ENCROACHMENT AREA(S) .................................................6
    2.33   ENCROACHMENT AGREEMENT........................................6
    2.34   ENFORCEMENT ASSESSMENTS .......................................6
    2.35   EXCLUSIVE USE BALCONY AREAS .................................6
    2.36   EXCLUSIVE USE COMMON AREA OR EXCLUSIVE USE
             EASEMENT ..........................................................................6

**16831**

2.37   EXCLUSIVE USE DECK AREAS ...........................................7
2.38   EXCLUSIVE USE PATIO AREAS ..........................................7
2.39   FINAL MAP .........................................................7
2.40   FIRST MORTGAGE ....................................................7
2.41   FIRST MORTGAGEE ...................................................7
2.42   FISCAL YEAR .......................................................7
2.43   GOVERNING DOCUMENTS ...............................................7
2.44   HAZARDOUS MATERIALS ...............................................7
2.45   HAZARDOUS MATERIALS LOCATIONS AND HAZARDOUS
       MATERIALS REPORT ..................................................7
2.46   IMPROVEMENTS ......................................................7
2.47   INSTITUTIONAL MORTGAGEE ...........................................8
2.48   INVITEE ...........................................................8
2.49   LEASE .............................................................8
2.50   LOWER LIVING ELEMENT ..............................................8
2.51   MAINTENANCE RESPONSIBILITY CHART ..................................8
2.52   MAINTENANCE OBLIGATIONS ...........................................8
2.53   MEMBER ............................................................8
2.54   MIDDLE LIVING ELEMENT .............................................9
2.55   MODULE ............................................................9
2.56   MORTGAGE ..........................................................9
2.57   MORTGAGEE .........................................................9
2.58   NOTICE AND HEARING ................................................9
2.59   OPERATING RULES ...................................................9
2.60   OWNER .............................................................9
2.61   PARKING GARAGE ....................................................9
2.62   PARKING SPACE(S) ..................................................9
2.63   PERSON ............................................................9
2.64   PROJECT ...........................................................9
2.65   PROJECT HANDBOOK ..................................................10
2.66   PROPERTY ..........................................................10
2.67   PUBLIC REPORT .....................................................10
2.68   QUALIFIED ENVIRONMENTAL CONSULTANT ................................10
2.69   REGULAR ASSESSMENTS ...............................................10
2.70   RESIDENTIAL COMMON AREA ...........................................10
2.71   RESIDENTIAL CONDOMINIUM ...........................................10
2.72   RESIDENTIAL FACILITIES ............................................10
2.73   RESIDENTIAL OWNER .................................................10
2.74   RESIDENTIAL UNIT ..................................................10
2.75   SPECIAL ASSESSMENTS ...............................................11
2.76   STORAGE SPACES ....................................................11
2.77   SUPPLEMENTARY CONDOMINIUM PLAN ....................................11
2.78   SUPPLEMENTARY DECLARATION .........................................11
2.79   UPPER LIVING ELEMENT ..............................................11
2.80   UNIT ..............................................................11
2.81   UTILITY FACILITIES ................................................12

16832

| | 2.82 | VOTING POWER | 12 |
| | 2.83 | WARRANTY AND MAINTENANCE MANUAL | 12 |
| ARTICLE 3 | | OWNERSHIP AND EASEMENTS | 12 |
| | 3.1 | OWNERSHIP OF CONDOMINIUM | 12 |
| | 3.2 | NO SEPARATE CONVEYANCE | 13 |
| | 3.3 | DELEGATION OF USE | 13 |
| | 3.4 | EASEMENTS | 13 |
| | 3.5 | LIGHT, AIR AND VIEW | 16 |
| | 3.6 | CREATION OF DESIGNATED EXCLUSIVE USE COMMON AREA WALLS OR FLOORS | 17 |
| | 3.7 | PARKING | 17 |
| | 3.8 | STORAGE RIGHTS | 18 |
| | 3.9 | CHARGE FEES | 19 |
| ARTICLE 4 | | THE ASSOCIATION | 19 |
| | 4.1 | THE ORGANIZATION | 19 |
| | 4.2 | ASSOCIATION ACTION; BOARD OF DIRECTORS AND OFFICERS; MEMBERS' APPROVAL | 19 |
| | 4.3 | POWERS OF THE ASSOCIATION | 20 |
| | 4.4 | DUTIES OF THE ASSOCIATION | 22 |
| | 4.5 | LIMITATIONS ON AUTHORITY OF BOARD | 25 |
| | 4.6 | PROHIBITED ACTIVITIES | 26 |
| | 4.7 | NO PERSONAL LIABILITY; INDEMNIFICATION OF BOARD MEMBER | 27 |
| ARTICLE 5 | | MEMBERSHIP AND VOTING RIGHTS IN ASSOCIATION | 28 |
| | 5.1 | MEMBERSHIP | 28 |
| | 5.2 | NUMBER OF VOTES | 28 |
| ARTICLE 6 | | ASSESSMENTS | 30 |
| | 6.1 | CREATION OF LIEN AND PERSONAL OBLIGATION FOR ASSESSMENTS | 30 |
| | 6.2 | PURPOSE OF ASSESSMENTS | 30 |
| | 6.3 | REGULAR ASSESSMENTS | 31 |
| | 6.4 | SPECIAL ASSESSMENTS | 31 |
| | 6.5 | CAPITAL IMPROVEMENT ASSESSMENT | 32 |
| | 6.6 | ENFORCEMENT ASSESSMENTS | 32 |
| | 6.7 | CHANGES TO ASSESSMENTS | 33 |
| | 6.8 | ALLOCATION OF ASSESSMENTS TO CONDOMINIUMS | 34 |
| | 6.9 | DATE OF COMMENCEMENT OF REGULAR ASSESSMENTS; DUE DATES | 34 |
| | 6.10 | NOTICE AND ASSESSMENT INSTALLMENT DUE DATES | 34 |
| | 6.11 | ESTOPPEL CERTIFICATE | 34 |
| | 6.12 | COLLECTION OF ASSESSMENTS, LIENS | 35 |
| | 6.13 | ADDITIONAL CHARGES | 37 |
| | 6.14 | WAIVER OF EXEMPTIONS | 37 |

16833

6.15    SUBORDINATION OF LIEN TO FIRST MORTGAGES ...................37
6.16    NO OFFSETS ...........................................................................38
6.17    PERSONAL LIABILITY OF OWNER .......................................38
6.18    TRANSFER OF PROPERTY ......................................................38
6.19    FAILURE TO FIX ASSESSMENTS ..........................................38
6.20    PROPERTY EXEMPT FROM ASSESSMENTS .........................38
6.21    INITIAL CAPITAL CONTRIBUTIONS .....................................38

ARTICLE 7 USE RESTRICTIONS ....................................................................38
7.1     USE RESTRICTIONS APPLICABLE TO RESIDENTIAL
        CONDOMINIUMS .................................................................39
7.2     USE RESTRICTIONS APPLICABLE TO COMMERCIAL
        CONDOMINIUMS .................................................................43
7.3     USE RESTRICTIONS APPLICABLE TO RESIDENTIAL AND
        COMMERCIAL CONDOMINIUMS .......................................46

ARTICLE 8 MAINTENANCE .............................................................................50
8.1     MAINTENANCE OBLIGATIONS OF OWNERS ......................50
8.2     MAINTENANCE OBLIGATIONS OF COMMERCIAL OWNERS .................51
8.3     MAINTENANCE OBLIGATIONS OF ASSOCIATION.................51
8.4     HISTORICAL LANDMARK......................................................52
8.5     FUTURE CONSTRUCTION ....................................................53
8.6     COMPLIANCE WITH REQUIREMENTS REGARDING PROJECT
        STORM WATER POLLUTION ..............................................53
8.7     INSPECTIONS .......................................................................54

ARTICLE 9 ARCHITECTURAL REVIEW ........................................................55
9.1     ARCHITECTURAL COMMITTEE APPROVAL ......................55
9.2     ORGANIZATION ...................................................................55
9.3     DESIGNATION OF MEMBERS AND TERMS OF OFFICE........55
9.4     DUTIES ..................................................................................56
9.5     MEETINGS .............................................................................56
9.6     SCOPE OF ARCHITECTURAL REVIEW .................................56
9.7     ARCHITECTURAL GUIDELINES ...........................................57
9.8     APPEAL ..................................................................................58
9.9     INSPECTION AND CORRECTION OF WORK.........................58
9.10    GOVERNMENT REGULATIONS .............................................59
9.11    DILIGENCE IN CONSTRUCTION ...........................................60
9.12    FEE FOR REVIEW .................................................................60
9.13    COMPENSATION ..................................................................60
9.14    INTERPRETATION ................................................................60
9.15    WAIVER .................................................................................60
9.16    ESTOPPEL CERTIFICATE......................................................60
9.17    LIABILITY .............................................................................61
9.18    NON-APPLICABILITY TO DECLARANT ...............................61
9.19    GOVERNMENT REQUIREMENTS..........................................61
9.20    AMENDMENTS .....................................................................61

9.21    VARIANCES................................................................................61
9.22    HISTORIC LANDMARK........................................................62

ARTICLE 10 DEVELOPMENT RIGHTS............................................62
    10.1    LIMITATIONS OF RESTRICTIONS .................................62
    10.2    RIGHTS OF ACCESS AND COMPLETION OF CONSTRUCTION ................62
    10.3    SIZE AND APPEARANCE OF PROJECT.........................63
    10.4    MARKETING RIGHTS ......................................................63
    I0.5    TITLE RIGHTS ..................................................................64
    10.6    POWER OF ATTORNEY ....................................................64
    10.7    AMENDMENT.....................................................................64

ARTICLE 11 INSURANCE......................................................................64
    11.1    LIABILITY INSURANCE..................................................64
    11.2    PROPERTY INSURANCE .................................................65
    11.3    INDIVIDUAL INSURANCE...............................................66
    11.4    FIDELITY BOND................................................................66
    11.5    WORKER'S COMPENSATION INSURANCE ...................67
    11.6    DIRECTORS AND OFFICERS INSURANCE ....................67
    11.7    OTHER INSURANCE .........................................................67
    11.8    COPIES OF POLICIES.......................................................67
    11.9    REVIEW OF INSURANCE .................................................67
    11.10   BOARD'S AUTHORITY TO REVISE INSURANCE COVERAGE................67
    11.11   ADJUSTMENT OF LOSSES..............................................68
    11.12   DISTRIBUTION TO MORTGAGEES.................................68
    11.13   COMPLIANCE WITH FEDERAL REGULATIONS ...........68

ARTICLE 12 DESTRUCTION OF IMPROVEMENTS AND CONDEMNATION .................68
    12.1    RESTORATION DEFINED.................................................68
    12.2    INSURED CASUALTY.......................................................68
    12.3    RESTORATION PROCEEDS .............................................68
    12.4    REBUILDING CONTRACT.................................................70
    12.5    AUTHORITY TO EFFECT CHANGES...............................71
    12.6    MINOR REPAIR AND RECONSTRUCTION .....................71
    12.7    DAMAGE OR DESTRUCTION TO A UNIT ......................71
    12.8    CONDEMNATION OF COMMON AREA/ASSOCIATION PROPERTY........72
    12.9    CONDEMNATION OF A UNIT ...........................................72

ARTICLE 13 PARTITION AND SEVERABILITY OF INTERESTS .................72
    13.1    PARTITION ........................................................................72
    13.2    SUSPENSION .....................................................................72
    13.3    PARTITION ........................................................................72
    13.4    DISTRIBUTION OF PROCEEDS ......................................73
    13.5    POWER OF ATTORNEY ....................................................73
    13.6    PROHIBITION AGAINST SEVERANCE............................74
    13.7    CONVEYANCES.................................................................74

16835

ARTICLE 14 RIGHTS OF MORTGAGEES ..................................................74
   14.1   CONFLICT ..........................................................................74
   14.2   LIABILITY FOR UNPAID ASSESSMENTS ..............................74
   14.3   PAYMENT OF TAXES AND INSURANCE.................................74
   14.4   NOTICE TO ELIGIBLE HOLDERS ........................................74
   14.5   RESERVE FUND ................................................................75
   14.6   INSPECTION OF BOOKS AND RECORDS ..............................75
   14.7   FINANCIAL STATEMENTS .................................................75
   14.8   VOTING RIGHTS OF MORTGAGEES ....................................75
   14.9   ACTIONS REQUIRING ELIGIBLE HOLDER APPROVAL ............75
   14.10  VOTES FOR TERMINATION OF PROJECT .............................76
   14.11  CONDEMNATION OR DESTRUCTION...................................76
   14.12  SELF-MANAGEMENT ........................................................77
   14.13  MORTGAGEE PROTECTION ...............................................77
   14.14  SUBORDINATION.............................................................77
   14.15  DISTRIBUTION OF INSURANCE AND CONDEMNATION
         PROCEEDS .....................................................................77
   14.16  VOTING RIGHTS ON DEFAULT ..........................................77
   14.17  FORECLOSURE ................................................................77
   14.18  NON-CURABLE BREACH ...................................................78
   14.19  LOAN TO FACILITATE .....................................................78
   14.20  APPEARANCE AT MEETINGS .............................................78
   14.21  RIGHT TO FURNISH INFORMATION ....................................78
   14.22  INAPPLICABILITY OF RIGHT OF FIRST REFUSAL TO
         MORTGAGEE ..................................................................78
   14.23  MULTIPLE MORTGAGES ...................................................78

ARTICLE 15 AMENDMENTS ................................................................78
   15.1   AMENDMENT BEFORE THE CLOSE OF FIRST SALE................78
   15.2   AMENDMENTS AFTER THE CLOSE OF FIRST SALE ...............79
   15.3   FURTHER APPROVALS REGARDING AMENDMENTS ...............80
   15.4   AMENDMENT RELATING TO COMMERCIAL CONDOMINIUMS ...........80
   15.5   CONFLICT WITH ARTICLE 14 OR OTHER PROVISIONS OF THIS
         DECLARATION .................................................................80
   15.6   BUSINESS AND PROFESSIONS CODE SECTION 11018.7 .............81
   15.7   RELIANCE ON AMENDMENTS.............................................81

ARTICLE 16 SUPPLEMENTARY DECLARATION ......................................81
   16.1   SUPPLEMENTARY DECLARATION ......................................81
   16.2   SUPPLEMENTARY CONDOMINIUM PLANS ...........................81

ARTICLE 17 ENFORCEMENT ...............................................................81
   17.1   TERM ............................................................................81
   17.2   ENFORCEMENT AND NONWAIVER......................................81
   17.3   NOTICE OF ACTIONS AGAINST DECLARANT.........................82
   17.4   ALTERNATIVE DISPUTE RESOLUTION ................................82

16836

ARTICLE 18 GENERAL PROVISIONS ................................................................86
 18.1 HEADINGS ...............................................................................86
 18.2 SEVERABILITY .......................................................................86
 18.3 CUMULATIVE REMEDIES .....................................................86
 18.4 VIOLATIONS AS NUISANCE .................................................86
 18.5 NO RACIAL RESTRICTION ....................................................87
 18.6 ACCESS TO BOOKS...............................................................87
 18.7 LIBERAL CONSTRUCTION ....................................................87
 18.8 NOTIFICATION OF SALE OF CONDOMINIUM ...................87
 18.9 NUMBER, GENDER ...............................................................87
 18.10 EXHIBITS ..............................................................................87
 18.11 BINDING EFFECT .................................................................87
 18.12 EASEMENTS RESERVED AND GRANTED................................87
 18.13 STATUTORY REFERENCES....................................................87

## LIST OF EXHIBITS

EXHIBIT "A" ..............................................................Legal Description of the Property

EXHIBIT "B" .............................................................Maintenance Responsibility Chart

EXHIBIT "C" ...........................................................................Variable Expenses

16837

## DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS
## OF
## THE ELECTRA

This DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS OF THE ELECTRA ("Declaration") is made this _____ day of _____, 2005 by BOSA DEVELOPMENT CALIFORNIA II, INC., a California corporation ("Declarant") with reference to the facts set forth below.

### ARTICLE 1
### RECITALS

1.1 **PROPERTY OWNED BY DECLARANT**. Declarant is the Owner (as defined below) of the real property (the "Property") situated in the City of San Diego, County of San Diego, State of California, more particularly described on **Exhibit "A"** attached hereto and incorporated herein.

1.2 **NATURE OF PROJECT**. Declarant intends to establish a plan of condominium ownership and to develop the Property as a condominium project within the meaning of California Business and Professions Code Section 11004.5(c) and California Civil Code Section 1351(f), to conform with the provisions of the California Subdivided Lands Law (California Business and Professions Code Section 11000, et seq.) and to subject the Property to certain limitations, restrictions, conditions and covenants as hereinafter set forth, in accordance with the provisions of California Civil Code Sections 1350 et seq. To that objective, Declarant desires and intends to impose on the Property certain mutually beneficial restrictions, limitations, easements, assessments and liens under a comprehensive plan of improvement and development for the benefit of all of the Owners, the Condominiums, Common Area and Association Property and the future Owners of said Condominiums, Common Area and Association Property.

1.3 **DESCRIPTION OF PROJECT**. Declarant intends to develop a mixed use residential and retail development on the Property consisting of Residential Condominiums and Commercial Condominiums. If developed as planned, the Project may consist of two hundred forty-eight (248) Residential Condominiums and two (2) Commercial Condominiums. Declarant makes no guarantee that the Project will be constructed as presently proposed. Owners of a Condominium will receive title to a Unit plus an undivided fractional interest as tenant in common to the Common Area located within the Module within which the Unit is located. In addition, Owners of a Condominium will receive the exclusive right of use and occupancy of a portion of the Common Area designated as an appurtenant Exclusive Use Easement, all as shown on the Condominium Plan. Each Residential Owner will also receive easements for ingress, egress and recreational use and enjoyment over the Residential Common Area and the Association Property designated on the Condominium Plan and each Commercial Owner will receive easements for ingress, egress, use and enjoyment over the Commercial Common Area and portions of the Association Property reasonably necessary as set forth herein. Such easements are more particularly described in this Declaration and the deeds conveying the Units to the Owners. Each Condominium shall have appurtenant to it a membership in The Electra Owners Association, a California nonprofit mutual benefit corporation ("Association").

16838

## DECLARATION

Declarant declares that the Property is, and shall be, held, conveyed, hypothecated, encumbered, leased, rented, used, occupied and improved subject to the following limitations, restrictions, easements, covenants, conditions, liens and charges, all of which are declared and agreed to be in furtherance of a plan of Condominium ownership as described in California Civil Code Section 1350 et seq. for the subdivision, improvement, protection, maintenance, and sale of Condominiums within the Property, and all of which are declared and agreed to be for the purpose of enhancing, maintaining and protecting the value and attractiveness of the Property. All of the limitations, restrictions, easements, covenants, conditions, liens and charges shall run with the land, shall be binding on and inure to the benefit of all parties having or acquiring any right, title or interest in the Property, shall be enforceable equitable servitudes and shall be binding on and inure to the benefit of the successors-in-interest of such parties. Declarant further declares that it is the express intent that this Declaration satisfy the requirements of California Civil Code Section 1354.

## ARTICLE 2
## DEFINITIONS

Unless the context otherwise specifies or requires, the terms defined in this Article shall, for all purposes of this Declaration, have the meanings herein specified.

2.1 **ADDITIONAL CHARGES**. The term "Additional Charges" means costs, fees, charges and expenditures, including without limitation, attorneys' fees, late charges, interest and recording and filing fees actually incurred by the Association in collecting and/or enforcing payment of assessments, fines and/or penalties.

2.2 **ARCHITECTURAL COMMITTEE**. The term "Architectural Committee" means the committee created under the Article of this Declaration entitled "Architectural Committee."

2.3 **ARCHITECTURAL GUIDELINES**. The term "Architectural Guidelines" means the design criteria adopted by the Board pursuant to the provisions of **Article 9** of this Declaration.

2.4 **ARTICLES**. The term "Articles" means the Articles of Incorporation of the Association as they may from time to time be amended which are or shall be filed in the Office of the Secretary of State for the State of California.

2.5 **ASSIGNED PARKING SPACES**. The term "Assigned Parking Spaces" refers to the Parking Spaces set forth in the records of the Association which are assigned to certain Owners as described in **Section 3.7** of this Declaration.

2.6 **ASSIGNED STORAGE SPACES**. The term "Assigned Storage Spaces" refers to the Storage Spaces set forth in the records of the Association which are assigned to certain Owners as described in **Section 3.8** of this Declaration.

·16839

2.7 **ASSOCIATION**. The term "Association" means The Electra Owners Association, a California nonprofit mutual benefit corporation, its successors and assigns.

2.8 .**ASSOCIATION MAINTENANCE MANUAL**. The term "Association Maintenance Manual" refers' to the manual which may be prepared by Declarant or its consultants and provided to the Association, specifying obligations for maintenance of the Common Area and Association Property and other areas to be maintained by the Association, as updated and amended from time to time.

2.9 **ASSOCIATION PROPERTY**. The term "Association Property" means all real property owned, from time to time, in fee title by the Association. The Association Property shall consist of the real property identified as Association Property on **Exhibit "A"**.

2.10 **ASSOCIATION RULES**. The term "Association Rules" refers to the rules and regulations promulgated by the Board which are included within the Project Handbook.

2.11 **BOARD**. The term "Board" means the board of directors of the Association.

2.12 **BUDGET**. The term "Budget" means the budget for the Association which sets forth all the Common Expenses to be allocated among all the Owners. The Budget consists of (a) a general budget ("General Budget") which sets forth the portion of the Common Expenses allocable to both the Residential Owners and the Commercial Owners, and (b) a residential budget which sets forth the portion of the Common Expenses allocable only to the Residential Owners ("Residential Budget").

2.13 **BUILDING**. The term "Building" refers to' the building within which the Condominiums and/or other Improvements are located.

2.14 **BYLAWS**. The term "Bylaws" means the bylaws of the Association, as they may be amended from time to time, which are or shall be adopted by the Board.

2.15 **CAPITAL IMPROVEMENT ASSESSMENTS**. The term "Capital Improvement Assessments" means the assessments which are levied pursuant to the provisions of **Section 6.6** of this Declaration.

2.16 **CITY**. The term "City" refers to the City of San Diego, California.

2.17 **COMMERCIAL COMMON AREA**. The term "Commercial Common Area" means the portions of the Commercial Module designated as "Commercial Common Area" on the Condominium Plan which is owned in undivided interests by the Owners of the Commercial Condominiums as described in the Condominium Plan. The Commercial Common Area consists of the Commercial Module excluding the Commercial Units.

2.18 **COMMERCIAL CONDOMINIUM(S)**. The term "Commercial Condominium" or "Commercial Condominiums" refers individually or collectively, as the context requires, to the Condominiums intended for commercial use designated as Commercial Condominiums on the Condominium Plan.

16840

2.19   **COMMERCIAL MODULE**.   The term "Commercial Module" refers to the Module within which the Commercial Condominiums are located as shown on the Condominium Plan.

2.20   **COMMERCIAL OWNER(S)**.   The term "Commercial Owner" or "Commercial Owners" refers individually or collectively, as the context requires, to the record owner, whether one or more persons or entities, including Declarant, of the Commercial Condominiums, but excluding those having such interest merely as security for the performance of an obligation.

2.21   **COMMERCIAL UNIT**.   The term "Commercial Unit" refers to the Units intended for commercial purposes and designated as Commercial Units on the Condominium Plan.

2.22   **COMMON AREA**.   The term "Common Area" refers collectively to the Residential Common Area and the Commercial Common Area, as the context requires. Bearing walls located within a Unit and all structural properties within a Unit which may be required for the support of the building within which the Units are located are Common Area and are not part of the Unit except for the finished surfaces thereof. Any Utility Facilities serving more than one Residential Unit located in a plenum area (which is the Common Area between the ceilings of the Residential Units and the floor of the Residential Units above), inside of perimeter Common Area walls or dropped ceilings or otherwise in an area designated as Common Area are a part of Residential Common Area, as shown on the Condominium Plan. Utility Facilities which serve more than one Commercial Unit is Commercial Common Area.

2.23   **COMMON EXPENSES**. The term "Common Expenses" refers to the actual and estimated costs and expenses incurred or to be incurred by the Association, the Board or the Architectural Committee, if any, including without limitation, the following:

2.23.1   maintenance, management, operation, repair and replacement of the Common Area and Association Property and any Improvements located thereon and any other portion of the Project required to be maintained by the Association under this Declaration;

2.23.2   due but unpaid assessments;

2.23.3   costs of management and administration of the Association, including, without limitation, compensation paid by the Association to managers, accountants, attorneys, architects and employees;

2.23.4   the costs of any utilities, trash pickup and disposal, elevator, landscaping, and other services benefiting the Owners and their Units to the extent such services are paid for by the Association;

2.23.5   the costs of fire, casualty, liability, worker's compensation and other insurance maintained by the Association;

2.23.6   reasonable reserves as deemed appropriate by the Board or otherwise required pursuant to the Governing Documents;

**16841**

2.23.7 the costs of bonding of the members of the Board, the Architectural Committee, if any, any professional managing agent or any other person handling the funds of the Association;

2.23.8 taxes paid by the Association;

2.23.9 amounts paid by the Association for the discharge of any lien or encumbrance levied against the Common Area, Association Property or portions thereof;

2.23.10 costs incurred by any committees of the Association; and

2.23.11 any other expenses incurred by the Association in connection with the operation and/or maintenance of the Common Area, Association Property or in furtherance of the purposes or the discharge of any obligations imposed on the Association by the Governing Documents.

2.24 **CONDOMINIUM**. The term "Condominium" means an estate in real property as defined in California Civil Code Section 1351(f) consisting of an undivided interest as a tenant-in-common in all or any portion of the Common Area, together with a separate fee interest in a Unit and any other separate interests in the Property as are described in this Declaration, the Condominium Plan or in the deed conveying the Condominium.

2.25 **CONDOMINIUM PLAN**. The term "Condominium Plan" means (i) the condominium plan recorded pursuant to California Civil Code Section 1351, and any amendments to the plan, (ii) any Supplementary Condominium Plans, recorded pursuant to the provisions of this Declaration.

2.26 **COUNTY**. The term "County" refers to the County of San Diego, California.

2.27 **DECLARANT**. The term "Declarant" means Bosa Development California II, Inc., a California corporation, and its successors and assigns, if such successors and assigns acquire any or all of Declarant's interest in the Property for the purpose of purchase or sale, and Declarant has expressly transferred or assigned to such successors or assigns its rights and duties as Declarant to all or any portion of the Project. For any successor or assignee of "Declarant" to be deemed a Declarant under the terms of this Declaration, Declarant shall record in the County a certificate so designating said successor or assignee as Declarant. A successor Declarant shall also be deemed to include the beneficiary under any deed of trust securing an obligation from a then existing Declarant encumbering all or any portion of the Property, which beneficiary has acquired any such property by foreclosure, power of sale or deed in lieu of such foreclosure or sale.

2.28 **DECLARATION**. The term "Declaration" means this Declaration of Covenants, Conditions and Restrictions of The Electra, as this Declaration may from time-to-time be amended, modified or supplemented.

2.29 **DESIGNATED EXCLUSIVE USE COMMON AREA, WALLS OR FLOORS**. The term "Designated Exclusive Use Common Area Walls or Floors" refers to those portions of the Common Area consisting of walls and internal equipment located within such

walls or floors such as plumbing, ventilating and electrical wires, which are located between two (2) adjacent Units (either horizontally or vertically) over which an Exclusive Use Easement shall be assigned by the Declarant or the Association if an Owner acquires fee title to two (2) or more adjacent Units separated by such wall or floor, subject to compliance with the requirements of this Declaration.

2.30 **DRE**. The term "DRE" means the California Department of Real Estate.

2.31 **ELIGIBLE HOLDER**. The term "Eligible Holder" means any First Mortgagee who has given written notice to the Association specifying the name and address of the Condominium subject to the Mortgage and requesting written notice of any or all of the events specified in this Declaration.

2.32 **ENCROACHMENT AREA(S)**. The term "Encroachment Area" or "Encroachment Areas" refers individually or collectively, as the context refers to the portions of façade of the Building described in the Encroachment Agreement located immediately adjacent to the Project and shown and described as the Encroachment Area or Encroachment Areas on the Condominium Plan.

2.33 **ENCROACHMENT AGREEMENT**. The term "Encroachment Agreement" refers to that certain Encroachment Agreement recorded or to be recorded in the Official Records of the San Diego County Recorder, relating to the installation, maintenance and possible removal of certain portion of the façade of the Building located in the public right-of-way, and any modification, amendments or supplements to such Encroachment Agreement. In the event the Encroachment Agreement is terminated and replaced with an easement or any other document providing rights to the Encroachment Areas, then, for purposes of this Declaration the term Encroachment Agreement refers to such successor document and any modifications, amendments, or supplements thereto.

2.34 **ENFORCEMENT ASSESSMENTS**. The term "Enforcement Assessments" means the assessments which are levied pursuant to the provisions of **Section 6.6** of this Declaration.

2.35 **EXCLUSIVE USE BALCONY AREAS**. The term "Exclusive Use Balcony Areas" refers to those portions of the Residential Common Area designated as "Exclusive Use Balcony Areas" on the Condominium Plan over which an exclusive easement has been reserved for the benefit of certain Owners for balcony purposes and which is appurtenant to such Owner's Residential Unit.

2.36 **EXCLUSIVE USE COMMON AREA OR EXCLUSIVE USE EASEMENT**. The term "Exclusive Use Common Area" or "Exclusive Use Easement" means those portions of the Residential Common Area over which exclusive easements are reserved for the benefit of certain Owners in accordance with California Civil Code Section 1351(i), including the Exclusive Use Balcony Areas, Exclusive Use Patio Areas and Exclusive Use Deck Areas as shown on the Condominium Plan or described in this Declaration to which an exclusive use easement is granted to an Owner and is appurtenant to such Owner's Residential Unit.

2.37   **EXCLUSIVE USE DECK AREAS**.   The term "Exclusive Use Deck Areas" means those portions of the Residential Common Area designated as Exclusive Use Deck Areas on the Condominium Plan over which an exclusive easement has been reserved for the benefit of certain Owners for deck purposes and which is appurtenant to such Owner's Residential Unit.

2.38   **EXCLUSIVE USE PATIO AREAS**.   The term "Exclusive Use Patio Areas" means those portions of the Residential Common Area designated as Exclusive Use Patio Areas on the Condominium Plan over which an exclusive easement has been reserved for the benefit of certain Owners for patio purposes and which is appurtenant to such Owner's Residential Unit, and which are conveyed to the Owners subject to any easements and other matters of record.

2.39   **FINAL MAP**.   The term "Final Map" means the final subdivision or parcel map covering the Property.

2.40   **FIRST MORTGAGE**.   The term "First Mortgage" means a Mortgage which has priority under the recording statutes of the State of California over all other Mortgages encumbering a specific Condominium in the Project.

2.41   **FIRST MORTGAGEE**.   The term "First Mortgagee" means the Mortgagee of a First Mortgage.

2.42   **FISCAL YEAR**.   The term "Fiscal Year" means the fiscal accounting and reporting period of the Association selected by the Board.

2.43   **GOVERNING DOCUMENTS**.   The term "Governing Documents" collectively means this Declaration, any Supplementary Declarations, the Articles, Bylaws and the Project Handbook (which includes the Association Rules and Architectural Guidelines).

2.44   **HAZARDOUS MATERIALS**.   The term "Hazardous Materials" refers to any toxic or hazardous substance, material or waste which is or becomes (i) regulated by any local governmental authority, the State of California or the United States Government; or (ii) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "Non-RCRA hazardous waste," RCRA hazardous waste," recyclable material," under any federal, state or local statute or regulation promulgated thereunder, including, without limitation, petroleum products, solvents, asbestos, PCBs, waste ore, automotive fluids, paints, pesticides, herbicides and cleaners.

2.45   **HAZARDOUS   MATERIALS   LOCATIONS   AND   HAZARDOUS MATERIALS REPORT**.   The term "Hazardous Materials Locations" means those portions of the Project which contain asbestos containing building materials or lead-based paints, which have been enclosed, encased or encapsulated by Declarant in the initial construction of the Project, which are subject to certain special requirements, limitations and restrictions as provided in the Declaration which areas are identified in the report to be provided by Declarant to the Association.   The term "Hazardous Materials Report" means the Hazardous Materials Report provided by Declarant to the Association.

2.46   **IMPROVEMENTS**.   The term "Improvements" means all structures or improvements of every type or kind installed or erected on the Property or any alteration or

16844

modification to a Unit, Exclusive Use Common Area, Association Property or the balance of the Common Area or Project or any addition to a Unit or the Common Area, Association Property or Project, including, without limitation, room partitions, structural alterations to any portion of a Unit or any Common Area surrounding the Unit, any additions or alterations to a Unit which cause penetrations beyond the unfinished surfaces of the walls, ceilings or surface flooring of a Unit or impact or effect in any manner any Common Area or Association Property within the Project, changes of level, grade or drainage patterns of any Exclusive Use Common Area, patios, patio covers, screening walls, skylights, stairs, decks, window tinting, plantings, potted plants, paving, tiling or other covering of any patio, deck or balcony areas, utility facilities, poles, signs, and all other structures or improvements of every type and kind installed or erected on the Property.

2.47  **INSTITUTIONAL MORTGAGEE**.  The term "Institutional Mortgagee" means a First Mortgagee which is (i) a bank, savings and loan association, insurance or mortgage company or other entity or institution chartered under federal and/or state law; (ii) an insurer or governmental guarantor of a First Mortgage; or (iii) any federal or state agency.

2.48  **INVITEE**.  The term "Invitee" means any person whose presence within the Project is approved by or is at the request of a particular Owner, including, without limitation, tenants and the family, guests, employees, licensees or invitees of Owners, tenants or lessees.

2.49  **LEASE**.  The term "Lease" means any lease, license or other agreement whereby an occupant acquires rights to use or occupy any portion of the Units for a specified term.

2.50  **LOWER LIVING ELEMENT**.  The term "Lower Living Element" means the portion of certain Residential Units described in the Condominium Plan as a Lower Living Element.

2.51  **MAINTENANCE RESPONSIBILITY CHART**.  The term "Maintenance Responsibility Chart" refers to **Exhibit "B"** attached hereto and incorporated herein which designates the components of the Project to be maintained by the Association and the Owners, respectively.  The Maintenance Responsibility Chart may be further modified or supplemented in a Supplementary Declaration.

2.52  **MAINTENANCE OBLIGATIONS**.  The term "Maintenance Obligations" refers to the Association's obligations and each Owner's obligations to perform (i) all reasonable maintenance consistent with the terms of the Association Maintenance Manual and Warranty and Maintenance Manual, respectively, any maintenance obligations and schedules in any warranty offered by Declarant or any manufacturer, and any maintenance obligations and schedules otherwise provided to the Association or the Owners by Declarant or any manufacturer, as applicable; (ii) any commonly accepted maintenance practices intended to prolong the life of the materials and construction of the Association Property, Common Area and Units, as applicable; and (iii) any maintenance obligations and requirements set forth in this Declaration, as updated and amended from time to time.

2.53  **MEMBER**.  The term "Member" means every person or entity who holds a membership in the Association.

16845

2.54   **MIDDLE LIVING ELEMENT.**  The term "Middle Living Element" means the portion of certain Residential Units described in the Condominium Plan as a Middle Living Element.

2.55   **MODULE.**   The term "Module" means each module designated on the Condominium Plan or in any subsequently recorded Condominium Plan which have been created pursuant to California Government Code Section 66427.  Each Module is a three-dimensional portion of either of the parcels described on the Condominium Plan.  The lower and upper boundaries of each Module are set forth in the Condominium Plan.  The lateral boundaries of each Module are vertical planes which are also described and depicted in the Condominium Plan.  The Module includes all land and Improvements whether now or hereafter located within its boundaries.  The Modules shown on the Condominium Plan consist of the Modules defined below.

2.55.1   **Commercial Module.**   The term "Commercial Module" refers to the Module designated on the Condominium Plan as the Commercial Module.

2.55.2   **Residential Module.**   The term "Residential Module" refers to the Module designated on the Condominium Plan as the Residential Module.

2.56   **MORTGAGE.**   The term "Mortgage" means a recorded mortgage or deed of trust encumbering a Condominium in the Project.

2.57   **MORTGAGEE.**   The term "Mortgagee" means a mortgagee under a Mortgage as well as a beneficiary under a deed of trust.

2.58   **NOTICE AND HEARING.**   The term "Notice and Hearing" means the procedure which gives an Owner notice of an alleged violation of the Governing Documents and the opportunity for a hearing before the Board.

2.59   **OPERATING RULES.**   The term "Operating Rules" refers to those Association Rules that constitute an operating rule under California Civil Code Section 1357.100 et seq.

2.60   **OWNER.**   The term "Owner" refers, individually or collectively, as the context requires, to a Commercial Owner and/or a Residential Owner.

2.61   **PARKING GARAGE.**   The term "Parking Garage" refers to the parking garage situated within the Association Property.

2.62   **PARKING SPACE(S).**   The term "Parking Space(s)" means those areas within the Parking Garage, designated for parking purposes, as shown on the Condominium Plan.

2.63   **PERSON.**   The term "Person" means a natural individual or any legal entity recognized under California law.  When the word "person" is not capitalized, the word refers only to natural persons.

2.64   **PROJECT.**   The term "Project" means all of the Property together with all Improvements situated thereon.

**16846**

2.65  **PROJECT HANDBOOK**. The term "Project Handbook" refers to the handbook which contains the Association Rules and the Architectural Guidelines.

2.66  **PROPERTY**. The term "Property" means all of the real property described in **Exhibit "A"** of this Declaration, and so long as the Encroachment Agreement is in place, or other agreements granting easements or rights of use over the Encroachment Areas are in place, the Encroachment Areas.

2.67  **PUBLIC REPORT**. The term "Public Report" means the Final Subdivision Public Report issued by the DRE for the Project.

2.68  **QUALIFIED ENVIRONMENTAL CONSULTANT**. The term "Qualified Environmental Consultant" means an environmental consultant certified by the State of California as an Asbestos Consultant pursuant to California Business and Professions Code Section 7180, et seq., as amended or superceded and as a California Registered Environmental Assessor pursuant to Health & Safety Code Section 25570, et seq., as amended or superceded, who has a minimum of five years of experience in this field and at least Two Million Dollars ($2,000,000) in both errors and omissions insurance and commercial general liability insurance and workers' compensation insurance as required by applicable law.

2.69  **REGULAR ASSESSMENTS**. The term "Regular Assessments" means the assessments that are levied pursuant to the provisions of **Section 6.3** of this Declaration.

2.70  **RESIDENTIAL COMMON AREA**. The term "Residential Common Area" means the portion of the Residential Module described as Residential Common Area on the Condominium Plan which is owned in undivided interests by the Owners of the Residential Units situated in the Residential Module within which the Common Area is situated. The Residential Common Area consists of the Residential Module excluding therefrom the Residential Units located within the Residential Module.

2.71  **RESIDENTIAL CONDOMINIUM**. The term "Residential Condominium" or "Residential Condominiums" refers individually or collectively, as the context requires, to the Condominiums intended for residential use as designated on the Condominium Plan or in the deed conveying the Residential Condominium to an Owner.

2.72  **RESIDENTIAL FACILITIES**. The term "Residential Facilities" refers to all of the recreational, business and parking facilities for the use and enjoyment of the Residential Owners and their Invitees, situated within the Association Property, including, but not limited to the swimming pool, spa, pool deck, outdoor barbecues, locker rooms, restrooms, and fitness facilities and lobby.

2.73  **RESIDENTIAL OWNER**. The term "Residential Owner" or "Residential Owners" refers individually or collectively, as the context requires, to the record owners, whether one or more persons or entities, including Declarant, of the Residential Condominiums excluding those having such interest merely as security for the performance of an obligation.

2.74  **RESIDENTIAL UNIT**. The term "Residential Unit" refers to the Units intended for residential purposes and designated as Residential Units on the Condominium Plan.

16847

2.75 **SPECIAL ASSESSMENTS**. The term "Special Assessments" means the assessments that are levied pursuant to the provisions of **Section 6.4** of this Declaration.

2.76 **STORAGE SPACES**. The term "Storage Spaces" refers to the storage spaces located within the Parking Garage as designated in the Condominium Plan(s).

2.77 **SUPPLEMENTARY CONDOMINIUM PLAN**. The term "Supplementary Condominium Plan" means (i) any Condominium Plan which supplements a previously recorded Condominium Plan and/or which is subsequently recorded to designate the boundaries of any Exclusive Use Areas; or (ii) a Condominium Plan or amendment to Condominium Plan which corrects errors in the originally recorded Condominium Plan; or (iii) a Condominium Plan which is recorded by Declarant after the completion of construction to show the actual "as-built" locations or dimensions of any component of the Project, which Supplemental Condominium Plan shall not require the consent of the Owners or the Association.

2.78 **SUPPLEMENTARY DECLARATION**. The term "Supplementary Declaration" means any instrument recorded in the Office of the County Recorder which (a) further describes or delineates other elements or restrictions applicable to certain Units or allocations relating to the Assessments, and/or (b) corrects any errors in this Declaration, the Condominium Plan or any of the Governing Documents.

2.79 **UPPER LIVING ELEMENT**. The term "Upper Living Element" means the portion of certain Residential Units described in the Condominium Plan as an Upper Living Element.

2.80 **UNIT**. The term "Unit" means the elements of a Condominium which are not owned in common with the other Owners of Condominiums in the Project, such units and their respective elements and boundaries being shown and particularly described in the Condominium Plan. The elements of a Condominium that are owned separately, consist of a separate interest in space, the boundaries of which are described as the area designated as "Unit" in the Condominium Plan(s). There are two types of Units consisting of Residential Units and the Commercial Units. Certain Residential Units consist of a Lower Living Element, Middle Living Element and an Upper Living Element as shown on the Condominium Plan. The dimensions of a Residential Unit are measured from the unfinished floor, walls, dropped ceiling, except as otherwise noted herein. The Unit includes all Improvements situated within its boundaries, and includes, without limitation, (i) interior walls (except interior bearing walls), (ii) the interior undercoated surfaces of bearing walls and perimeter walls, floors and ceilings, (iii) any door or window including any sliding glass doors, (iv) appliances, cabinets, interior doors, and all electrical, heating, plumbing and other utility fixtures, (v) the openings and outlets of all Utility Facilities that are located partially within the Unit and partially in the Common Area, such as electrical outlets, and that exclusively serve the Unit, (vi) all Utility Facilities serving solely that Unit, whether located in the Unit or the Common Area, and (vii) the fire box of any fireplace located in the Unit. The following are not part of any Unit: bearing walls, columns, floors, roofs and foundations, Utility Facilities that serve two or more Condominiums wherever located. Areas within a dropped ceiling that contain Utility Facilities that serve two or more Condominiums are Common Area and not part of the Unit. In interpreting deeds and plans, the existing physical boundaries of the Unit or Unit reconstructed in substantial conformance with

**16848**

the original plan shall be conclusively presumed to be its boundaries, rather than the description expressed in the Condominium Plan or any other recorded document, regardless of minor variances between boundaries shown on the Condominium Plan or in any other recorded document is located and regardless of settling or lateral movement of the building in which the Unit is located.

2.81  **UTILITY FACILITIES**.  The term "Utility Facilities" means all utility facilities including intake and exhaust systems, any back flow preventers, storm and sanitary sewer systems, drainage systems, ducting systems for ventilation and utility services, domestic water systems, natural gas systems, heating and air conditioning systems, electrical systems, fire protection water and sprinkler systems, telephone systems, cable television systems, telecommunications systems, satellite communications systems, water systems, sump pumps, pool equipment, central utility services and all other utility systems and facilities reasonably necessary to service any Improvement situated in, on, over and under the Project.

2.82  **VOTING POWER**.  The term "Voting Power" refers to the Voting Power of the Association. Due to the interests of the Commercial Owners and the Residential Owners, there are certain issues which may only be voted upon by Residential Owners and other issues which may only be voted upon by Commercial Owners as defined below.

2.82.1  **Residential Owner Issues**.  The term "Residential Owner Issues" refers to those matters and issues which require a vote of only the Residential Owners as more particularly described in **Section 5.2.4(a)** below.

2.82.2  **Commercial Owners Issues**.  The term "Commercial Owner Issues" refers to those matters and issues which require a vote of only the Commercial Owners as more particularly described in **Section 5.2.4(b)** below.

2.82.3  **Association Issues**.  The term "Association Issues" refers to those matters and issues which require a vote of all the Owners, which for purposes of the Governing Documents means any matter which is not a Residential Owner Issue or a Commercial Owner Issue.

2.83  **WARRANTY AND MAINTENANCE MANUAL**.  The term "Warranty and Maintenance Manual" refers to the manual which may be prepared by Declarant or its consultants and provided to each Owner, specifying obligations for maintenance of Units by the Owners, as updated and amended from time to time.

## ARTICLE 3
## OWNERSHIP AND EASEMENTS

3.1  **OWNERSHIP OF CONDOMINIUM**.  Ownership of each Condominium within the Project shall include (a) fee title to a Residential Unit, (b) an undivided interest in the Common Area of the Module within which the Unit is situated as shown on the Condominium Plan and the deed to the Condominium, (c) a membership in the Association, and (d) subject to the terms of the Governing Documents, any exclusive or non-exclusive easement or easements appurtenant to such Condominium over the Common Area and/or Association Property as described in this Declaration, the Condominium Plan, and the deed to the Condominium. The

16849

Commercial Owners shall have a non-exclusive easement for ingress and egress over the Commercial Common Area, and an easement over those portions of the Association Property as may be reasonably necessary for (i) ingress and egress to the management office, if any, of the Association, (ii) maintenance, repair and replacement of the Commercial Units as set forth herein, (iii) ingress and egress to the Parking Spaces of the Commercial Units, (iv) ingress and egress to the trash facilities which will be used by the Commercial Units. The Commercial Owners do not have an easement or any other right of use or enjoyment of the Residential Facilities. The Residential Owners shall have a non-exclusive easement for ingress and egress over the Residential Common Areas and the Association Property, subject to any exclusive easements or other easements of record.

3.2 **NO SEPARATE CONVEYANCE**. The interest of each Owner in the use and benefit of the Common Area and Association Property shall be appurtenant to the Condominium owned by the Owner. No Unit shall be conveyed by the Owner separately from the interest in the Common Area or the right to use the Association Property. Any conveyance of any Condominium shall automatically transfer the interest in the Common Area and the Owner's right to use the Association Property and the Encroachment Areas (subject to the rights set forth in the Encroachment Agreement) as provided in this Declaration without the necessity of express reference in the instrument of conveyance.

3.3 **DELEGATION OF USE**. Any Owner entitled to the right and easement of use and enjoyment of the Common Area and the Association Property may delegate such Owner's rights provided in this Declaration to use and enjoyment of the Common Area, the Association Property, and to the extent applicable, the Encroachment Areas, to his or her other tenants, contract purchasers or subtenants who reside in such Owner's Condominium, subject to reasonable regulation by the Board. An Owner who has made such a delegation of rights shall not be entitled to use or enjoyment of the Common Area and the Association Property for so long as such delegation remains in effect, other than such access rights as are directly related to the Owner's rights and duties as landlord.

3.4 **EASEMENTS**. The ownership interests in the Common Area, Association Property, and to the extent applicable, the Encroachment Areas, and Units described in this Article are subject to the easements and the rights of the Association granted and reserved in this Declaration and the other Governing Documents. Each of the easements reserved or granted under this Declaration shall be deemed to be established upon the recordation of this Declaration and shall henceforth be deemed to be covenants running with the land for the use and benefit of the Owners, and their Condominiums, the Association and Association Property, the Common Area and the Declarant superior to all other encumbrances applied against or in favor of any portion of the Project. Individual grant deeds to Condominiums may, but shall not be required to, set forth the easements specified in this Article.

3.4.1 **Declaration Subject to Easements**. Notwithstanding anything herein expressly or impliedly to the contrary, this Declaration and the Project shall be subject to all easements and rights-of-way shown on the Condominium Plan, Final Map and all other easements of record.

**16850**

3.4.2   **Utilities**.  There are reserved and granted for the benefit of the Units, the Association Property and the Common Area, over, under, across and through the Project, reciprocal, non-exclusive easements for the maintenance, repair and replacement of the Utility Facilities.

3.4.3   **Encroachment**.  There are hereby reserved and granted for the benefit of the Units, the Association Property and the Common Area, over, under, across and through the Project, reciprocal, non-exclusive easements for encroachment, support, maintenance, repair, occupancy and use of such portions of the Units and/or, Association Property and/or Common Area as are encroached upon, used or occupied as a result of any original construction design, accretion, erosion, addition, deterioration, decay, errors in original construction, movement, settlement, shifting or subsidence of any building, structure, or other improvements or any portion thereof, or any other cause.  In the event any portion of the Project is partially or totally destroyed, the encroachment easement shall exist for any replacement structure that is rebuilt pursuant to the original construction design.  The easement for the maintenance of the encroaching improvement shall exist for as long as the encroachments exists; provided, however, that no valid easement of encroachment shall be created due to the willful misconduct of the Association or any Owner.  Any easement of encroachment may, but need not be, cured by repair and restoration of the structure.

3.4.4   **Support, Maintenance and Repair**.  There is hereby reserved and granted a non-exclusive easement appurtenant to the Common Area, the Association Property and to all other Units, as dominant tenements, through each Unit and the Common Area and Association Property, as servient tenements, for the support, maintenance and repair of the Common Area, Association Property and all Units to the extent necessary.  Without limiting the generality of the foregoing, the Residential Module and the Commercial Module shall have an easement for support, maintenance, repair and encroachment on, over, through and across the Association Property and, to the extent necessary, each other Module.

3.4.5   **Association Easement**.  The Association shall have an easement over the Common Area for performing its duties and exercising its powers described in the Governing Documents, and for performing repairs or maintenance not performed by the Owner pursuant to the terms of this Declaration.

3.4.6   **Window Washing Equipment**.  The Association shall have a non-exclusive easement over the roof of each building, as necessary, for the maintenance, storage and operation of window washing equipment.  The Association shall also have an easement over the Exclusive Use Balcony Areas, Exclusive Use Deck Area or Exclusive Use Patio Area as needed for the placement and storage or window washing equipment and access to such areas to use and operate such window washing equipment.

3.4.7   **Trash Enclosure**.  Each Commercial Owner shall have a non-exclusive easement by, over, through and across the Parking Garage and such other portions of the Residential Common Area or Association Property as may be necessary to access the trash enclosures intended for use by the Commercial Condominiums and as necessary for the removal or pick up of garbage from the retail trash facility.

3.4.8   **Cable/Data System**.   Declarant hereby reserves the exclusive right to install or have installed a Cable/Data System, as defined below.  The Cable/Data System, if and when installed, shall be maintained by either a satellite/cable television provider or a telecommunication service provider or both.  Declarant reserves the right to grant nonexclusive easements over the Property as necessary to provide cable television and telecommunication services to Owners, including easements for access, ingress and egress for installation, maintenance and removal of any type of cable and telecommunication equipment, (collectively, "Cable/Data System"), as well as for the solicitation of sales, marketing, disconnection of service and subscriber equipment retrieval.  Each Unit and the Common Area shall be subject to an easement in favor of all other Units and in favor of the entity holding the right to provide cable television and telecommunication service to the Project, to provide for the passage through the Units and the Common Area of television and telecommunication connections from any other Unit to the Cable/Data System, and shall be subject to further easement for the placement and maintenance of such connections.  Declarant, on behalf of itself and its successors, assigns and grantees, hereby acknowledges and agrees that its interest in the Property is subject to the terms of any agreement between Declarant and a satellite/cable television provider or a telecommunication services provider (collectively, the "Cable Contract"), and the Association and all Owners shall be subject to all of the limitations, restrictions, reservations, rights, easements, conditions, and covenants set forth in such Cable Contract.  The Declarant shall be entitled to collect and retain all amounts payable under the Cable Contract or any assignment of Declarant's rights thereunder.

3.4.9   **Communications Facility**.  The Association shall have the right to install, maintain and repair and replace a satellite or other communications device on the roof of the Building.

3.4.10  **Parking**.   Declarant shall have and there is expressly reserved to Declarant all of the Parking Spaces in the Parking Garage with the exclusive right to assign such Parking Spaces to Owners and/or to license the use of such spaces to the Association and/or sell the remaining Parking Spaces, if any, to Owners.

3.4.11  **Non-Exclusive Easements Over the Project for Access to Parking Spaces**.  Declarant hereby reserves for its benefit the right and easement for access, ingress and egress through the Parking Garage to any Parking Spaces which have not yet been assigned pursuant to Section **3.7**.  Declarant hereby reserves for its benefit the right and easement for access, ingress and egress through the Parking Garage to any Parking Spaces which have not yet been assigned pursuant to **Section 3.7**.

3.4.12  **Storage Spaces**.  Declarant shall have and there is expressly reserved to Declarant all of the Storage Spaces with the exclusive right to assign such Storage Spaces to Owners.  Declarant hereby reserves for its benefit the right and easement for access, ingress and egress through the Parking Garage to any Storage Spaces which have not yet been assigned pursuant to **Section 3.8**.

3.4.13  **Easements for Common Area and Association Property**.  Subject to the provisions of Governing Documents and any matters of record, and any Exclusive Use Easements, every Owner of a Residential Condominium shall have, for himself or herself and

**16852**

such Owner's Invitees, a non-exclusive easement of access, ingress, egress, use and enjoyment of, in, to and over the Residential Common Area and the Association Property, and each Commercial Owner shall have a non-exclusive easement of access, ingress, egress, use and enjoyment of, in, to and over the Commercial Common Area, and an easement over those portions of the Association Property as may be reasonably necessary for (i) ingress and egress to the management office, if any, of the Association, (ii) maintenance, repair and replacement of the Commercial Units as set forth herein, (iii) ingress and egress to the Parking Spaces of the Commercial Units, (iv) ingress and egress to the trash facilities which will be used by the Commercial Units. Notwithstanding the forgoing, no Owner shall have the right of access to any rooftop areas, any mechanical or operating areas or any other areas within the Project to which access has been restricted by this Declaration or the Association. Such easements shall be appurtenant to and shall pass with title to such Condominiums, subject to the rights and restrictions set forth below:

(a) **Suspend Rights of Members**. The Association shall have the right, after Notice and Hearing, to temporarily suspend an Owner's rights as a Member pursuant to the terms of this Declaration.

(b) **Dedicate or Grant Easements**. The Association shall have the right, without the consent of the Owners, to dedicate and/or grant easements over all or any portion of the Common Area and the Association Property.

(c) **Control Parking**. Subject to the provisions of this Declaration, the Association shall have the right to control parking within the Parking Garage and to promulgate Association Rules to control parking in a manner consistent with this Declaration; provided however, that the Declarant has reserved an easement over all of the unassigned Parking Spaces with the exclusive right to assign such Parking Spaces to Owners. Upon assignment by Declarant of a Parking Space any easements over the Common Area shall be subject to the rights of Owners to the Assigned Parking Spaces.

(d) **Limit Guests**. The Association shall have the right to (i) limit, on a reasonable basis, the number of guests and tenants of the Owners using the recreational and other facilities situated within the Association Property and the Common Area, and (ii) to charge reasonable admissions or other fees for special or extraordinary use of such facilities.. Any such limitation or restrictions shall be set forth in the Association Rules.

(e) **Association Right of Entry**. The Association and the Association's agents shall have the right to enter upon the Unit as set forth in **Section 4.3.4** of this Declaration.

3.4.14 **Easement to Declarant**. Declarant shall have and hereby expressly reserves the easements necessary for Declarant and its agents, employees and independent contractors to exercise Declarant's rights set forth in **Article 10** of this Declaration and to perform its obligations under any warranty provided by Declarant to an Owner.

3.5 **LIGHT, AIR AND VIEW**. No Owner shall have an easement for light, air or view over the Unit of another Owner and no diminution of light, air or view by any building or

16853

Improvement now existing or hereafter erected shall entitle the Owner or any Invitee to claim any easement for light, air or view within the Project.

3.6    **CREATION OF DESIGNATED EXCLUSIVE USE COMMON AREA WALLS OR FLOORS**. The Declarant and, subject to the provisions of **Article 9** of this Declaration, the Association shall have the right to grant to an Owner who acquires fee title to two (2) or more adjacent Residential Units, without amending this Declaration or the Condominium Plan, an Exclusive Use Easement on and through any demising wall(s) or floors separating two (2) or more Residential Units and the right to alter, modify or remove such demising walls or floors subject to the consent of the Declarant and conformance with the requirements of the Board, pursuant to the provisions of **Article 9**. If an Owners receives the required approvals hereunder and combines two (2) or more adjacent Units, such Units shall be treated as separate Units for all purposes under this Declaration, including separate assessments for such individual Unit.

3.7    **PARKING**.

3.7.1   **Parking Rights**. Declarant shall, so long as Declarant owns any portion of the Property, have the sole right to assign to Owners an exclusive right to use a Parking Space or Parking Spaces in the Parking Garage ("Assigned Parking Spaces") provided that each Residential Condominium be assigned at least one (1) Parking Space within the Parking Garage at all times. Declarant shall, upon assigning a Parking Space to an Owner of a Residential Condominium designate such assignment in the records of the Association. Upon assignment of an Assigned Parking Space to an Owner of a Residential Condominium, such Owner shall have the exclusive right to the use of the Parking Space so assigned, subject to the rights of the Declarant and the Association set forth below. Upon such assignment by Declarant, the Association shall not have the right to change the location of such Assigned Parking Space, except as provided below. Upon conveyance of a Condominium by an Owner to another Owner, the parking rights assigned to such Owner in the records of the Association shall automatically inure to the benefit of the new Owner. Except as provided in **Section 3.10.3** below, any remaining Parking Spaces shall be owned by Declarant and Declarant shall have the exclusive right to sell any such Parking Space to a Residential Owner. Any subsequent resale of such Parking Space is restricted to Residential Owners.

3.7.2   **Relocation Rights**. Prior to the Close of Escrow for the initial sale of a Residential Unit from Declarant, Declarant reserves the right to relocate Assigned Parking Spaces due to the reconfiguration of the Parking Garage during the course of construction or in order to comply with any City requirements. After the Close of Escrow for the initial conveyance of a Residential Unit from Declarant, the rights assigned to the Owner of a Residential Unit to use or occupy an Assigned Parking Space shall be subject to the rights of the Declarant or the Association to temporarily relocate such Parking Space, upon reasonable notice, in order to accommodate any construction, maintenance or repairs of Improvements located within the Project or to accommodate the assignment of Disabled Parking Spaces pursuant to Section **3.7.4** below. In such case, Declarant or the Association shall have the right to exchange the affected Parking Space for another available Parking Space, if any. If no alternative Parking Spaces are available, neither the Association nor Declarant shall have an obligation to provide temporary parking. Each Owner hereby acknowledges that such activities of the Declarant or the

**16854**

Association may impair the use of such Owner's Assigned Parking Spaces and may constitute an inconvenience or nuisance to the Owners and each Owner hereby consents to such impairment, inconvenience or nuisance, and hereby releases the Declarant and the Association from any claims with respect to such matters.

      3.7.3  **Relocation Based Upon Agreement of Owners**.  So long as an Owner always retains at least the minimum number of Parking Spaces required by the City for such Owner's use, if an Owner desires to exchange his or her Assigned Parking Space with another Owner, or to sell or lease his or her Assigned Parking Space to another Owner, and both affected Owners voluntarily agree to the exchange, sale or lease, and provided the two Owners sign an agreement in a form prepared by the Association agreeing to the exchange, lease or sale, the Association may then change its records to reflect the exchange requested by the two Owners, or the sale or lease of the Assigned Parking Space, as applicable.  The Association shall retain in its records the written agreement of the two Owners.  Upon the change to the records of the Association, the new rights granted with respect to such Assigned Parking Spaces shall inure to the benefit of the current and the future Owners of the Condominium(s) to which such rights relate.

      3.7.4  **Disabled Parking Spaces**.  Certain Parking Spaces will be designated for use by disabled persons ("Disabled Parking Spaces") and will be designated as such on the Condominium Plan. Such Disabled Parking Spaces may be assigned by the Declarant or the Association (as applicable) to disabled Owners on a "first-come, first-served" basis. Evidence of disabled status shall be by distinguishing license plate or placard issued by the California Department of Motor Vehicles ("Disabled Status").  The Association shall adopt Association Rules which establish procedures to be followed should an Owner become disabled and wish to use a Disabled Parking Space, forms and methods of notice to be given to the Association, and procedures for review of the required evidence of Disabled Status. If an Owner is assigned a Disabled Parking Space, such assignment is in lieu of one of the Parking Spaces to which the Owner would otherwise be entitled.  When such Owner can no longer provide evidence of Disabled Status, the Owner may, at the election of the Association, be reassigned to another available Parking Space.  In no event shall the Declarant or the Association be held liable if the Declarant or the Association is unable to assign a Disabled Parking Space to a disabled Owner because all designated Disabled Parking Spaces have previously been assigned to other Owners providing evidence of Disabled Status.

      3.8  **STORAGE RIGHTS**.  Declarant shall, so long as Declarant owns any portion of the Property and thereafter the Association shall have the sole right to assign to Owners an exclusive license and right to a Storage Space ("Assigned Storage Spaces").  Declarant shall, upon assigning a Storage Space to an Owner of a Residential Condominium designate such assignment in the records of the Association. Upon such assignment, such Owner shall have the exclusive right to the use of the Assigned Storage Spaces, subject to the rights of the Declarant and Association set forth herein.  Upon assignment by Declarant, the Association shall not have the right to change the location of such Assigned Storage Space except as provided below. Upon conveyance of a Residential Condominium by an Owner to another Owner, the storage rights assigned to such Owner in the records of the Association shall automatically inure to the benefit of the new Owner.  Upon conveyance of the last Condominium to an Owner by

16855

Declarant, the Declarant may assign to the Association any Storage Spaces not previously assigned and/or sold by Declarant for use by the Association for guest or Owner storage.

3.8.1   **Temporary Relocation Rights**.  The right of an Owner to use or occupy an Assigned Storage Space shall be subject to the rights of the Declarant and the Association to relocate such Assigned Storage Space as described below.  Declarant, so long as Declarant owns any Units and thereafter, the Association, upon reasonable notice, shall have the right to temporarily relocate an Assigned Storage Space in order to accommodate any construction, maintenance or repairs of Improvements located within the Project.  If any Assigned Storage Space is affected by such construction, maintenance or repair, Declarant or the Association shall have the right (but not the obligation) to exchange the affected Storage Space for another available Storage Space.  Each Owner acknowledges that such activities of the Declarant and/or the Association may impair the use of such Owner's Assigned Storage Spaces and may constitute an inconvenience or nuisance to the Owners and hereby consents to such impairment, inconvenience or nuisance, and hereby releases the Declarant and the Association from any claims with respect to such matters.

3.8.2   **Relocation Based Upon Agreement of Owners**.  If an Owner desires to exchange his or her Assigned Storage Space with another Owner, or to sell its Assigned Storage Space to another Owner, and both affected Owners voluntarily agree to the exchange, or sale, and provided the two Owners sign an agreement in a form prepared by the Association agreeing to the exchange, or sale, then the Association may change its records to reflect the exchange requested by the two Owners, or the sale of the Assigned Storage Space, as applicable.  The Association shall retain in its records the written agreement of the two Owners.  Upon the change of the records of the Association, then the new Assigned Storage Space shall inure to the benefit of the future Owners of such Condominium.

3.9   **CHARGE FEES**.  To the extent the Declarant assigns to the Association any Parking Spaces and/or Storage Spaces which are in excess of the Parking Spaces and/or Storage Spaces assigned by Declarant to Owners, the Association shall have the right to charge reasonable fees for the use of any such Parking Spaces and Storage Spaces so assigned by Declarant to the Association.  The Association shall also have the right to charge a fee for guest parking and for the parking of any vehicles by an Owner in excess of the rights assigned under **Section 3.1**.

## ARTICLE 4
## THE ASSOCIATION

4.1   **THE ORGANIZATION**.   The Association is a nonprofit mutual benefit corporation formed under the Nonprofit Mutual Benefit Law of the State of California.  On the conveyance of the first Condominium to an Owner under a Public Report, the Association shall be charged with the duties and invested with the powers set forth in the Governing Documents.

4.2   **ASSOCIATION ACTION; BOARD OF DIRECTORS AND OFFICERS; MEMBERS' APPROVAL**.  Except as to matters requiring the approval of Members as set forth in the Governing Documents, the affairs of the Association shall be conducted by the Board and such officers as the Board may elect or appoint.  Such election or appointment shall be in

accordance with the Governing Documents. Except as otherwise provided in this Declaration, the Articles and the Bylaws, all matters requiring the approval of Members shall be deemed approved if (i) Members holding a majority of the total Voting Power assent to them by written consent as provided in the Bylaws, (ii) such matters are approved by a majority vote of a quorum of Members at any regular or special meeting held in accordance with the Bylaws, or (iii) in certain situations set forth in **Section 4.5** of this Declaration, by written ballot without a meeting pursuant to California Corporations Code Section 7513, of a simple majority of the Members, other than Declarant, constituting a quorum consisting of more than a majority of the Voting Power of the Association residing in Members other than the Declarant; provided, however, **if** such matter is a Residential Owner Issue or a Commercial Owner Issue, then for purposes of such vote or quorum, the vote or quorum of the Residential Owners or Commercial Owners, respectively shall only be required.

4.3     **POWERS OF THE ASSOCIATION**.  The Association shall have all the powers of a nonprofit corporation organized under the Nonprofit Mutual Benefit Corporation Law of California subject only to such limitations on the exercise of such powers as are set forth in the Governing Documents. It shall have the power to do any lawful thing that may be authorized, required, or permitted to be done by the Association under the Governing Documents, and to do and perform any act that may be necessary or proper for or incidental to, the exercise of any of the express powers of the Association, including, without limitation, the powers set forth below. Notwithstanding the foregoing, the Association shall not undertake any of the activities described in **Section 4.6** below.  Unless otherwise provided, the Association's action shall be undertaken by and through the Board.

4.3.1     **Assessments**. The Association shall have the power to establish, fix, and levy assessments against the Owners and to enforce payment of such assessments, in accordance with the provisions of the Governing Documents.

4.3.2     **Right of Enforcement and Notice and Hearing**.

(a)     **Enforcement Actions**.  The Association in its own name and on its own behalf, can commence and maintain actions for damages or to restrain and enjoin any actual or threatened breach of any provision of the Governing Documents or any resolutions of the Board, and to enforce by mandatory injunction, or otherwise, all of these provisions. In addition, the Association can temporarily suspend the membership rights and privileges and/or can assess monetary penalties against any Owner or other person entitled to exercise such rights or privileges for any violation of the Governing Documents or Board resolutions.

(b)     **Notice Requirements**.  Before a decision to impose such a suspension or monetary penalties is reached by the Board, the aggrieved Owner shall be provided with an opportunity to be heard by the Board, orally or in writing, in accordance with the procedures set forth in California Corporations Code Sections 7341 and 1363. Additionally, the Board shall provide written notice of any sanctions to be imposed and the reasons for such sanctions, not more than fifteen (15) days following the Board action. For the purposes of this Subsection, notice shall be given by any method reasonably calculated to provide actual notice. Notice may be hand-delivered to the Owner or sent by first class registered or certified mail, return receipt requested or overnight courier delivery and addressed to the Owner at the last

address of the Owner shown on the Association's records, or any other method deemed reasonable by the Board for delivering notices.

4.3.3 **Delegation of Powers, Professional Management**. The Association can delegate its powers, duties, and responsibilities to committees or employees, including a professional managing agent, subject to the requirements of **Section 4.6.4** entitled "Contracts."

4.3.4 **Right of Entry and Enforcement**. Except in the case of emergencies in which case no prior notice need be given, the Board or any authorized representative thereof shall have the right, upon forty-eight (48) hours prior notice and during reasonable hours, to enter into a Unit for the purpose of construction, maintenance or emergency repair for the benefit of the Common Area, Association Property, Encroachment Areas or the other Condominiums or to perform its obligations under this Declaration or to cure any default by an Owner under this Declaration. Such persons shall not be deemed guilty of trespass by reason of such entry. If any such repair or maintenance is due to the failure of an Owner to perform its obligations hereunder, the cost of such maintenance or repair shall be assessed against said Owner as an Enforcement Assessment in accordance with the provisions of the Article hereof entitled "Assessments."

4.3.5 **Easements and Rights of Way**. The Association may grant and convey to any third party easements and licenses for use and rights of way in, on, over or under any Common Area and Association Property in accordance with the provisions of this Declaration.

4.3.6 **Capital Improvements**. Subject to the terms of this Declaration, the Board may, on its own motion or acting on a petition signed by two-thirds (2/3rds) of the Owners, may approve the construction, installation or acquisition of a particular capital improvement to the Common Area and/or the Association Property up to $50,000; provided however, if such Capital Improvement is for the Residential Common Area or the Residential Facilities situated in the Association Property, then only the consent of two-thirds (2/3rds) of the Residential Owners shall be required, and if such Capital Improvement is for the Commercial Common Area, then only the consent of both of the Commercial Owners shall be required.

4.3.7 **Personal Property**. The Association may acquire and hold, as trustee for the benefit of its Members, tangible and intangible personal property and to dispose of the same by sale or otherwise, subject to the limitations set forth in **Section 4.5.2**.

4.3.8 **Enter Into Subsidy or Maintenance Agreements**. The Association shall have the power to enter into maintenance or subsidy agreements with Declarant.

4.3.9 **Contract for Goods and Services**. The Association shall have the power to contract for goods and services for the benefit of the Project that are necessary for the Association to perform its duties and obligations hereunder, subject to the limitations set forth in **Section 4.5** below.

4.3.10 **Architectural Committee**. Subject to the provisions of **Article 10**, the Association shall have the right to form an Architectural Committee and appoint and remove Members of the Architectural Committee.

4.3.11 **Borrow Funds**. The Association shall have the right to borrow money to improve, repair or maintain the Common Area and Association Property and to hypothecate any or all real or personal property owned by the Association, including pledging as collateral the assessment liens levied thereon provided that, the borrowing of any money or hypothecation of any real or personal property in excess of five percent (5%) of the budgeted gross expenses of the Association shall require the approval by written ballot of fifty-one at least (51%) of each class of Members, except that if the borrowing is for the benefit of the Residential Common Area or Residential Facilities situated in the Association Property, only the approval of each class of Residential Owners shall be required, and if the borrowing is for the benefit of the Commercial Common Area or Commercial Use Areas, only the approval of each class of Commercial Owners shall be required.

4.3.12 **Rights Regarding Title Policies**.   If any title claims regarding the Association Property are made by any third party, the Association shall have the power to pursue such claims on any title insurance policy held by the Owners or the Association and each Owner hereby delegates, on a non-exclusive basis, and assigns to the Association any rights it may have under its title insurance policies to the extent that the title claim relates to the Association Property.

4.3.13 **Provide Services**.   The Association shall have the power to engage Persons necessary for the effective operation and maintenance of the Association including legal, management and accounting services.

4.3.14 **Claims and Actions**.   Subject to the provisions of this Declaration, the Association shall have the power, but not the duty, to initiate, defend, settle release, or intervene in mediation, arbitration, judicial or administrative proceedings on behalf of the Association in matters pertaining to (a) the application or enforcement of this Declaration and (b) any and all claims, causes of action, damages. and suits for defects relating in any way to the design or construction of the Association Property or the Common Area or any portion thereof on behalf of all Owners; provided, however that no representative of Declarant on the Board shall vote on the initiation of any claim under California Civil Code Section 895 et seq., such that from and after the first annual meeting of the Association, Declarant shall have no control over the Association's ability to decide whether to initiate a claim under such statutory provisions and in the event of such a vote, the affirmative vote of the two non-Declarant representatives on the Board shall be binding so long as a quorum of the Board is present at any meeting where such vote is taken.  The Association and not the individual Members shall have the power to pursue any claims or other actions using the non-adversarial procedures for construction defects in the Association Property or the Common Area pursuant to California Civil Code Section 895 et seq. The Association shall comply with such non-adversarial procedures in bringing any such claims or actions.  Each Owner hereby agrees to designate such authority to the Association and assigns to the Association all power and authority as is necessary for any settlement or release of any such claims.

4.4    **DUTIES OF THE ASSOCIATION**.  In addition to the powers described above, and without limiting their generality, the Association, has the obligation to perform each of the duties set forth below.

16859

4.4.1   <u>Taxes and Assessments</u>.  The Association shall pay all real and personal property taxes and assessments and all other taxes levied against the Association Property, personal property owned by the Association or against the Association, if any.  Such taxes and assessments may be contested or compromised by the Association; if they are paid or a bond insuring payment is posted before the sale or the disposition of any property to satisfy the payment of such taxes.

4.4.2   <u>Water and Other Services</u>.  The Association shall have the duty to acquire, provide and pay for water, sewer, garbage disposal, electrical, telephone, gas and other necessary utility services for the Association Property and Common Area to the extent necessary.

4.4.3   <u>Utilities Suppliers</u>.  The Association shall have the duty to permit utility suppliers and other providers of any telecommunications or other services to use portions of the Common Area and/or the Association Property reasonably necessary to the ongoing development and operation of the Project.

4.4.4   <u>Maintenance of Project</u>.  The Association shall landscape, maintain and/or replace and repair the Common Area and Association Property, and any other portions of the Project described in **Article 8** pursuant to the provisions of this Declaration and the Association Maintenance Manual.

4.4.5   <u>Association Rules</u>.  The Board shall adopt, amend and repeal the Association Rules as it deems reasonable. The Board may, in its discretion, promulgate rules applicable to the Residential Owners and rules applicable to the Commercial Owners.  The Association Rules set forth in the Project Handbook shall govern the use of the Common Area and the Association Property by all Owners and their Invitees.  However, the Project Handbook shall not be inconsistent with or materially alter any provisions of the Governing Documents.  A copy of the Project Handbook as adopted, amended or repealed, shall be mailed or otherwise delivered to each Owner.  In case of any conflict between any of the Association Rules set forth in the Project Handbook and any other provisions of this Declaration, the Articles, or Bylaws, the conflicting Association Rules set forth in the Project Handbook shall be deemed to be superseded by the provisions of the Governing Documents.  Notwithstanding the foregoing, with regard to the Operating Rules, the Association shall comply with the requirements and procedures set forth in California Civil Code Section 1357.100 et seq.

4.4.6   <u>Association Maintenance Manual</u>.  The Association shall maintain at the offices of the Association a copy of the Warranty and Maintenance Manual provided by Declarant to the Owners and shall make available to every Owner upon request a copy of the Owner Maintenance Manual applicable to the Owner's Residential Condominium or Commercial Condominium.  The Association shall have the right to charge the requesting Owner a fee for the copying of such Warranty and Maintenance Manual.  The Association shall also comply with provisions of the Association Maintenance Manual provided by Declarant to the Association.  The Board may, from time to time, make appropriate revisions to the Warranty and Maintenance Manual and the Association Maintenance Manual based on the Board's review thereof, to update such manual to provide for maintenance according to current industry practices so long as such changes do not reduce the useful life or functionality of the items being maintained.

**16860**

4.4.7   **Refuse and Rubbish Collection**.  The Association shall provide refuse and rubbish collection for the Residential Condominium Owners, the Commercial Condominium Owners and the Association Property, which cost shall be included as a Common Expense.

4.4.8   **Insurance**.  The Association shall have the duty to obtain, from reputable insurance companies licensed to do business in California and maintain the insurance described in the Article hereof entitled "Insurance".

4.4.9   **Notice Prior to Litigation**.  The Association shall notify all Owners of any litigation filed for or on behalf of the Association pursuant to the provisions of **Sections 17.3 and 17.4** of this Declaration.

4.4.10   **Financial Matters**.  The Association shall have the duty to prepare annual Budgets, reports, balance sheets and operating statements for the Association as required under the Governing Documents.

4.4.11   **Use of Proceeds to Repair**.  If the Association receives, on its own behalf or for the benefit of the Owners, any proceeds as a result of any construction defect or other claims or litigation brought by the Association, then the Association shall apply such proceeds first for the purpose of repairing such defects or replacing reserve funds previously utilized by the Association to cause such repairs and then to the costs of such litigation.  Any excess proceeds shall be applied as determined by the Board, subject to any requirements established by the non-profit mutual benefit laws of the State of California and any other applicable laws.

4.4.12   **Warranties**.  The Board shall comply with the terms of any warranty in favor of the Association for any equipment or facilities within the Association Property or Common Area.  The Association acknowledges that certain warranties require the Association to maintain certain maintenance contracts in effect and, to the extent the Board discontinues such maintenance contracts, the effectiveness of the warranty may be impaired or eliminated.

4.4.13   **Management of and Improvements to Hazardous Materials Locations**.  The Association shall maintain and make available to Owners upon request of an Owner a copy of the Hazardous Materials Report.  The Association shall not undertake any modifications, alterations, repairs or Improvements to any   Hazardous Materials Location without first obtaining a work plan from a Qualified Environmental Consultant which provides for the method and manner in which such modifications, alterations, repairs or Improvements must be conducted in order to prevent the release of the hazardous materials contained therein and to otherwise comply with all applicable laws.  A Qualified Environmental Consultant shall oversee all activities that would breach or remove the encapsulation of the asbestos containing building materials within the Project.  The Association shall complete such modifications, alterations, repairs and Improvements only in compliance with the work plan provided by the Qualified Environmental Consultant and in accordance with all legal requirements.  The Association shall also ensure that all managing agents and maintenance, construction or other personnel completing any work within the Project have received proper training with respect to the handling of repairs to or work within any Hazardous Materials Location.

**16861**

4.4.14 **Member's Approval of Certain Actions**. In the event that any claim or other actions brought by the Association against Declarant, including, but not limited to claims brought under California Civil Code Section 895 et seq., involving allegations of construction defects relating to the Association Property or the Common Area is not resolved pursuant to the non-adversarial procedures set forth in California Civil Code Sections 910 through 938, the Association shall not initiate a further action or procedure against Declarant under **Section 17.4** or otherwise without first obtaining the consent of the Owners other than Declarant, constituting a quorum of more than fifty percent (50%) of the Owners of the Association casting a majority of the votes at a meeting or election of the Association conducted in accordance with the provisions of California Corporations Code Sections 7510 et. seq. and 7613.

4.5 **LIMITATIONS ON AUTHORITY OF BOARD**: The Board shall not take any of the actions listed below except with the vote or approval by written consent of (a) a majority of the Members of each of Class A and Class B during the time the Class B voting structure set forth in **Section 5.2** of this Declaration is in effect; or (b) except with the vote at a meeting of the Association or by written ballot without a meeting pursuant to California Corporations Code Section 7513 of at least a majority of the Members of the Association including at least a majority of Association Members other than Declarant after conversion to a single Class A voting membership.

4.5.1 **Limit on Capital Improvements**. The Board shall not, without obtaining the consent of the Members as set forth above, incur aggregate expenditures for capital improvements to the Common Area or the Association Property in any Fiscal Year in excess of five percent (5%) of the budgeted gross expenses of the Association for that Fiscal Year.

4.5.2 **Limit on Sales of Association Property**. The Board shall not, without obtaining the consent of the Members as set forth above, sell during any Fiscal Year property of the Association having an aggregate fair market value greater than five percent (5%) of the budgeted gross expenses of the Association for that Fiscal Year.

4.5.3 **Limit on Compensation**. The Board shall not, without obtaining the consent of the Members as set forth above, pay compensation to members of the Board for services performed in the conduct of the Association's business. However, the Board may cause a member of the Board to be reimbursed for expenses incurred in carrying on the business of the Association.

4.5.4 **Limit on Third Person Contracts**. The Board shall not, without obtaining the consent of the Members as set forth above, enter into a contract with a third person wherein the third person will furnish goods or services for the Common Area or the Association Property or the Association for a term longer than one (1) year with the following exceptions:

(a) A contract with a public utility company if the rates charged for the materials or services are regulated by the Public Utilities Commission; provided, however, that the term of the contract shall not exceed the shortest term for which the supplier will contract at the regulated rate;

16862

(b)     A prepaid casualty and/or liability insurance policy not to exceed three (3) years duration; provided that the policy permits for short-rate cancellation by the insured;

(c)     An agreement for cable television services and equipment or satellite television services or equipment of not to exceed (5) five years duration but which may provide for renewals for an additional ten (10) years so long as a majority of the Owners do not object;

(d)     An agreement for sale or lease of any security, fire, or other similar equipment, installation and services or telecommunications, data processing, fiber optics, cable or other similar services or technological evolutions of the foregoing, of not to exceed ten (10) years duration but which may provide for renewals for an additional ten (10) years so long as a majority of the Owners do not object;

(e)     A contract for a term not to exceed three (3) years that is terminable by the Association after no longer than one (1) year without cause, penalty or other obligations upon ninety (90) days written notice of termination to the other party;

(f)     A contract approved by the DRE; and

(g)     Any maintenance agreement for the maintenance of any portion of the Association Property or Common Area which is required as a condition to the effectiveness of any warranty in favor of the Association.

4.6     **PROHIBITED ACTIVITIES**.  Notwithstanding any other provisions of this Declaration or the other Governing Documents, the Association is expressly prohibited from undertaking or performing any of the following activities, or expending or otherwise utilizing Association funds or resources therefor, and the following activities shall not be permitted functions of the Association.

4.6.1   **Property Manager**.  For so long as Declarant's Class C votes are in effect, the Association shall not discontinue the management of the Association by a professional, certified or accredited management company.  After Declarant's Class C votes are no longer in effect, the Association shall not discontinue the management of the Association by a professional, and certified or accredited management company without the vote of (a) Declarant, so long as Declarant owns any Unit within the Project, or Additional Property and (b) at least seventy-five percent (75%) of the Voting Power of the Association and their First Mortgagees. If the Association votes to discontinue the management of the Association by a certified or accredited professional manager in accordance with the procedures set forth above, then any replacement manager shall have at least five (5) years experience in the management of high-rise mixed use condominium projects and shall have earned accreditation or certification from a professional association management organization such as the Professional Community Association of Managers designation from the Community Association Institute.  Nothing contained herein shall limit the Association from hiring other employees for the Property.

4.6.2   **Off-Site Nuisances**.  The Association shall not use any Association funds or resources to abate any annoyance or nuisance emanating from outside the Project.  The

**16863**

Association and the Owners acknowledge that the Project is located in an area where there will continue to be ongoing development which may be residential and/or commercial.

        4.6.3   **Political Activities**.  The Association shall not (a) participate in federal, state or local political activities or activities intended to influence a governmental action affecting areas outside the boundaries of the Property (e.g., endorsement or support of (i) legislative or administrative actions by a local governmental authority, (ii) candidates for elected or appointed office, or (iii) ballot proposals, or (b) conduct, sponsor, participate in or expend funds or resources or any activity, campaign or event, including any social or political campaign, event or activity which is not directly and exclusively pertaining to the authorized activities of the Association.  There shall be no amendment of this Section so long as Declarant, owns any portion of the Property.

        4.6.4   **Contracts**.  Any agreement for professional management of the Project or any agreement providing for services of the Declarant shall be for a term not to exceed one (1) year without the consent of a majority of each class of Members; provided, however, that in no event shall such an agreement exceed a term of three (3) years.  Any such agreement shall provide that the agreement may be terminated by either party without cause and without payment of a termination fee upon not more than ninety (90) days written notice.

    **4.7**   **NO PERSONAL LIABILITY; INDEMNIFICATION OF BOARD MEMBER**.  No volunteer officer or volunteer director of the Board, or of any committee of the Association (each a "Management Party"), shall be personally liable to any Owner, or to any other party, including the Association, for any act or omission of any Management Party if such Person has, on the basis of such information as may be possessed by him or her, acted in good faith without willful, wanton or grossly misconduct within the scope of the Person's Association duties (collectively, an "Official Act").  California Civil Code Section 1365.7, as drafted as of the date of recordation of this Declaration, does not apply to common interest developments that are not "exclusively residential."  The Project contains some Commercial Condominiums.  However, the criteria and requirements set forth in California Civil Code Section 1365.7 are hereby incorporated herein by reference, and shall apply to the Management Parties, regardless of the fact that the Project includes Commercial Condominiums.

    The Association has the power and duty to indemnify, defend, protect and hold harmless each Management Party for all damages, and expenses incurred (including, without limitation, reasonable attorneys' fees), and satisfy any judgment or fine levied as a result of any action or threatened action brought because of an act or omission what such Person reasonably believed was an Official Act.  Management Parties are deemed to be agents of the Association when they are performing Official Acts for purposes of obtaining indemnification from the Association pursuant to this Section.  The entitlement to indemnification under this Declaration inures to the benefit of the estate, executor, administrator and heirs of any Person entitled to such indemnification.  The Association has the power, but not the duty, to indemnify any other person acting as an agent of the Association for damages incurred, pay expenses incurred, and satisfy any judgment or fine levied as a result of any action or threatened action because of an Official Act.  The Association also has the power, but not the duty, to contract with any person to provide indemnification in addition to any indemnification authorized by law on such terms and subject to such conditions as the Association may impose.

`16864`

## ARTICLE 5
## MEMBERSHIP AND VOTING RIGHTS IN ASSOCIATION

5.1   **MEMBERSHIP**.

5.1.1   **Qualifications**.   Each Owner of a Condominium which is subject to assessment, including Declarant, shall be a Member of the Association.   Ownership of a Condominium or interest in it shall be the sole qualification for membership in the Association. Each Owner shall remain a Member of the Association until his or her ownership interest in the Condominium in the Project ceases at which time his or her membership in the Association shall automatically cease.   Persons or entities who hold an interest in a Condominium merely as security for performance of an obligation are not to be regarded as Members.

5.1.2   **Members' Rights and Duties**.   Each Member shall have the rights, duties, and obligations set forth in the Governing Documents, as the same may from time to time be amended.

5.1.3   **Transfer of Membership**.   The Association membership of each person or entity who owns, or owns an interest in, one or more Condominiums shall be appurtenant to each such Condominium, and shall not be assigned, transferred, pledged, hypothecated, conveyed or alienated in any way except on a transfer of title to each such Condominium or interest in it and then only to the transferee. Any attempt to make a prohibited transfer shall be void. Any transfer of title to a Condominium or interest in it shall operate automatically to transfer the appurtenant membership right in the Association to the new Owner.   Declarant's Class C membership may not be transferred except to a successor to Declarant's rights to all or a portion of the Project.   Transfer of Declarant's Class C membership shall be evidenced by the recordation in the Office of the County Recorder of an Assignment of Declarant's Rights which specifically assigns such Declarant's Class C membership rights.

5.1.4   **Commencement of Voting Rights**.   An Owner's right to vote, including Declarant, shall not vest until Regular Assessments have been levied upon such Owner's Condominium as provided in this Declaration. All voting rights shall be subject to the restrictions and limitations provided for herein and in the other Governing Documents.

5.2   **NUMBER OF VOTES**.   The Association shall have three (3) classes of voting membership which are described below.  The voting rights described in **Sections 5.2.1** and **5.2.2** below shall constitute the Voting Power of the Association:

5.2.1   **Class A Members**.   Class A Members shall be all Owners, with the exception of Declarant (until the conversion of Declarant's Class B membership to a Class A membership as provided in **Section 5.2.2** below), and shall be entitled to one (1) vote for each Condominium owned.   When more than one (1) person holds an interest in any Condominium, all such persons shall be Members.   The vote for such Condominium shall be exercised as they among themselves determine, but in no event shall more than one (1) vote be cast with respect to any Condominium.

5.2.2   **Class B Members**.   Class B Member(s) shall be Declarant who shall be entitled to three (3) votes for each Condominium owned.   The Class B membership shall cease

**16865**

and be converted to Class A membership on the happening of the earliest of the following to occur:

(a)   On the date the total outstanding votes held by the Class A Members is equal to the total outstanding votes held by the Class B Members; or

(b)   The fourth (4th) anniversary of the first close of escrow of a Condominium covered by the original Public Report; provided, however, if as of such fourth anniversary ninety percent (90%) of the Condominiums are not sold by the fourth anniversary of the issuance of the Public Report, then the conversion date shall be extended to the fifth (5th) anniversary of the issuance of the Public Report.

As long as Class B membership exists, no action by the Association that must have the prior approval of the Association Members shall be deemed approved by the Members unless approved by the appropriate percentage of Class A and Class B Members, except as set forth in **Section 15** of this Declaration entitled Members' Approval of Certain Actions. Upon conversion to a single Class A voting membership, any action by the Association that must have the prior approval of the Members will require approval by at least a majority of the Members of the Association including at least a majority of Members other than Declarant.

5.2.3   **Class C Member**.  The Class C Member shall be Declarant (whether or not Declarant is an Owner).  The Class C membership shall not be considered a part of the Voting Power of the Association and Declarant shall not be entitled to exercise any Class C votes except for the purpose of electing a majority of the members of the Board pursuant to the provisions set forth below.  The Class C Member shall be solely entitled to elect a majority of the members of the Board until the day after the first annual meeting of the Members of the Association as further provided in the Bylaws; provided that during the initial three-year terms of the Board members elected by the Class C Member, the Class C Member shall be entitled to replace any Member of the Board initially elected by Declarant using its Class C membership upon the death, resignation or removal of any such Board member.

5.2.4   **Special Voting Rights**.

(a)   **Vote of Residential Owners**.  Notwithstanding anything to the contrary set forth in this Declaration, any issue relating to the following shall require the approval of only the Residential Owners:

(i)   Any matter requiring a vote of Owners relating to the allocation, increase or decrease of the Residential Assessment Component of the Common Expenses except that, if Section 1366 of the California Civil Code or any similar applicable statute or law requires the approval of all Owners, then this provision shall not apply; and

(ii)   Any matter requiring a vote of Owners relating to the Residential Common Areas or the Residential Facilities.

(b)   **Vote of Commercial Owners**.  Notwithstanding anything to the contrary set forth in this Declaration, any issue relating to the following shall require the approval of only the Commercial Owners:

16866

        (i)      Any matter requiring a vote of Owners relating to the allocation, increase or decrease of the Commercial Assessment Component of the Common Expenses except that, if Section 1366 of the California Civil Code or any similar applicable statute or law requires the approval of all Owners, then this provision shall not apply; and

        (ii)     Any matter requiring a vote of Owners relating to the Commercial Common Areas.

        (c)    **Vote on Budget Issues**.  The Association shall not, without the consent of at least seventy five percent (75%) of the Commercial Owners, modify the categories or amounts for the Commercial Condominium Contribution set forth in the Base Budget, or the formula for allocating such amounts set forth in **Section 6.8.1(a)** of this Declaration.

       5.2.5   **Joint Owner Votes**.  The voting rights for each Condominium may not be cast on a fractional basis.  If the joint Owners of a Condominium are unable to agree among themselves as to how their voting rights shall be cast, they shall forfeit the vote on the matter in question.  If any Owner exercises the voting rights of a particular Condominium, it will be conclusively presumed for all purposes that such Owner was acting with the authority and consent of all other Owners of the same Condominium.  If more than one (1) person or entity exercises the voting rights for a particular Condominium, their votes shall not be counted and shall be deemed void.

## ARTICLE 6
## ASSESSMENTS

   6.1   **CREATION OF LIEN AND PERSONAL OBLIGATION FOR ASSESSMENTS**.  Declarant, for each Condominium owned within the Property, hereby covenants, and each Owner of a Condominium by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agrees to pay to the Association all assessments levied pursuant to the provisions of this Declaration.  All assessments levied hereunder, together with interest, costs and reasonable attorneys' fees assessed hereunder, shall be a charge on the land and shall be a continuing lien upon the Condominium against which each such assessment is made, the lien to be effective upon recordation of a notice of delinquent assessments.  Each such assessment, together with interest, costs and reasonable attorneys' fees, shall also be the personal obligation of the person who was the Owner of such Condominium at the time when the assessment fell due and shall bind his or her heirs, devisees, personal representatives and assigns.  Unlike the lien for non-delinquent assessments, the personal obligation for delinquent assessments shall not pass to successive Owners, unless expressly assumed by such successive Owner.  No such assumption of personal liability by a successive Owner (including a contract purchaser under an installment land contract) shall relieve any Owner against whose Condominium the lien was levied from personal liability for delinquent assessments.  If more than one person or entity was the Owner of a Condominium, the personal obligation to pay such assessment or installment respecting such Condominium shall be both joint and several.

   6.2   **PURPOSE OF ASSESSMENTS**.  The assessments levied by the Association shall be used exclusively to perform the obligations and duties of the Association, including,

**16867**

without limitation, the improvement and maintenance of the Common Area and Association Property and for any other maintenance responsibilities of the Association, and to reimburse the Association for the costs incurred in bringing an Owner into compliance with the Governing Documents. The Association shall not impose or collect any assessment, penalty or fee that exceeds the amount necessary for the purpose or purposes for which it is levied.

6.3     **REGULAR ASSESSMENTS**.

     6.3.1     **Payment of Regular Assessments**.  Regular Assessments for each Fiscal Year shall be established when the Board approves the Budget for that Fiscal Year, which Budget shall be prepared in accordance with the provisions of this Declaration and the Governing Documents.  Regular Assessments shall be levied on a Fiscal Year basis.  Unless otherwise specified by the Board, Regular Assessments shall be due and payable in monthly installments on the first day of each month during the term of this Declaration.  Declarant's obligation or subsidy for such Regular Assessments may be reduced in accordance with the terms of any maintenance or subsidy agreement executed by Declarant and the Association.

     6.3.2     **Budgeting**.  Regardless of the number of Members or the amount of assets of the Association, each year the Board shall prepare, approve and make available to each Member a Budget as described in the Article of the Bylaws entitled "Budget and Financial Statements" not less than thirty (30) days nor more than ninety (90) days prior to the beginning of the Fiscal Year or as otherwise required by law.

     6.3.3     **Restrictions for Tax Exemption**.  As long as the Association seeks to qualify and be considered as an organization exempt from federal and state income taxes pursuant to Internal Revenue Code Section 528 and California Revenue and Taxation Code Section 23701t and any amendments thereto, then the Board shall prepare its annual Budget and otherwise conduct the business of the Association in such a manner consistent with federal and state requirements to qualify for such status.

     6.3.4     **Non-Waiver of Assessments**.  If before the expiration of any Fiscal Year the Association fails to fix Regular Assessments for the next Fiscal Year, the Regular Assessment established for the preceding year shall continue until a new Regular Assessment is fixed.

    6.4     **SPECIAL ASSESSMENTS**.  If the Board determines that the estimated total amount of funds necessary to defray the Common Expenses of the Association for a given Fiscal Year is or will become inadequate to meet expenses for any reason, including, without limitation, unanticipated delinquencies, costs of construction, costs arising under the Encroachment Agreement due to Encroachment, unexpected repairs or replacements of capital improvements on, damage and destruction or condemnation of, the Common Area, the Association Property or any other areas which the Association is obligated to maintain, the Board shall determine the approximate amount necessary to defray such expenses, and if the amount is approved by a majority vote of the Board and does not exceed five percent (5%) of the budgeted gross expenses of the Association, it shall become a Special Assessment; provided, however, that such limitation shall not apply to Special Assessments levied by the Board to replenish the Association's reserve account as provided in the Section of the Bylaws titled "Reserves".  Except for Special

Assessments levied pursuant to the Section of the Bylaws titled "Reserves", any Special Assessment in excess of five percent (5%) of the budgeted gross expenses of the Association shall be subject to the limitations set forth in **Section 6.7** below. The Board may, in its discretion, prorate such Special Assessment over the remaining months of the Fiscal Year or levy the assessment immediately against each Condominium. Unless exempt from federal or state income taxation, all proceeds from any Special Assessment shall be segregated and deposited into a special account and shall be used solely for the purpose or purposes for which it was levied or it shall be otherwise handled and used in a manner authorized by law or regulations of the Internal Revenue Service or the California Franchise Tax Board in order to avoid, if possible, its taxation as income of the Association.

6.5   **CAPITAL IMPROVEMENT ASSESSMENT**.   In addition to any other assessments provided for hereunder, the Association may levy a Capital Improvement Assessment for the purpose of defraying, in whole or in part, the cost of any construction or replacement of a capital improvement in accordance with the provisions of **Section 4.3.6**. Capital Improvement Assessments shall be due and payable by all Owners in such installments and during such period or periods as the Board shall designate.   Increases in Capital Improvement Assessments shall be subject to the limitations set forth in **Section 6.7** below. The Commercial Owners shall not be required to contribute to the cost of capital improvements to the Residential Facilities or any other areas for which they are not contributing to fund ongoing maintenance and reserves.

6.6   **ENFORCEMENT ASSESSMENTS**.   The Association may levy an Enforcement Assessment against any Owner whose negligence or willful misconduct causes damage to the Common Area, the Association Property or any other area the Association is obligated to maintain, or for the cost of bringing an Owner or his or her Condominium into compliance with the provisions of the Governing Documents and/or any other charge designated an Enforcement Assessment in the Governing Documents, together with attorneys' fees, interest and other charges related thereto as provided in this Declaration. If the Association undertakes to provide materials or services which benefit individual Owners, then such Owners in accepting such materials or services agree that the costs thereof shall be an Enforcement Assessment. The Board shall have the authority to adopt a reasonable schedule of Enforcement Assessments for any violation of the Governing Documents.   If, after Notice and Hearing as required by this Declaration and that satisfies Section 7341 of the California Corporations Code, the Owner fails to cure or continues such violation, the Association may impose an additional fine each time the violation is repeated, and may assess such Owner and enforce the Enforcement Assessment as herein provided for nonpayment of an assessment.   A hearing committee may be established by the Board to administer the foregoing.   Notwithstanding any other provision in this Declaration to the contrary, except as provided in **Section 6.12** of this Declaration, Enforcement Assessments are assessments but they may not become a lien against the Owner's Condominium that is enforceable by a power of sale under California Civil Code Sections 2924, 2924b and 2924c. This restriction on enforcement is not applicable to late payment penalties for delinquent assessments or charges imposed to reimburse the Association for loss of interest or for collection costs, including reasonable attorneys' fees, for delinquent assessments.

**16869**

6.6.1 **Reconstruction Assessments**.   Reconstruction Assessments may be levied by the Board under the conditions and in the manner specified in the Article hereof entitled "Destruction of Improvements."

## 6.7   CHANGES TO ASSESSMENTS.

6.7.1 **Limitation on Assessments**.   From and after January 1st of the year immediately following the conveyance of the first Condominium to an Owner, other than Declarant, the maximum annual Regular Assessment may not, except in the case of an Emergency (as hereinafter defined), be increased by an amount greater than twenty percent (20%) of the Regular Assessments for the preceding Fiscal Year and Special Assessments and Capital Improvement Assessments shall not be imposed that in the aggregate exceed five percent (5%) of the budgeted gross expenses of the Association for that Fiscal Year, without the consent of the Owners, constituting a quorum and casting a majority of the votes at a meeting or election of the Association conducted in accordance with the provisions of California Corporations Code Sections 7510 et. seq. and 7613.  The Board may not increase the Regular Assessments for any Fiscal Year unless it has complied with California Civil Code Section 1365.5.  For the purpose of this Section, a quorum shall mean more than fifty percent (50%) of the Owners of the Association and an Emergency shall mean any one of the following:

(a)     an extraordinary expense required by an order of a court;

(b)     an extraordinary expense necessary to repair or maintain the Common Area, Association Property or any part of the Project which is the responsibility of the Association to maintain where a threat to personal safety on the Project is discovered; or

(c)     an extraordinary expense necessary to repair or maintain the Common Area and Association Property or any part of the Project for which the Association is responsible to maintain that could not have been reasonably foreseen by the Board in preparing and distributing the Budget required under this Declaration and the Bylaws and California Civil Code Section 1365; provided, however, that prior to the imposition or collection of a Regular Assessment under this Section, the Board shall pass a resolution containing written findings as to the necessity of the extraordinary expense which is involved and why the expense was not or could not have been reasonably foreseen in the budgeting process, and the resolution shall be distributed to the Members with the notice of Regular Assessment.  For the purpose of calculating whether an increase to Regular Assessments exceeds twenty percent (20%), the term "Regular Assessments" shall be deemed to include the amount assessed against each Condominium by the Association as a Regular Assessment plus any amount paid by the Declarant as a subsidy pursuant to any subsidy agreements, to the extent such subsidy payments offset any amount which would otherwise be paid by Owners as Regular Assessments.  Any increases authorized under this Section shall not be imposed unless the Board has complied with the budgetary requirements set forth in **Article 9** of the Bylaws with respect to the Fiscal Year for which an assessment is being levied.

6.7.2 **Notice to Owners**.   The Association shall provide notice by first class mail to the Owners of any increase in the Regular Assessments or Special Assessments of the

16870

Association, not less than thirty (30) days and not more than sixty (60) days prior to the increased assessment becoming due and payable.

### 6.8 ALLOCATION OF ASSESSMENTS TO CONDOMINIUMS.

6.8.1 **General Budget**. That portion of Regular, Special and Capital Improvement Assessments set forth in the General Budget as "variable expenses" shall be allocated by the Board among the Residential Condominiums and Commercial Condominiums as provided in **Exhibit "C"** attached hereto. All other items covered by any Regular, Special and Capital Improvement Assessments set forth in the General Budget shall be fixed at a uniform rate for all Condominiums.

(a) **Commercial Owners' Proportionate Share of Variable Expenses**. Each Commercial Owner shall pay an amount equal to the Commercial Owner's Proportionate Share (as defined below) of the percentage specified on **Exhibit "C"** as the "Commercial Contribution" for the variable expenses in the General Budget.

6.8.2 **Residential Budget**. That portion of Regular, Special and Capital Improvement Assessments set forth in the Residential Budget as "variable expenses" shall be allocated by the Board among the Residential Units as provided in **Exhibit "C"** attached hereto. All other items covered by any Regular, Special and Capital Improvement Assessments set forth in the Residential Budget shall be fixed at a uniform rate for the Residential Units. Enforcement Assessments and Reimbursement Assessments shall be levied directly to the individual Units.

### 6.9 DATE OF COMMENCEMENT OF REGULAR ASSESSMENTS; DUE DATES.
The Regular Assessments provided for herein shall commence as to all Condominiums subject to this Declaration on the first day of the month following the conveyance of the first Condominium to an Owner under authority of a Public Report.

### 6.10 NOTICE AND ASSESSMENT INSTALLMENT DUE DATES.
A single ten (10) day prior written notice of each Special Assessment and Capital Improvement Assessment shall be given to each Owner. The due dates for the payment of installments normally shall be the first day of each month unless some other due date is established by the Board. Each installment of Regular Assessments, Special Assessments and Capital Improvement Assessments shall become delinquent if not paid within fifteen (15) days after its due date. There shall accrue with each delinquent installment a late charge, interest charge to be set by the Board and reasonable costs of collection, including attorneys' fees, but which shall not, in any event, exceed the maximum rates permitted under California Civil Code Section 1366.

### 6.11 ESTOPPEL CERTIFICATE.
The Board on not less than ten (10) days prior written request shall execute, acknowledge and deliver to the party making such request a statement in writing stating whether or not to the knowledge of the Association, a particular Owner is in default as to such Owner's Condominium under the provisions of this Declaration and further stating the dates to which installments of assessments, regular or special, have been paid as to such Condominium. Any such statement may be relied on by any prospective purchaser or Mortgagee of the Condominium, but reliance on such statement may not extend to

16871

any default not involving the payment of assessments of which the signer had no actual knowledge.

### 6.12   COLLECTION OF ASSESSMENTS, LIENS.

6.12.1 **Right to Enforce**. The right to collect and enforce assessments is vested in the Board acting for and on behalf of the Association. The Board or its authorized representative, can enforce the obligations of the Owners to pay assessments provided for in this Declaration by commencement and maintenance of a suit at law or in equity, or the Board may foreclose by judicial proceedings or through the exercise of the power of sale pursuant to **Section 6.12.6** enforce the lien rights created. Suit to recover a money judgment for unpaid assessments together with all other Additional Charges described in **Section 6.13** shall be maintainable without foreclosing or waiving the lien rights. Notwithstanding anything else to the contrary herein a monetary penalty imposed by the Association as a disciplinary measure for failure of a Member to comply with the Governing Documents or as a means of reimbursing the Association for costs incurred by the Association in the repair of damage to Association Property, Common Area and facilities for which the Member was allegedly responsible or in bringing the Member and his or her Unit into compliance with the Governing Documents of the Association may not be characterized nor treated as an assessment which may become a lien against the Member's Unit enforceable by a sale of the interest hereunder. The limitation in the preceding sentence however, does not apply to any Additional Charges.

6.12.2 **Notice of Assessments and Foreclosure**. The Association shall distribute a written notice regarding assessments and foreclosure as set forth in California Civil Code Section 1365.1 during the sixty (60) day period immediately preceding the beginning of the Association's Fiscal Year.

6.12.3 **Delinquent Assessments**. The Association shall comply with the requirements of California Civil Code Section 1367.1 when collecting delinquent assessments. The Board or its authorized representative must send to the delinquent Owner or Owners, at least thirty (30) days prior to the recordation of a lien against the delinquent Owner's Condominium (as set forth in **Section 6.12.6**), a written notice by certified mail, which notice shall contain all of the information specified in California Civil Code Section 1367.1 ("Initial Notice"). The delinquent Owner may dispute the debt noticed pursuant to the Initial Notice by submitting to the Board a written explanation of the reasons for the delinquent Owner's dispute ("Owner Explanation"). The Board shall respond to the Owner Explanation in writing to the delinquent Owner within the time frame set forth in California Civil Code Section 1367.1. The delinquent Owner may submit a written request to the Board to meet with the Board to discuss a payment plan for the debt noticed in the Initial Notice. The Board shall meet with the delinquent Owner in executive session within the time frame set forth in California Civil Code Section 1367.1. The Association shall provide the Owners the standards for payment plans if any exists.

6.12.4 **Creation of Lien**. If there is a delinquency in the payment of any assessment, or installment on a Condominium any amounts that are delinquent, together with the late charge described in California Civil Code Section 1366, interest at the rate permitted in such Section, and all costs that are incurred by the Board or its authorized representative in the collection of the amounts, including reasonable attorneys' fees, shall be a lien against such

16872

Condominium upon the recordation in the Office of the County Recorder of a notice of delinquent assessment ("Notice of Delinquent Assessment") as provided in California Civil Code Section 1367.1. After its recordation, the Notice of Delinquent Assessment shall be mailed to all Owners of record as provided in California Civil Code Section 1367.1.

6.12.5 **Assignment**. The Association may not voluntarily assign or pledge the Association's right to collect payments or assessments, or to enforce or foreclose a lien to a third party except where provided under California Civil Code Section 1367.1(g).

6.12.6 **Notice of Default; Foreclosure**. The Board or its authorized representative can record a notice of default and can cause the Condominium with respect to which a notice of default has been recorded to be sold in the same manner as a sale is conducted under California Civil Code Sections 2924, 2924b and 2924c, or through judicial foreclosure, and as provided in California Civil Code Section 1367.1. However, as a condition precedent to the holding of any such sale under Section 2924c, appropriate publication shall be made. In connection with any sale under Section 2924c, the Board is authorized to appoint its attorney, any officer or director, or any title insurance company authorized to do business in California as trustee for purposes of conducting the sale. The fee of the trustee shall not exceed the amounts prescribed in California Civil Code Sections 2924c and 2924d. If (a) a delinquency is cured before sale, or before completing a judicial foreclosure, or (b) if it is determined that a lien previously recorded against a Condominium was recorded in error, the Board or its authorized representative, within the time frame set forth in California Civil Code Section 1367.1 shall cause to be recorded in the office of the County Recorder a certificate setting forth the satisfaction or rescission of such claim and release of such lien upon payment of actual expenses incurred, including reasonable attorneys' fees by any delinquent Owner. If the lien was satisfied, the Association shall provide the delinquent Owner a copy of the lien release or notice that the delinquent assessment has been satisfied and if the Association filed a rescission of the lien, then the Association shall provide such Owner with a declaration that the lien filing or recording was in error and a copy of the lien release or notice of rescission. Any payments made on delinquent assessments shall be applied in accordance with California Civil Code Section 1367.1. On becoming delinquent in the payment of any assessments, or installments each delinquent Owner shall be deemed to have absolutely assigned all rent, issues and profits of Owner's Condominium to the Association and shall further be deemed to have consented to the appointment of a receiver (which appointment may, at the election of the Association, be enforced by the Association through specific performance). The Association, acting on behalf of the Owners, shall have the power to bid upon the Condominium at foreclosure sale and to acquire, hold, lease, mortgage and convey the Condominium and vote as an Owner of the Condominium.

6.12.7 **Payments Under Protest**. Notwithstanding any other provisions set forth in this **Section 6.13**, the Owners shall have the right to make certain payments under protest and be entitled to alternative dispute resolution as provided in California Civil Code Sections 1354, 1366.3, 1367.1, as provided in **Section 17.4** of this Declaration.

6.12.8 **Payment of Assessments**. Any payments of sums due under this Article shall first be applied to assessments owed, and only after assessments owed have been paid in full shall the payments be applied to the fees and costs of collections, attorney's fees, late charges or interest. If an Owner requests a receipt after payment of a delinquent assessment, the

16873

Association shall provide a receipt which sets forth the date of payment and the individual who received such payment.

6.13 **ADDITIONAL CHARGES**.  In addition to any other amounts due or any other relief or remedy obtained against an Owner who is delinquent in the payment of any assessments, each Owner agrees to pay Additional Charges incurred or levied by the Board including such additional costs, fees, charges and expenditures as the Association may incur or levy in the process of collecting from that Owner monies due and delinquent.  Additional Charges shall include, but not be limited to, the following:

6.13.1 **Attorneys' Fees**.  Reasonable attorneys' fees and costs incurred in the event an attorney(s) is employed to collect any assessment or sum due, whether by suit or otherwise;

6.13.2 **Late Charges**.  A late charge in an amount to be fixed by the Board in accordance with California Civil Code Section 1366, to compensate the Association for additional collection costs incurred in the event any assessment or other sum is not paid when due or within any "grace" period established by law;

6.13.3 **Costs of Suit**.  Costs of suit and court costs incurred as are allowed by the court;

6.13.4 **Interest**.  Interest to the extent permitted by law; and

6.13.5 **Other**.  Any such other additional costs that the Association may incur in the process of collecting delinquent assessments or sums.

6.14 **WAIVER OF EXEMPTIONS**.  Each Owner, to the extent permitted by law, waives, to the extent of any liens created pursuant to this Article, the benefit of any homestead or exemption laws of California in effect at the time any assessment or installment becomes delinquent or any lien is imposed.

6.15 **SUBORDINATION OF LIEN TO FIRST MORTGAGES**.  When a Notice of Delinquent Assessment has been recorded, such assessment shall constitute a lien on such delinquent Owner's Condominium prior and superior to all other liens, except, (a) all taxes, (b) bonds, assessments and other levies which, by law, would be superior thereto, and (c) any First Mortgage now or hereafter placed upon any Condominium subject to assessment.  The sale or transfer of any Condominium pursuant to judicial or nonjudicial foreclosure (excluding a transfer by a deed in lieu of foreclosure) of a First Mortgage shall extinguish the lien of such assessments as to payments which became due prior to such sale or transfer.  No sale or transfer shall relieve such Condominium from any assessments thereafter becoming due or from the lien of any subsequent assessment.  Where the Mortgagee of a First Mortgage or other purchaser of a Condominium obtains title to the same as a result of foreclosure (excluding a transfer by a deed in lieu of foreclosure), such acquiror of title, his or her successors and assigns, shall not be liable for the share of the Common Expenses or assessments by the Association chargeable to such Condominium that became due prior to the acquisition of title to such Condominium by such acquiror, except for a share of such charges or assessments resulting from a reallocation of such charges or assessments which are made against all Condominiums.

**16874**

6.16   **NO OFFSETS**.  All assessments shall be payable in the amounts specified by the particular assessment and no offsets against such amount shall be permitted for any reasons, including, without limitation, a claim that the Association is not properly exercising its duties of maintenance, operation or enforcement.

6.17   **PERSONAL LIABILITY OF OWNER**.  No Owner may exempt himself or herself from personal liability for assessments, nor any part thereof, levied by the Association, nor release the Condominium owned by him or her from the liens and charges hereof by waiver of the use and enjoyment of the Common Area and Association Property and facilities thereof, or by abandonment of such Owner's Condominium.

6.18   **TRANSFER OF PROPERTY**.  After transfer or sale of property within the Project, the selling Owner or Owners shall not be liable for any assessment levied on such Owner or Owner's Condominium after the date of such transfer of ownership if written notice of such transfer is delivered to the Association.  The selling Owner shall still be responsible for all assessments and charges levied on his or her property prior to any such transfer.

6.19   **FAILURE TO FIX ASSESSMENTS**.  The omission by the Board to fix the assessments hereunder before the expiration of any year, for that or the next year, shall not be deemed either a waiver or modification in any respect of the provisions of this Declaration or a release of the Owner from the obligation to pay the assessments or any installment thereof for that or any subsequent year, but the assessment fixed for the preceding year shall continue until a new assessment is fixed.

6.20   **PROPERTY EXEMPT FROM ASSESSMENTS**.  The Association Property shall be exempt from the assessments, charges and liens created herein.

6.21   **INITIAL CAPITAL CONTRIBUTIONS**.  Upon acquisition of record title to a Residential Condominium from Declarant, each Owner shall contribute to the capital of the Association an amount equal to Two Hundred Dollars ($200).  This amount shall be deposited by the Owner into the purchase and sale escrow for his or her Condominium and disbursed therefrom to the Association or to reimburse Declarant for any capital contributions paid by Declarant to the Association on behalf of Owners.

### ARTICLE 7
### USE RESTRICTIONS

*Living in a mixed use community with both residential and commercial uses occurring in close proximity has the benefit of allowing Owners to live and work or shop in the same environment. All commercial uses in The Electra will be confined to the Commercial Condominiums within the Commercial Module(s) shown on the Condominium Plan.  However, impacts from these commercial uses may be evident throughout The Electra project.  For residents in The Electra, living in close proximity to these Commercial Condominiums will affect day-to-day living experiences.  Residents will experience more noise, smells and general traffic than they may be accustomed to in a typical residential neighborhood where retail uses are located in a separate area.  Residents in The Electra appreciate the value of living in a mixed use community and acknowledge that the impacts from the commercial uses are outweighed by the value of living in*

**16875**

*such an exciting environment.  To ensure the continued value and enjoyment of The Electra, there are use restrictions which govern the Residential Owners and Commercial Owners within The Electra.*

7.1 **USE     RESTRICTIONS     APPLICABLE     TO     RESIDENTIAL CONDOMINIUMS**.  The following restrictions shall be applicable to the Residential Condominiums.

7.1.1 **Residential Use**. The Residential Condominiums shall be used for residential purposes only; provided, however, any Residential Condominium may be used incidentally for the purpose of operating a home based small business if, and only if, (a) the business is operated solely within the Residential Condominium, (b) the business is limited to the rendition of professional services or other similar activities, (c) the business is operated by the Owner of the Residential Condominium whose principal residence is the Residential Condominium, by a tenant whose principal residence is the Residential Condominium or by a member of such Owner's or tenant's family whose principal residence is the Residential Condominium, (d) the operation of the business is permitted by, and is at all times in compliance with, all applicable laws, and (e) the operation of the business does not result in (i) the violation of any of the other provisions of this Declaration, (ii) any unreasonable increase in the flow of traffic within the Property, (iii) any odor, noise, or vibration outside of the Condominiums, or (iv) parking problems within the Project.  No other use shall be allowed except as specifically permitted by local ordinance; provided, however, Declarant may use any of the Condominiums owned by Declarant as model homes sales offices, construction offices or storage for the Project during that period of time commencing when the Condominiums are first sold or offered for sale to the public and ending when all the Condominiums in the Project are sold and conveyed by Declarant to separate owners thereof.

7.1.2 **Commercial Use**.  Except as otherwise provided in this Declaration, including without limitation **Section 7.1.2** above, no part of the Residential Module shall be used or caused, allowed, or authorized to be used in any way, directly or indirectly, for any business, retail, commercial, manufacturing, mercantile, storing, vending, or other such non-residential purpose.

7.1.3 **Rental of Residential Condominiums**.  An Owner shall be entitled to rent the Owner's entire Residential Condominium (but not a portion thereof) subject to the restrictions contained in this Declaration and the other Governing Documents.  Any rental or lease agreement shall be in writing, shall provide that the lease is subject to the Governing Documents and shall provide that any failure to comply with any provisions of the Governing Documents shall be a default under the terms of the lease agreement.  A copy of this Declaration and the other Governing Documents shall be made available to each tenant or lessee by the Owner so renting or leasing.  The Owners shall, at all times, be responsible for their tenant's or lessee's compliance with all of the provisions of this Declaration pursuant to the occupancy and use of the Condominium.  A lessee shall have no obligation to the Association to pay assessments imposed by the Association nor shall any lessee have any voting rights in the Association.  No Owner may lease a Condominium situated thereon for hotel, motel or transient purposes or any other purpose inconsistent with the provisions of this Declaration.  All Owners

16876

who rent their Condominiums shall submit names and contact numbers and proof of insurance coverage for their tenants to the management company for the Project.

7.1.4   **Signs and Displays**.  No sign, advertising device or other display of any kind shall be displayed in the Project, except for the following: (a) entry monuments, community identification signs, and traffic or parking control signs maintained by the Association; (b) for each Condominium, one (1) nameplate or similar Owner name or address identification which complies with the Architectural Guidelines; (c) for each Condominium, one (1) sign advertising the Condominium for sale or lease that complies with the following requirements, subject to California Civil Code Sections 712 and 713: (i) the sign is a reasonable size; and (ii) the sign is in compliance with the Architectural Guidelines or is otherwise authorized by the Board; (d) noncommercial signs permitted by California Civil Code Section 1353.6; and (e) such other signs or displays authorized by the Board.  In addition to the foregoing, all signs must comply with all applicable laws.  Notwithstanding the foregoing, Declarant shall have the right to display signs as set forth in **Article 10**.

7.1.5   **Use of Exclusive Common Use Areas**.

(a)   **Approval of Improvements**.  Improvements including, without limitation, plants, fountains and other landscaping features within the Exclusive Use Common Areas shall be subject to the Project Handbook and any Improvements within such areas shall require the approval of the Architectural Committee.

(b)   **Vegetation and Plants**.  Unless installed by Declarant, no vegetation shall be permitted to extend beyond the railings, fences, walls and/or other boundaries of the Exclusive Use Common Areas.  If required by the Project Handbook, any plants placed on balcony areas or deck areas must be approved by the Architectural Committee, must have sufficiently large receptacles to contain all drainage from such plants and must not be allowed to collect condensation or moisture between the receptacles and the floor of an Exclusive Use Common Area.  The Project Handbook may limit the number and weight of plants allowed in an Exclusive Use Common Area.

(c)   **Furnishings**.  Exclusive Use Common Areas shall be used only as outdoor living areas containing patio furniture and other similar outdoor furnishings which comply with the standards governing the appearance of such items as set forth in the Project Handbook.  Furniture, furnishings, umbrellas, plants, equipment and other materials kept or stored on any Exclusive Use Common Area shall be of a neutral color harmonious with and not in conflict with the color scheme of the exterior walls of the Building and must be approved in writing by the Architectural Committee unless expressly permitted by the Architectural Guidelines.  Said furnishings shall be equipped with protective leg caps or other devices to prevent damage to the floor of an Exclusive Use Common Area.

(d)   **Improvements and Restrictions on Attaching or Hanging Items**.  Unless expressly permitted in this Declaration or in the Project Handbook, no Improvement shall be nailed, bolted, or otherwise attached to the floor, walls, or any other portion of an Exclusive Use Common Area without the prior approval of the Architectural Committee.  No hanging screens, banners, or wind chimes and no other accoutrement (other than

plants) which may be visible from any other Units or the Common Area are permitted on any portion of an Exclusive Use Common Area. Any plants placed on balcony areas must have sufficiently large receptacles to contain all drainage from such plants, must not extend beyond the railings of the Exclusive Use Common Area and must not be allowed to collect condensation or moisture between the receptacles and the floor of the balcony area. The Association Rules may limit the number and weight of plants allowed in the Exclusive Use Common Areas.

(e)  **Surface of Decks, Balconies and Patios**. No Owner shall change or alter the surface of any Exclusive Use Common Area. In addition, no Astroturf, carpet or other floor covering shall be installed in any Exclusive Use Common Area.

(f)  **Storage on Decks, Balconies and Patios**. No Owner shall use any Exclusive Use Common Area for storage purposes, including, without limitation, the storage of bicycles.

(g)  **Association Entry Rights**. Each Owner acknowledges that, notwithstanding anything to the contrary set forth in this Declaration, the Association shall have the right to enter onto the Exclusive Use Common Areas to perform its maintenance and other obligations under this Declaration. Additionally, each Owner's right to use their Exclusive Use Common Area is subject to the Association's rights set forth in **Section 3.4.5** for the maintenance, storage and operation of window washing equipment.

(h)  **Barbeques**. No charcoal barbeque grill may be kept or used on any Exclusive Use Common Area.

7.1.6  **Storage Spaces**. Storage Spaces shall be used only for the storage of personal property. In no event shall the Storage Spaces be used for the storage of any Hazardous Materials or any other noxious, toxic, or odorous substances.

7.1.7  **Animals**. No livestock or poultry shall be kept, maintained, or bred in any Residential Unit or elsewhere within the Project. An Owner shall not maintain or keep in its Residential Unit or other portion of the Project more than a total of two (2) dogs (other than dogs which in the reasonable determination of the Board are determined to be a threat to the safety of the occupants of the Project, which shall not be allowed under any circumstances in the Project) and/or two (2) domestic cats or a combination thereof (but not to exceed two (2) total), provided such animals are not kept, bred or raised for commercial purposes. Domestic reptiles, birds, rodents and fish shall be permitted so long as such animals are kept in the interior of a Residential Unit and are (a) kept as household pets, (b) are not so excessively noisy as to disturb the quiet enjoyment by each Owner of his or her Residential Unit, (c) are not kept, bred or raised for commercial purposes or, as determined by the Board, in unreasonable numbers, and (d) do not constitute a nuisance or threat to the personal safety of other Owners and their Invitees in the Project. Notwithstanding the foregoing, the Project Handbook may further limit or restrict the keeping of such pets. The Board shall specifically have the power to prohibit the keeping or maintenance of any animal, which, in the opinion of the Board, after Notice and Hearing, is deemed by the Board to constitute a nuisance to any other Owner in the sole and exclusive opinion of the Board. Each person bringing or keeping a pet within the Project shall be absolutely liable to other Owners and their Invitees for any damage to persons or property caused

16878

by any pet brought upon or kept upon the Project by such person or by members of his or her family, his or her guests or Invitees. Each Owner shall clean up after such animals that have deposited droppings or otherwise used any portion of the Project or public street abutting or visible from the Property. Animals belonging to Owners or Invitees of any Owner must be kept within an enclosure or on a leash held by a person capable of controlling the animal when outside the Unit or Exclusive Use Common Area. Animals shall not be left unattended on any Exclusive Use Common Area. Nothing contained herein shall constitute a restriction on seeing eye dogs.

7.1.8   **Water Beds and Limitations on Size of Aquariums.**   No water beds shall be permitted in any Condominium and no Owner can maintain in his or her Condominium any aquarium or other container holding thirty (30) or more gallons of water. Each Owner acknowledges that substantial damage to other Residential Units, Association Property and/or Common Area may occur as a result of a violation of this restriction.

7.1.9   **Window Coverings.**   All window coverings shall be of a neutral color harmonious with and not conflict with the color scheme of the exterior wall surface of the Condominium.   Window tinting and coverings shall be subject to the approval of the Architectural Committee.

7.1.10 **Outside Drying and Laundering.**   No exterior clothesline shall be erected or maintained or hung on balconies or railings within the Project and there shall be no exterior drying or laundering of clothes or any other items on any Common Area, Exclusive Use Common Area or Association Property.

7.1.11 **Decorating by Owner.**   Each Owner shall have the right, at his or her sole cost and expense, to maintain, repair, paint, paper, panel plaster, tile and finish the interior surfaces of the ceilings, floors, window frames, door frames, trim and perimeter walls of the Unit, and the surfaces of the bearing walls and partitions located within the Residential Unit, subject to the Owner complying with any restrictions or limitations set forth in the Project Handbook and, obtaining the approval required under **Article 9** of this Declaration entitled "Architectural Review." In addition to the foregoing, no Owner or agents or contractors of an Owner shall cut, drill, demolish, strip or otherwise repair, change, modify or alter any portion of the Project which contains a Hazardous Materials Location without first complying with the procedures set forth in **Section 9.6** of this Declaration.

7.1.12 **Hard Surface Floors.**   Except for those hard surface floors installed by Declarant as part of the original construction of the Project, no Owner shall install any hard surface flooring (including without limitation tile or hardwood floors) or replace any flooring with any hard surface flooring within any Residential Unit unless the prior approval of the Architectural Committee has been obtained.   As a condition to approving the installation or replacement of hard surface flooring, the Owner shall submit to the Architectural Committee a construction drawing clearly indicating the type of flooring to be installed and the underlayment to be provided to mitigate against impact noises such as footfalls.   The drawing must clearly identify all materials, their composition and thickness.

**16879**

7.1.13 **Sound Attenuation**. In any multi-family dwelling, sound may be audible between Units, particularly where the sound level of the source is sufficiently high and the background noise in an adjacent Unit is very low. Each Owner shall endeavor to minimize any noise transmission from his or her Unit, and shall comply with any of the Association Rules which are designed to minimize noise transmission. To minimize the noise transmission from a Unit, each Owner (other than Declarant) shall adhere to the following:

(a)     No holes or other penetrations shall be made in demising walls (party walls) without the permission of the Board pursuant to **Article 9** and the requirements of the Project Handbook. No penetrations of any sort shall be made in the ceiling of any Unit. Acoustical sealant shall be packed around the point of penetration of all pictures and other items hung from the wall that require nailing or screwing.

(b)     No modifications shall be made to any Unit which would result in a reduction in the minimum impact insulation class of the Unit.

(c)     Loudspeakers for music reproduction and television shall be elevated from the floor by a proper acoustic platform.

(d)     Pianos shall have at least one half (½) inch neoprene pads under the supports to minimize vibration transmission into the structure.

## 7.2   USE   RESTRICTIONS   APPLICABLE   TO   COMMERCIAL CONDOMINIUMS.

7.2.1   **Prohibited Uses**. No use or operation shall be made, conducted or permitted on or with respect to all or any part of the Project, which use or operation violates applicable laws or the provisions of this Declaration. In addition to the foregoing, no Commercial Condominium or any part of the Project shall be used for an activity or purpose considered by the Association to pose a safety hazard or health risk within the Project including but not limited to, the following:

(a)     Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness, provided, however, that noise due to normal restaurant or bar operation shall be permitted;

(b)     Any noxious, hazardous, toxic, caustic, explosive or corrosive fuel, gas or other substance;

(c)     Any fire, explosion or other damaging or dangerous hazard, including the storage or sale of explosives or fireworks;

(d)     Any distillation or refinery facility (excepting therefrom any microbrewery or similar business);

(e)     Any dumping of garbage or refuse, except in places designated for disposal by the Association;

16880

(f)    Any motorized vehicle repair shop;

(g)    Any meeting place, place of public assembly, pool hall, game arcade, betting facility or video or games arcade;

(h)    Any business which derives fifty percent (50%) or more of its gross sales volume serving or selling alcoholic beverages;

(i)    Any indecent or pornographic uses, massage parlor, adult bookstore, peepshow store, or any other similar store or club; and any business devoted to sale of articles and merchandise normally used or associated with illegal or unlawful activities, including, without limitation, the sale of paraphernalia used in connection with marijuana, cocaine or other controlled drugs or substances;

(j)    Any gymnasium or martial arts;

(k)    Any tattoo parlors or body piercing;

(l)    Maintaining or keeping of any animals;

(m)    Any laundromat, secondhand surplus store, bankruptcy sale;

(n)    Any places of religious worship; and

(o)    Any dry cleaning facility or store, except that a "drop off" for dry cleaning shall be permitted so long as the actual dry cleaning is conducted at a site outside the Project.

7.2.2  **Advertising**.  No Owner or lessee shall employ an advertising medium which can be heard or experienced outside of a Commercial Unit, including, without limitation, flashing lights, searchlights, loudspeakers, phonographs, compact disk players, radios or television.  Identification and other signage shall be governed by **Section 7.2.6 below**.  No Owner, or his lessee, shall distribute, or cause to be distributed, any handbill or other advertising device in the Common Area, Association Property, or on the public sidewalks or streets adjacent to the Project.

7.2.3  **Commercial Invitees and Lessees; Insurance**.   An Owner of a Commercial Unit shall be responsible for compliance by his or her commercial Invitees and lessees, and his or her lessees' commercial Invitees, with the provisions of the Governing Documents applicable to the Commercial Condominiums.  The Owner of a Commercial Unit or such Owner's lessee shall maintain a policy or policies of public liability insurance in an amount which is reasonable for the use of such Commercial Unit, and shall demonstrate proof of such insurance to the Board annually upon request.  Any rental or leasing agreement shall be in writing, shall provide that the lease or rental is subject to the Governing Documents and shall provide that any failure to comply with any provision of this Declaration or the Governing Documents shall be a default under the terms of the lease agreement.  A copy of this Declaration shall be made available to each tenant or lessee by the Owner so renting or leasing.  The Owners shall, at all times, be responsible for their tenant's or lessee's compliance with all of the

**16881**

provisions of this Declaration pursuant to the occupancy and use of the Commercial Condominium. A lessee shall have no obligation to the Association to pay assessments imposed by the Association nor shall any lessee have any voting rights in the Association. No Owner may lease a Commercial Condominium for a period less than thirty (30) days, or for hotel, motel or transient purposes or any other purpose inconsistent with the provisions of this Declaration. All Owners who rent their Commercial Condominiums shall submit names and contact numbers for their tenants to the management company for the Association. By acceptance of a deed to a Commercial Condominium, each Commercial Owner agrees that during any period that the Commercial Unit is unoccupied, the Commercial Owner shall take such reasonable steps as required by Declarant, or by the Board after Declarant no longer owns any interest in the Project, to keep those portions of the Commercial Unit visible from public areas from appearing abandoned, including, without limitation, installation of smoked glass on windows or glass doors visible from public areas, free of stored materials, clean and otherwise maintained such that it is not readily apparent that business is not being conducted therein.

      7.2.4   **Restrictions on Commercial Units**. Except as otherwise stated herein or in the Architectural Guidelines, the Board may not restrict the reasonable use of a Commercial Unit as provided for herein. All uses shall be in conformity with the zoning ordinances of the City. Commercial uses by their nature create a variety of impacts that would not occur, or would occur to a lesser degree, in a project with only residential uses. Such impacts include, without limitation, vehicular and pedestrian traffic, light, noise, odors and pests. The benefits of living in a mixed-use project with commercial uses are deemed to outweigh the additional impacts from such uses.

      7.2.5   **Restaurant Use**. All utilities serving a restaurant within the Project, if any, shall be provided independent from the utilities servicing the Residential Condominium, except for the sprinkler system and life-safety systems.

      7.2.6   **Signage**. Each Owner or tenant of Commercial Condominium shall have the right to display identification and other commercial signs on or in such Commercial Condominium in accordance with the Commercial Signage Guidelines to be provided by Declarant and in accordance with all applicable federal, state and local laws and regulations. At all times, the Commercial Signage Guidelines shall preserve the right of each Commercial Owner to place reasonable identification and other commercial signs in or on such Commercial Condominium consistent with the permitted commercial use of the Commercial Condominium. So long as Declarant owns any interest in the Project, the Commercial Signage Guidelines may be modified or amended only by Declarant and at least seventy-five percent (75%) of the Owners of the Commercial Condominiums. When Declarant no longer owns any interest in the Project, the Commercial Signage Guidelines may be modified or amended by the Board and at least seventy-five percent (75%) of the Owners of the Commercial Condominiums, provided that any modification by the Board does not apply to signs existing at the time of any such modification. So long as Declarant owns any interest in the Project, all identification and other retail signs for Commercial Condominiums (and any changes thereto) are subject to the prior written approval of Declarant.

      7.2.7   **Alarms**. Any alarm installed in a Commercial Unit by a Commercial Owner shall be the type of alarm which is monitored by a certified alarm company.

### 7.3 USE RESTRICTIONS APPLICABLE TO RESIDENTIAL AND COMMERCIAL CONDOMINIUMS.

7.3.1 **Installations**. This Section does not apply to Improvements installed by Declarant.

(a) **Outside Installations**. The following items are prohibited: (i) outside installations (except as installed by Declarant), (ii) Improvements to deck or balcony railings, and (iii) other exterior additions or alterations to any Unit unless installed by Declarant.

(b) **Inside Installations**. Nothing may be done in any Condominium or in, on or to the Common Area or the Association Property which may impair the structural integrity of the Building in the Project or which structurally alters the Building except as otherwise expressly approved by the Architectural Committee. In addition to the foregoing, no Owner shall cut, drill, demolish, strip or otherwise repair, change, modify or alter any portion of the Project which contains a Hazardous Materials Location without first complying with the procedures set forth in **Section 9.6.1** of this Declaration.

(c) **Vibrations**. No Owner shall attach to the walls or ceilings of any Condominium any fixtures or equipment which will cause vibrations or noise or unreasonable annoyance to the Owners of the other Condominiums or to the Common Area or Association Property.

(d) **Water Supply System**. No individual water supply, sewage disposal or water softener system is permitted in any Condominium unless such system is designed, located, constructed and equipped in accordance with the requirements, standards, and recommendations of any water district having jurisdiction, the City, Architectural Committee, and all other governmental authorities with jurisdiction.

(e) **Awnings, Etc**. No awnings, ornamental screens, screen doors, sunshades, or umbrellas of any nature shall be erected or maintained on or around any portion of any structure or elsewhere within the Project except those that are installed in accordance with the original construction of the Project or as are authorized and approved by the Architectural Committee.

(f) **Exterior Lighting**. Any exterior electrical, gas or other artificial lighting installed on any Unit shall be positioned, screened, or otherwise directed or situated and of such controlled focus and intensity so as not to unreasonably disturb the residents of any other Units. No exterior lighting shall be installed other than the lighting initially installed by Declarant. Further rules regarding exterior lighting may be promulgated by the Board.

(g) **Antenna and Satellite Dishes**. No Owner shall install any antenna, satellite dish, or other over-the-air receiving device ("Antenna") (i) on any real property which such Owner is not entitled to exclusively use or control, as provided in Title 47 U.S.C. §§ 1 et seq., 47 CFR § 1.4000 and any other applicable laws, rules and decisions promulgated with respect thereto ("collectively "Antenna Laws"), (ii) in a particular location if, in the Board's opinion, the installation, location or maintenance of such Antenna unreasonably affects the safety of the Owners or any other Person, or for any other safety-related reason established by the

**16883**

Board, or (iii) that is of a size larger than is permitted under the Antenna Laws. If an Owner is entitled to install an Antenna under the foregoing requirements, such Owner shall provide the Board with written notice that such Owner has installed or is about to install the Antenna. If an Owner desires to install an Antenna, other than as described in (i) through (iii) above, such Owner may do so only upon the prior approval of the Board pursuant to **Article 9**. The Board shall not impose or enforce any restrictions upon Antennae that are inconsistent with the Antenna Laws.

(h)     **Structural Alterations**. Except as permitted under **Section 9.6** of this Declaration or other provisions of this Declaration, no structural alterations to the interior of or Common Area surrounding any Unit shall be made and no plumbing, electrical or other work which would result in the penetration of the unfinished surfaces of the ceilings, walls or floors shall be performed by any Owner without the prior written consent of the Architectural Committee and, if required under **Section 9.6**, the Declarant. An Owner who acquires fee title to two (2) or more adjoining Residential Units, may be permitted to remove the demising wall dividing the two (2) or more Residential Units, so long as the Owner has complied with the requirements and obtained the approvals required under **Article 9** of this Declaration.

(i)     **Mechanics Liens**. No Owner may cause or permit any mechanic's lien to be filed against the Project for labor or materials alleged to have been furnished or delivered to the Project or any Condominium for such Owner, and any Owner who does so shall immediately cause the lien to be discharged within five (5) days after notice to the Owner from the Board. If any Owner fails to remove such mechanic's lien, the Board may, discharge the lien and charge the Owner a Special Assessment for such cost of discharge.

(j)     **Concrete Walls or Slabs**. Notwithstanding anything contained herein to the contrary, no Owner shall drill, penetrate or otherwise tamper with the concrete or other structural components of the Project, including the Exclusive Use Common Area. By accepting a grant deed to a Condominium in the Project, each Owner specifically covenants and agrees that: (1) such Owner shall not cut into or otherwise tamper with the concrete walls or slab; (2) such Owner shall not knowingly permit or allow any person to cut into or tamper with the concrete walls or slabs so long as such Owner owns any interest in the Condominium; and (3) such Owner shall indemnify, protect, defend and hold Declarant and its respective officers, employees, contractors and consultants, free and harmless from and against any and all claims, damages, losses, or other liability (including, without limitation, attorneys' fees) arising from any breach of this Section.

7.3.2   **Drainage**. There shall be no interference with the established drainage pattern over the Property, unless an adequate alternative provision is made for proper drainage and the prior written approval of the Architectural Committee is obtained. For the purpose hereof, "established drainage" means the drainage which exists at the time of the first Close of Escrow for a Residential Unit, or that which is shown on any plans approved by the Board. Each Owner shall have the duty and obligation to maintain the drainage situated within any Exclusive Use Common Area free of debris and any other material which may impede the flow of water and to clean such drainage, as may be necessary. No Owner shall dispose of any Hazardous Materials in any drains. If an Owner fails to maintain such drainage and, as a result, imminent danger or damage to person or property may result to other Owners, then the Association shall

**16884**

have the right of access onto such area for the purpose of clearing debris and other material so as to not impede the flow of water. The Owner shall reimburse the Association for any costs and expenses incurred in clearing such debris and/or restoring such drainage patterns. The Association shall, after giving reasonable notice, have the right to enter any Exclusive Use Common Area to conduct a cleaning of and to inspect the established system of drainage located thereon.

### 7.3.3   Parking and Vehicular Restrictions.

(a)   **Authorized Vehicles**. The following vehicles are Authorized Vehicles: motorized land vehicles designed and used primarily for non-commercial passenger transport, such as automobiles, passenger vans designed to accommodate ten (10) or fewer people, two-wheel motorcycles, and pick-up trucks having a manufacturer's rating or payload capacity of one (1) ton or less. Subject to **Section 7.3.3(c)** below, Authorized Vehicles may be parked in the parking areas in the Property intended for parking of motorized vehicles.

(b)   **Prohibited Vehicles**. The following vehicles are Prohibited Vehicles: recreational vehicles (e.g., motor homes, travel trailers, camper vans, boats, dune buggies, etc.), commercial-type vehicles (e.g., stake bed trucks, tank trucks, dump trucks, step vans, concrete trucks, trucks with any exterior commercial advertisement, or other similar vehicles), buses or vans designed to accommodate more than ten (10) people, vehicles having more than two (2) axles, trailers, inoperable vehicles or parts of vehicles, aircraft, other similar vehicles or any vehicle or vehicular equipment deemed a nuisance by the Board. Prohibited Vehicles shall not be parked, stored or kept in any parking areas in the Property.

(c)   **General Restrictions**. All Authorized Vehicles owned or operated by or within the control of an Owner and kept within the Property shall be parked in that Owner's Assigned Parking Space. No vehicle shall be parked in any Parking Space if such vehicle does not completely and clearly fit between the painted parking lines designated for an Assigned Parking Space or otherwise physically fit wholly within the designated space or any other portion of the parking areas in the Property designed for ingress and egress of vehicles. There shall be no parking in the Property that obstructs free traffic flow, constitutes a nuisance, violates the Association Rules, or otherwise creates a safety hazard. The parking areas in the Property shall be used for parking Authorized Vehicles only and shall not be used for storage, living, recreational or business purposes (except for storage in authorized Storage Spaces). No maintenance, repair, restoration, or construction of any vehicle shall be conducted on the Property.

(d)   **Lease of Parking Space**. The Owner of a Condominium may lease to other Owners in the Project the Assigned Parking Space(s) which is a part of his or her Condominium, subject to all the requirements of this Declaration and the Project Handbook. The Owner of a Condominium may not lease an Assigned Parking Space to any Person who is not also an Owner of a Condominium in the Project. The conveyance of the Condominium by an Owner shall terminate the lease of a Parking Space. Rental of an Assigned Parking Space shall not give to any lessee the right to vote or any other rights of membership in the Association.

(e)    **Parking Regulations**. Subject to the rights of Declarant to control the Parking Spaces which have not been assigned by Declarant, the Board may establish additional regulations as it deems appropriate in its sole discretion with regard to any of the parking areas not assigned to individual Units, including, without limitation, designating "residential guest parking", "commercial parking," "parking," and "no parking" areas thereon. Any parking areas shall be subject to such further reasonable control and use limitations as the Board may establish. The Board shall determine, in its discretion, whether there is a violation of the parking and vehicular restrictions set forth in this Declaration or established by the Board, and, if such noncompliance is determined by the Board to exist, the Board shall have the power to enforce all parking and vehicle use regulations applicable to the Property, including the power to remove violating vehicles from any of the Property pursuant to California Vehicle Code Section 22658.2 or other applicable statute.

(f)    The terms of **Subsections (a) through (e) of 7.3.3** shall not apply to Declarant.

7.3.4    **Access Restrictions**. Owners and Invitees, shall not at any time or for any reason whatsoever enter upon or attempt to enter upon (i) the roof of the Project (provided that this subsection shall not apply to the Commercial Owners), (ii) any portion of the Common Area used by the Association for management, administrative, or other purposes; and (iii) utility closets and rooms, without the prior approval of the Board.

7.3.5    **Window Cleaning**. Each Owner will cooperate with the Association to provide access to the Association to clean such windows which are the responsibility of the Association to clean. The Association shall provide reasonable advance notice to the Owners and shall be responsible for any damage to the Unit resulting from such entry.

7.3.6    **Trash Disposal**. No garbage, trash, rubbish, or other waste material shall be kept or permitted on the Project except in garbage cans, trash containers, trash chutes, or other waste receptacles located on the Project provided for the use of all Owners. All trash must be bagged or otherwise sealed before using any trash chute located in the Project. No odor shall emanate therefrom so as to be unreasonably unsanitary, unsightly, offensive or detrimental to the Owners in the Project. Under no circumstances may explosives, fireworks, or highly flammable materials such as gasoline, kerosene, oil, oil-based paints, or solvents, be disposed of in the trash chutes or anywhere else in the Project. Any and all costs incurred by the Association for the removal of combustible or toxic materials from the trash chutes shall be borne by the offending Owner at such Owner's sole cost and expense.

7.3.7    **Offensive Conduct; Nuisances**. No noxious or offensive activities, shall be conducted within the Project. Nothing shall be done on or within the Project that may be or may become a nuisance to the residents of the Project. No odorous matters shall be emitted upon or about the Project in such quantity as to be readily detectable outside the physical boundaries of the space within which such odor was generated.

7.3.8    **Toxic or Noxious Matter**. No person shall discharge into the Project's sewer system, storm drain or any Hazardous Materials, toxic or noxious matter in such concentrations as to be detrimental to or endanger the public health, safety, welfare, violate any

16886

law, subject any Owner to liability under state and federal law for any clean-up or cause injury or damage to neighboring property or business elsewhere on the Project.

7.3.9   **Air Pollution**.  No air pollutants or contaminants sufficient to create a nuisance shall be discharged, and no processes which by their nature are likely to cause air pollution shall be undertaken or permitted unless there is available an adequate, economically feasible method of controlling the omission or contaminates, and such controls are applied by the Board.

7.3.10  **Compliance With Laws, Etc**.  Nothing shall be done or kept in any Unit or in the Common Area or the Association Property that might increase the rate of, or cause the cancellation of, insurance for the Project, or any portion of the Project.  No Owner shall permit anything to be done or kept in his or her Condominium that violates any law, ordinance, statute, rule or regulation of any local, county, state or federal body, including any laws, ordinances or statutes pertaining to the use or storage of any hazardous, contaminated or toxic materials.  No Owner shall allow furniture, furnishings, or other personalty belonging to such Owner to remain within any portion of the Common Area or the Association Property except portions subject to Exclusive Use Easements appurtenant to such Owner's Condominium and except as may otherwise be permitted by the Board or the Project Handbook.

7.3.11  **Indemnification**.  Upon demand by the Association, each Owner shall be responsible for the payment of any deductible amount payable under the Association's insurance policy as a result of any claims arising as a result of the negligent or willful misconduct of such Owner or the Owner's Invitees.

## ARTICLE 8
## MAINTENANCE

8.1   **MAINTENANCE OBLIGATIONS OF OWNERS**.  Each Owner is responsible for the care and maintenance of those components of each Owner's Unit and Exclusive Use Common Area designated for maintenance by the Owner on the Maintenance Responsibility Chart.

8.1.1   **Quality of Maintenance**.  All such maintenance shall be performed in such a manner as shall be deemed necessary in the judgment of the Board to preserve the attractive appearance thereof, protect the value thereof and in compliance with all requirements of the Warranty and Maintenance Manual, the Maintenance Obligations in this Article, and the Maintenance Responsibility Chart.  Any such maintenance, repair or replacement of any of the foregoing which is visible from outside of a Unit shall be consistent with the existing design, aesthetics and architecture of the Project and shall be approved by the Board, as provided in **Article 9** of this Declaration.

8.1.2   **Standards of Maintenance**.    Any such maintenance, repair or replacement of any of the foregoing shall be in accordance with the obligations and schedules set forth in the Warranty and Maintenance Manual.  Any maintenance, repair or replacement which is visible from outside of a Unit shall also be in conformance with the existing design, aesthetics and architecture of the Project and shall be approved by the Board.  Maintenance of any

16887

Exclusive Use Common Areas by an Owner shall be conducted in such a manner as shall be deemed necessary in the judgment of the Board to preserve the attractive appearance thereof, protect the value thereof and to maintain the established system of drainage (as described below).

8.1.3   **Compliance with Maintenance Obligations**. Each Owner acknowledges and agrees that each Owner is required to comply with all of the Maintenance Obligations and schedules set forth in the Warranty and Maintenance Manual and each Owner is further obligated to provide a copy of all documents describing Maintenance Obligations to any successor purchaser of such Owner's Condominium.

8.1.4   **Owner's Failure to Maintain**.  If an Owner fails to maintain the areas and items as provided above or make repairs thereto in such manner as shall be deemed necessary in the judgment of the Board to preserve the attractive appearance thereof and protect the value thereof, the Board shall give written notice to such Owner, stating with particularity the work of maintenance or repair which the Board finds to be required and requesting that the same be carried out within a period of thirty (30) days from the giving of such notice.  If the Owner fails to carry out such maintenance or repair within the period specified by the notice, the Board shall cause such work to be completed and shall assess the cost thereof to such Owner as an Enforcement Assessment in accordance with the procedures set forth in this Declaration.

8.2   **MAINTENANCE OBLIGATIONS OF COMMERCIAL OWNERS**.

8.2.1   **Maintenance of Commercial Condominiums**. Each Commercial Owner is responsible for the care and components of the Commercial Condominium designated for maintenance by the Commercial Owner on the Maintenance Responsibility Chart.

8.2.2   **Commercial Owner's Compliance with Maintenance Obligations**. Each Commercial Owner will comply with the Maintenance Obligations and each Commercial Owner is further obligated to provide a copy of the Warranty and Maintenance Manual and any documents describing the Maintenance Obligations to any successor purchaser of a Commercial Condominium.

8.3   **MAINTENANCE OBLIGATIONS OF ASSOCIATION**.  The Association is responsible for the care and maintenance of those components of the Project designated for maintenance by the Association on the Maintenance Responsibility Chart in accordance with the Maintenance Obligations.  The Association shall keep such portions of the Project in good condition and repair, provide for all necessary services and cause all acts to be done which may be necessary or proper to assure the maintenance of such areas.  The Association shall also be responsible for maintaining any Improvements that a majority of the Voting Power of the Association designates for maintenance by the Association.  All costs of maintenance, repairs and replacements for the Property and shall be paid for as Common Expenses as provided in this Declaration.

8.3.1   **Termite Eradication**.  The Association shall be responsible for the repair and maintenance of the Common Area and Association Property occasioned by the presence of wood-destroying pests or organisms.  The Association may cause the temporary, summary removal of any occupant of the Project for such periods and at such times as may be necessary

for prompt, effective treatment of wood-destroying pests or organisms. The costs of temporary relocation during the repair and maintenance by the Association shall be borne by the affected Owners and not the Association. The Association shall give notice of the need to temporarily vacate a Unit to the occupants and to the Owner, not less than fifteen (15) days nor more than thirty (30) days prior to the date of the temporary relocation, the date and time of the beginning of treatment, the anticipated date and time of termination of treatment, and that the occupants will be responsible for their own accommodations during the temporary relocation. Notice by the Association shall be deemed complete upon either:

        (a)    personal delivery of a copy of the notice to the occupants, and sending a copy of the notice to the Owner, if different than the occupants, by first-class mail, postage pre-paid at the most current address shown on the books of the Association, or

        (b)    by sending a copy of the notice to the occupants at the Unit address and a copy of the notice to the Owner, if different than the occupants, by first-class mail, postage prepaid at the most current address shown on the books of the Association.

        8.3.2  **Association's Compliance with Maintenance Obligations**. The Association will comply with the Maintenance Obligations for the Association Property, Common Area and any other areas to be maintained by the Association in accordance with the requirements of the Association Maintenance Manual and the Maintenance Responsibility Chart.

        8.3.3  **Damage by Owners**. Each Owner is liable to the Association for any damage to the Project if the damage is sustained due to the act of an Owner, or such Owner's guests, tenants or invitees, or any other persons deriving their right to use the Project from the Owner, or such Owner's respective family, tenants and guests. The Association may, after Notice and Hearing, (a) determine whether any claim shall be made on the Association's insurance, and (b) levy an Enforcement Assessment equal to the cost of repairing the damage or any deductible paid and the increase, if any, in insurance premiums directly attributable to the damage caused by such Owner or the person for whom such Owner may be liable as described in this Declaration. If a Condominium is jointly owned, the liability of its Owners is joint and several, except to the extent that the Association has previously contracted in writing with the joint owners to the contrary. After Notice and Hearing, the cost of correcting the damage shall be an Enforcement Assessment against such Owner.

        8.4    **HISTORICAL LANDMARK**. A portion of the exterior of the Building was designated as City of San Diego Historical Landmark #354 on March 25, 1998 due to its significant example of Neoclassical and Art Decco (with Spanish and Moorish influences) and its significance as the main power plant for San Diego Gas and Electric Company during the period 1911 through the 1950s. Such designation was in accordance with the City of San Diego Municipal Code ("SDMC") is subject to the jurisdiction of the City Historical Resources Board, all provisions of the SDMC pertaining to designated historical resources and the California Environmental Quality Act ("CEQA"). Any alterations or improvements to the historical facades of the building will be subject to the Historical Resources Board, the Center City Development Corporation (or its successor) and the City staff responsible for enforcing CEQA. The Association must not make any changes to the facades of the Building without obtaining the

**16889**

necessary approvals from the appropriate governmental agency. The Secretary of the Interior's Standards for rehabilitation are as follows:

(a)     A property will be used as it was historically or will be given a new use that requires minimal change to its distinctive materials, features, spaces and spatial relationships.

(b)     The historical character of a property will be retained and preserved. The removal of distinctive materials or alterations of features, spaces and spatial relationships that characterize a property will be avoided.

(c)     Each property will be recognized as a physical record of its time, place and use. Changes that create a false sense of historical development, such as adding conjectural features or elements from other historical properties, will not be undertaken.

(d)     Changes to a property that have acquired historical significance in their own right will be retained and preserved.

(e)     Distinctive materials, features, finishes and construction techniques or examples of craftsmanship that characterize a property will be preserved.

(f)     Deteriorated historical features will be repaired rather than replaced. Where the severity of deterioration requires replacement of a distinctive feature, the new feature will match the old in design, color, texture, and where possible, materials. Replacement of missing features will be substantiated by documentary and physical evidence.

(g)     Chemical or physical treatments, if appropriate, will be undertaken using the gentlest means possible. Treatments that cause damage to historical materials will not use used.

(h)     Archaeological resources will be protected and preserved in place. If such resources must be disturbed, mitigation measures will be undertaken.

(i)     New additions, exterior alterations or related new construction will not destroy historical materials, features and spatial relationships that characterize the property. The new work shall be differentiated from the old and will be compatible with the historical materials, features, size, scale and proportion, and massing to protect the integrity of the property and its environment.

8.5     **FUTURE CONSTRUCTION**. Nothing in this Declaration shall limit the right of Declarant to complete construction of Improvements to the Common Area and Association Property and to Condominiums owned by Declarant or to alter them or to construct additional Improvements as Declarant deems advisable before completion and sale of the entire Project.

8.6     **COMPLIANCE WITH REQUIREMENTS REGARDING PROJECT STORM WATER POLLUTION**. Water that enters a storm drain (such as the drains in the Exclusive Use Easement Areas and in the Parking Garage) flows directly, without any treatment, to waterways, creeks, streams, rivers, lakes and/or oceans. Accordingly, various Federal, State

16890

and City laws, regulations, policies and ordinances prohibit discharging anything other than natural rain water into storm drainage systems. No Owner, nor the Association, shall discharge any toxic chemicals or hydrocarbon compounds such as gasoline, motor oil, antifreeze, solvents, paints, paint thinners, detergents, pet waste, and other such materials and pollutants into the storm drain system. The disposal of such pollutants and materials into a storm drain system may result in significant penalties and fines and such Owner may be responsible for any activities by Owner's contractors (e.g., painters, etc.) who dispose of such pollutants from an Owner's Residential Unit or Exclusive Use Easement Area into a storm drain system.

8.6.1   **Storm Water Pollution Prevention Best Management Practices**. The City has required the Declarant to establish best management practices in connection with handling storm water pollution at the Project ("BMPs"). The Association shall comply with and perform all maintenance that may be imposed by any water quality management plan that may affect the Property. The costs of such maintenance by the Association, if any, shall be treated as Common Expenses.

8.6.2   **Liability to Declarant**. So long as Declarant owns any Condominium, if the Association is not in compliance with the provisions of this Section and, as a result, Declarant may incur any liability, Declarant shall have the right but not the obligation to enter upon the Project to correct such violation. If the Association violates the requirements of this Section, the Association shall indemnify, protect, defend and hold Declarant and Declarant's officers, directors, successors and assigns entirely free and harmless from and against any liabilities, penalties, costs, expenses and actions, including, without limitation, attorneys' fees and costs arising from or attributed to a violation of the provisions of this Section and shall within fifteen (15) days after request from Declarant, reimburse Declarant for any costs and expenses incurred by Declarant in correcting any violation of this Section.

8.7   **INSPECTIONS**. The Association shall regularly inspect, maintain and repair the Association Property, including without limitation, the landscaping, drainage and irrigation systems serving or within the Association Property. The Association shall comply with the requirements of the Association Maintenance Manual. The Association shall employ the services of such experts and consultants as are necessary to assist the Association in performing its duties hereunder and follow any recommendations contained in the Association Maintenance Manual. The inspections required to be conducted by the Board under this Article shall take place at least annually. The inspectors shall provide written reports of their inspections to the Association and, if requested by the Declarant, to the Declarant promptly following completion thereof. If requested by Declarant, Declarant shall be invited to attend any such inspections. The written reports shall identify any items of maintenance or repair which either require current action by the Association or will need further review and analysis. Such written reports shall specifically include a review of all irrigation and drainage systems on the Project. The Board shall report the contents of such written reports to Declarant (if not already provided by the inspector directly) so requested by Declarant and to the Members of the Association at the next meeting of the Members following receipt of such written reports or as soon thereafter as reasonably practicable and shall include such written reports in the minutes of the Association meeting. The Board shall promptly cause all matters identified as requiring attention to be maintained, repaired, or otherwise pursued in accordance with prudent business practices and the recommendations of the inspectors and shall keep a record of all such matters in the Board's

16891

minutes. Should such inspection require the inspection of any Exclusive Use Common Area, there is hereby created a non-exclusive easement in favor of the Association, and its officers, agents, employees and independent contractors, to conduct such inspections and to provide such maintenance, repair and replacement, provided that entrance is made at reasonable hours and with at least three (3) days advance notice to the Owner, except in case of emergency. Any damage to any structure, landscaping or other improvements caused by the Association, or any of its officers, agents, employees or independent contractors, while performing such maintenance, repair or replacement work shall be repaired by the Association at its sole cost and expense.

**ARTICLE 9**
**ARCHITECTURAL REVIEW**

9.1   **ARCHITECTURAL COMMITTEE APPROVAL**.  Each Owner, other than Declarant, shall obtain the approval of the Architectural Committee for any Improvements in accordance with the provisions set forth below.

9.2   **ORGANIZATION**.  There shall be an Architectural Committee consisting of three (3) persons.  There shall also be one (1) alternate member who may be designated by the Architectural Committee to act as a substitute on the Architectural Committee in the event of absence or disability of any member.  The members of the Architectural Committee shall be appointed as provided in **Section 9.3** below.

9.3   **DESIGNATION OF MEMBERS AND TERMS OF OFFICE**.

9.3.1   **Initial Members**.  The initial members of the Architectural Committee shall be appointed by Declarant prior to the conveyance of the first Condominium to a member of the public.  Such designation shall be reflected in the minutes of the Association.  Declarant shall designate one member to serve a term of one (1) year; one member to serve a term of (2) years and one member to serve a term of three (3) years from the date of appointment.  After the date Declarant no longer owns any Condominiums in the Project, one (1) member of the Architectural Committee shall be appointed by the Owners of the Commercial Condominium and the other two (2) members shall be appointed by the Owners of the Residential Condominiums, except that if the Owners of the Commercial Condominiums elect not to appoint a member of the Architectural Committee, all of the members of the Architectural Committee shall be selected by the Residential Owners.  The alternate member shall serve a term of three (3) years.  Each of said Architectural Committee members shall serve the length of said terms specified unless they have resigned or have been removed from office.  Thereafter, the terms of all Architectural Committee members shall be three (3) years.  Any new member appointed to replace a member who has resigned or been removed shall serve such member's unexpired term.

9.3.2   **Appointment and Removal**.  Until the date which is ten (10) years after the conveyance of the last Unit within the Project to an Owner , under authority of a Public Report, the right to appoint and remove all Architectural Committee members and alternate members shall be, and is hereby, vested solely in Declarant unless prior to said time Declarant waives its rights hereunder by notice to the Association; provided, however, that after one (1) year from the issuance of the Public Report, the Board shall have the right to appoint one (1) member to the Architectural Committee.  When Declarant waives or no longer has the right

16892

to appoint and remove the members of the Architectural Committee, said right shall be vested solely in the Board. The Board, in selecting members for the Architectural Committee shall endeavor to appoint individuals who have sufficient expertise to evaluate the effect of any Improvements on the architectural design and structural integrity of the Project. The appointment and removal of Architectural Committee members shall be specified in the minutes of the Association.

9.3.3 **Resignations**. Any member or alternate member of the Architectural Committee may at any time resign from the Architectural Committee upon written notice delivered to Declarant or to the Board, whichever then has the right to appoint Architectural Committee members.

9.3.4 **Vacancies**. Vacancies on the Architectural Committee, however caused, shall be filled by the Declarant or the Board, whichever then has the power to appoint Architectural Committee members.

9.4 **DUTIES**. The Architectural Committee shall consider and act upon such proposals or plans submitted to it pursuant to the terms of this **Article 9**. In making its decisions hereunder, the Architectural Committee shall, among other matters, consider the following: (a) whether the proposed Improvements will impair the structural integrity of the Project, (b) whether the proposed Improvements will adversely impact or increase the costs of operating the heating, ventilating and air conditioning system or the plumbing, electrical or mechanical systems, or (c) whether the proposed Improvements will adversely impact the sound insulation or sound transmissions within the Project.

9.5 **MEETINGS**. The Architectural Committee shall meet from time to time as necessary to properly perform its duties hereunder. The vote or written consent of any two (2) members of the Architectural Committee shall constitute an act by the Architectural Committee unless the unanimous decision of its members is otherwise required by this Declaration. The Architectural Committee shall keep and maintain a record of all actions taken by it at such meeting or otherwise.

9.6 **SCOPE OF ARCHITECTURAL REVIEW**. No Improvements of any kind whatsoever shall be commenced, erected, placed or altered upon or around any Unit or any Exclusive Use Common Area until the Owner has submitted complete plans and specifications showing the nature, kind, shape, height and materials, including the color and any other requirements set forth in the Architectural Guidelines ("Plans and Specifications"), have been submitted to and approved in writing by the Architectural Committee as provided herein. The Architectural Committee shall not approve any Plans and Specifications without first submitting such Plans and Specifications to an architect, landscape architect, engineer or other consultants as deemed appropriate in the determination of the Architectural Committee based on the nature of the proposed Improvements (collectively the "Outside Consultant"), which Outside Consultant is duly qualified and licensed in the State of California and has no current financial or ownership interest in the Project for review and comment at each stage of approval by the Architectural Committee described herein. The determination of the Architectural Committee as to the Outside Consultants shall be deemed to be final. All fees, costs and expenses associated with retaining the Outside Consultant shall be borne by the submitting Owner as provided in

16893

Section 9.12 hereof.  In addition, any alteration, modification or removal of any Designated Exclusive Use Common Area Walls or Floors or other work involving the penetration of the unfinished surfaces of the ceilings, walls or floors shall, for a period of ten (10) years after the date a certificate of occupancy is issued for the last Unit in the Project, require the prior written consent of the Declarant unless Declarant has notified the Association, in writing, that it (i) waives its consent to the particular work of Improvement or (ii) no longer desires to exercise such right of review and approval for any future works of Improvement.  In this case, the Architectural Committee shall not grant approval unless an Outside Consultant consisting of both an architect and structural engineer licensed in the State of California has approved the Plans and Specifications for such Improvements.  In addition, so long as the removal of a demising wall or floor between two (2) or more adjoining Units which are owned by one (1) Owner does not adversely impact the structural integrity of the Project, and the Plans and Specifications are otherwise in conformance with the requirements of this Declaration and the Architectural Guidelines, and, if required above, the consent of the Declarant and a licensed architect and structural engineer retained by the Architectural Committee as provided above has been obtained with respect to the removal of the demising wall or floor, approval may be granted by the Architectural Committee.

      9.6.1  **Hazardous Materials Locations**.  Any cutting, drilling, stripping or other modification, alteration, repair (including painting or removal of paint), removal or other disruption of any Hazardous Materials Location within either an Owner's Residential Unit or the surrounding Common Area shall, for a period of ten (10) years after the date that a certificate of occupancy is issued for the last Residential Unit in the Project, require the prior written consent of the Declarant unless the Declarant has notified the Association, in writing, that it (i) waives its consent to the particular work of Improvement or (ii) no longer desires to exercise such right of review and approval for any future works of Improvement and shall further obtain the approval of the Architectural Committee as provided herein.  The Architectural Committee shall not grant approval of any such work unless a Qualified Environmental Consultant selected or approved in writing by the Architectural Committee has provided a work plan specifying procedures to properly remove such material without exposure to people.  Any hazardous materials removed by Owner during an Improvement project shall be properly managed and disposed of off the Project.  All recommendations and requirements set forth in the work plan shall be complied with by such Owner, which must be confirmed in writing to the Architectural Committee by a follow-up inspection report to be completed by the Qualified Environmental Consultant.  All fees, costs and expenses associated with retaining the Qualified Environmental Consultant shall be borne by the submitting Owner as provided herein.  The determination of the Architectural Committee shall be reviewed by the Board and if acceptable to the Board shall be deemed to be final.  Each Owner shall be absolutely liable to and shall protect, defend, hold harmless and indemnify each other Owner and the Association and its officers, directors, employees and agents with respect to any damages, liabilities, costs or expenses arising out of the release and/or disposal of any hazardous materials by such Owner in completing a work of Improvement, whether or not such Owner complied with the foregoing requirements.

    9.7  **ARCHITECTURAL GUIDELINES**.  The Board may, from time to time, adopt, amend and repeal, by unanimous vote, architectural standards and procedures for review and approval of Plans and Specifications to be known as "Architectural Guidelines to ensure that the proposed plans and Improvements delineated therein are in conformance with and are

harmonious with the exterior design and existing materials within the Project."   The Architectural Guidelines adopted shall include guidelines applicable to the Units and guidelines applicable to the Commercial Units.  The Architectural Guidelines can be amended, changed, or modified from time to time by the Board without a vote of the Members, however, the Board must, so long as Declarant owns any Units,  obtain the Declarant's written consent to such amendment, change or modification.  Notwithstanding anything to the contrary set forth herein, in no event shall the Association make any modifications to the guidelines applicable to the Commercial Units without the prior consent of both of the Owners of the Commercial Units.

9.7.1   **Time Limitations**.  The Architectural Guidelines shall set forth the periods for review and approval of plans.  The Architectural Guidelines may also set forth time limitations for the completion of any Improvements for which approval is required pursuant to the Architectural Guidelines.

9.7.2   **Procedures**.  The Architectural Guidelines may also set forth procedures for the submittal and/or review of plans by an Owner.  In the event of any inconsistency between the Architectural Guidelines and this **Article 9**, the Architectural Guidelines shall control.

9.7.3   **Other Limitations**.  The Architectural Guidelines may include such other limitations and restrictions as the Board in its reasonable discretion shall adopt including, without limitation, regulations of the following: construction, reconstruction, exterior addition, change or alteration to or the maintenance of any building, structure, wall or fence, including, without limitation, the nature, kind, shape, height, materials, exterior color and surface and location of any Unit, or other Improvements of any kind.

9.8   **APPEAL**.   If the Architectural Committee disapproves any Plans and Specifications submitted by an Owner pursuant to this Article, the party or parties making such submission may appeal in writing to the Board.  The Board must receive the written request not more than thirty (30) days following the final decision of the Architectural Committee.  Within thirty (30) days following receipt of the written request for appeal, the Board shall render its written decision.  The failure of the Board to render a decision within the thirty (30) day period shall be deemed a decision against the appellant.  The decision of the Board shall be binding and final.

9.9   **INSPECTION AND CORRECTION OF WORK**.  Inspection of work and correction of defects therein shall proceed as follows:

9.9.1   **Right of Inspection During Course of Construction**.  The Architectural Committee or its duly authorized representative may enter into any Residential Unit, from time to time, as provided below during the course of construction or installation of any Improvements for the purpose of inspecting such construction and/or installation.   If the Architectural Committee determines that such construction and/or installation is not being done in substantial compliance with the approved Plans and Specifications, it shall notify the Owner of such non-compliance.  The Architectural Committee may not enter into a Residential Unit without obtaining the prior permission of the Owner or occupant of such Residential Unit; provided, however, that such permission shall not be unreasonably withheld and shall be given for entry by

16895

the Architectural Committee during daylight hours within forty-eight (48) hours of the request for entry.

9.9.2   **Notice of Completion**.  Upon the completion of any Improvements for which approved Plans and Specifications are required under this Article, the Owner shall give written notice of completion thereof to the Architectural Committee.

9.9.3   **Inspection**.   Within thirty (30) days thereafter, the Architectural Committee, or its duly authorized representative, shall have the right to enter into the Residential Unit, as provided in **Section 9.9.1** above, to inspect such Improvements to determine whether it was constructed, reconstructed, altered or refinished to substantial compliance with the approved Plans and Specifications.  If the Architectural Committee finds that such Improvements are not in substantial compliance with the approved Plans and Specifications, it shall notify the Owner in writing of such non-compliance within such thirty (30) day period, specifying particulars of non-compliance, and shall require the Owner to remedy such non-compliance.

9.9.4   **Non-Compliance**.  If, upon the expiration of thirty (30) days from the date of notification of non-compliance, the Owner shall have failed to remedy such non-compliance, the Architectural Committee shall notify the Board in writing of such failure.  After affording such Owner Notice and Hearing, the Board shall determine whether there is a non-compliance, and if so, the nature thereof and the estimated cost of correcting or removing the same.  If non-compliance exists, the Board shall require the Owner to remedy or remove the same within a period of not more than thirty (30) days from the date of the Board ruling.  If the Owner does not comply with the Board ruling within such period or within any extension of such period as the Board, in its discretion, may grant, the Board, at its option, may either remove the non-complying Improvement or remedy the non-compliance and the Owner shall reimburse the Association for all expenses incurred in connection therewith upon demand.  If such expenses are not promptly repaid by the Owner to the Association, the Board shall levy an Enforcement Assessment against such Owner for reimbursement.

9.9.5   **Failure to Notify**.  If for any reason the Architectural Committee fails to notify the Owner of any non-compliance within sixty (60) days after receipt of the notice of completion from the Owner, the Improvements shall be deemed to be in accordance with said approved Plans and Specifications.

9.10   **GOVERNMENT REGULATIONS**.   If there is any conflict between the requirements or actions of the Architectural Committee and the mandatory regulations or ordinances of any governmental entity relating to the Property, the government regulations, ordinances or rules, to the extent that such regulations ordinances or rules are more restrictive, shall control and the Architectural Committee shall modify its requirements or actions to conform to the government regulation or ordinance, provided, however, that if the governmental rules and regulations are less restrictive, the provisions of this Declaration shall nonetheless apply.  The application by an Owner for review and approval by the Architectural Committee of any Plans and Specifications or other submittals by such Owner shall in no way be deemed to be satisfaction or compliance with any applicable statute or law, or governmental rule or regulation or public utility requirement (hereinafter collectively referred to as "Additional Requirements");

provided, however, if the Additional Requirements are less restrictive than the provisions of this Declaration, the provisions of this Declaration shall nonetheless apply.

9.11   **DILIGENCE IN CONSTRUCTION**.   Upon final approval of any Plans and Specifications, the Owner shall promptly commence construction of the Improvements and diligently pursue the same to completion.

9.12   **FEE FOR REVIEW**.   The Architectural Committee shall have the right to establish a fee for the review and approval of Plans and Specifications which must be submitted to the Architectural Committee pursuant to the provisions of this Article.   The Architectural Committee may also require an Owner to pay any fees, costs or expenses associated with the review and approval of the Owner's Plans and Specifications by an outside consultant or any costs associated with the review of the Plans and Specifications by any architect on the Architectural Committee.   The Architectural Committee shall have the right to hire any engineer or other consultant, the opinion of which the Architectural Committee deems necessary in connection with its review of any plans submitted by any Owner and such Owner shall be liable for payment of such engineer's and/or consultant's fee.

9.13   **COMPENSATION**.   The members of the Architectural Committee shall receive no compensation for services rendered, other than reimbursement by the Association for expenses incurred by them in the performance of their duties hereunder, unless the Association retains an Outside Consultant as a member of the Architectural Committee for the purpose of providing professional services, in which event reasonable compensation for such member shall be approved by the Board or may be required to be paid by an Owner pursuant to **Section 9.12** above.

9.14   **INTERPRETATION**.   All questions of interpretation or construction of any of the terms or conditions herein shall be resolved by the Architectural Committee, and its decision shall be final, binding and conclusive on all of the parties affected.

9.15   **WAIVER**.   The approval by the Architectural Committee of any Plans and Specification for any work done or proposed, or for any other matter requiring the approval of the Architectural Committee under this Declaration, shall not be deemed to constitute a waiver of any right to withhold approval of any similar Plans and Specifications or matter subsequently submitted for approval.

9.16   **ESTOPPEL CERTIFICATE**.   Within thirty (30) days after written demand is delivered to the Architectural Committee by any Owner, and upon payment to the Association of a reasonable fee (as fixed from time to time by the Association), the Architectural Committee shall record an estoppel certificate, executed by any two (2) of its members, certifying (with respect to any Unit of said Owner) that as of the date thereof, either: (a) all Improvements made and other work completed by said Owner comply with this Declaration, or (b) such Improvements or work do not so comply, in which event the certificate shall also identify the non-complying Improvements or work and set forth with particularity the basis of such non-compliance.   Any purchaser from the Owner, or from anyone deriving any interest in said Condominium through him, shall be entitled to rely on said certificate with respect to the matters

16897

therein set forth, such matters being conclusive as between the Association, Declarant and all Owners and such persons deriving any interest through them.

9.17  **LIABILITY**.  Neither the Board, Architectural Committee nor any member thereof shall be liable to the Association or to any Owner for any damage, loss or prejudice suffered or claimed on account of (a) the approval or disapproval of any plans, drawings and specifications, whether or not defective; (b) the construction or performance of any work, whether or not pursuant to approved plans, drawings, and specifications; (c) damage to the Project of any property within the Project; or (d) the execution and filing of an estoppel certificate pursuant to **Section 9.16**, whether or not the facts therein are correct- provided, however, that such Architectural Committee member has acted in good faith on the basis of such information as may be possessed by him.  Without in any way limiting the generality of the foregoing, the Architectural Committee, or any member thereof, may, but is not required to, consult with or hear the views of the Association or any Owner with respect to any proposal submitted to the Architectural Committee.

9.18  **NON-APPLICABILITY TO DECLARANT**.   The provisions of this Article shall not apply to any Improvements installed by the Declarant and neither the Board nor the Architectural Committee shall have any rights of review or approval with respect thereto.

9.19  **GOVERNMENT REQUIREMENTS**.  The application to and the review and approval by the Architectural Committee of any proposals, plans or other submittals shall in no way be deemed to be satisfaction of or compliance with any building permit process or any other governmental requirements, the responsibility for which shall lie solely with the respective Owner.

9.20  **AMENDMENTS**.  Notwithstanding the Article hereof entitled "Amendments," no amendment, verification or rescission of this Article may be made, nor shall Declarant, or any successor thereof, be prohibited from completing the construction of the Project prior to the later to occur of (a) the expiration of the right of Declarant, or its successor, to appoint members to the Architectural Committee or (b) the conveyance by Declarant, or its successor, of the last Unit in the Project except upon, (i) written consent of Declarant, and the (ii) recording of such consent in the Office of the County Recorder.   Such written consent shall not be required after the conveyance by Declarant (or its successors) of all of the Condominiums.

9.21  **VARIANCES**.  The Architectural Committee may authorize variances from compliance with any of the architectural provisions of this Declaration.  Such variances must be evidenced in writing, must be signed by at least two (2) members of the Architectural Committee.  If such variances are granted, no violation of the covenants, conditions and restrictions contained in this Declaration shall be deemed to have occurred with respect to the matter for which the variance was granted.  The granting of such a variance shall not operate to waive any of the terms and provisions of this Declaration for any purpose except as to the particular Unit and the particular provision hereof covered by the variance, nor shall it affect in anyway the Owner's obligation to comply with all governmental laws and regulations affecting its use of the Unit, including, without limitation, zoning ordinances or other requirements imposed by the City or any other governmental authority.

16898

9.22  **HISTORIC LANDMARK.**  Notwithstanding anything to the contrary set forth in this Declaration, the Board shall not make or approve any changes to the facades of the Building without obtaining the necessary approvals from the appropriate governmental agency as set forth in **Section 8.4** of this Declaration.

# ARTICLE 10
# DEVELOPMENT RIGHTS

10.1  **LIMITATIONS OF RESTRICTIONS.**  Declarant is undertaking the work of developing Units and other Improvements within the Project.  The completion of the development work and the marketing and sale, rental and other disposition of the Units is essential to the establishment and marketing of the Property as a first-class condominium community.  In order that the work may be completed, nothing in this Declaration shall be interpreted to deny Declarant the rights set forth in this Article.

10.2  **RIGHTS OF ACCESS AND COMPLETION OF CONSTRUCTION.**  Until the seventh (7th) anniversary of the original issuance of a Public Report for the Project, Declarant, its contractors and subcontractors shall have the rights set forth below.

10.2.1  **Access.**  Declarant, its contractors and subcontractors shall have the right to obtain reasonable access over and across the Common Area and Association Property of the Project or do within any Unit owned by it whatever is reasonably necessary or advisable in connection with the completion of the Project and the development, marketing and maintenance thereof.

10.2.2  **Construct Improvements.**  Declarant, its contractors and subcontractors shall have the right to erect, construct and maintain on the Common Area and the Association Property of the Project or within any Unit owned by it such structures or Improvements, including, without limitation, sales offices and signs, as may be reasonably necessary for the conduct of its business to complete the work, establish the Project as a residential community and dispose of the Project in parcels by sale, lease or otherwise, as determined by Declarant in its sole discretion.

10.2.3  **Grant Easements.**  Declarant, its contractors and subcontractors shall have the right to establish and/or grant over and across said Common Area and the Association Property such easements and rights of way on, over, under or across all or any part thereof to or for the benefit of the State of California, the City, the County or any other political subdivision or public organization, or any public utility entity or cable television provider, for the purpose of constructing, erecting, operating and maintaining Improvements thereon, therein or thereunder at that time or at any time in the future, including:  (i) roads, streets, walks, driveways, trails, parkways and park areas; (ii) poles, wires and conduits for transmission of electricity, providing telephone service and cable television service to the Project and for the necessary attachments in connection therewith; and (iii) public and private sewers, sewage disposal systems, storm water drains, land drains and pipes, water systems, sprinkling systems, water, heating and gas lines or pipes and any and all equipment in connection therewith.  The Common Area and the Association Property shall be subject to any dedication stated in any subdivision map, Condominium Plan for the Project of an easement for public use for installation, maintenance

16899

and operation of facilities for public utilities over all of the Common Area and the Association Property. Said public utilities easement shall inure and run to all franchised utility companies and to the City, the County and the State and shall include the right of ingress and egress over the Common Area and the Association Property by vehicles of the City, the County and the State and such utility companies to properly install, maintain, repair, replace and otherwise service such utility facilities. The grant of said public utility easement shall not be interpreted to imply any obligation or responsibility of any such utility company or the City, the County or the State for maintenance or operation of any of the Common Area and the Association Property or the facilities located thereon or the repair, replacement or reconstruction thereof except as occasioned by such utility companies or City or County of the Utility Facilities for which they are responsible. Except for lawful and proper fences, structures and facilities placed upon the Common Area and the Association Property by utility companies, the Common Area Association Property subject to the public utility easement shall be kept open and free from buildings and structures. The City and County furthermore are granted an easement across the Common Area/Association Property for ingress and egress for use by emergency vehicles of the City or County.

10.3  **SIZE AND APPEARANCE OF PROJECT**. Declarant shall not be prevented from increasing or decreasing the number of Units in the Project or from changing the exterior appearance of the Association Property structures, the landscaping or any other matter directly or indirectly connected with the Project in any manner deemed desirable by Declarant, if Declarant obtains governmental consents required by law.

10.4  **MARKETING RIGHTS**.

10.4.1  **General Rights**. Subject to the limitations of this Declaration, Declarant shall have the right to: (i) maintain model homes, sales offices, customer service offices, storage areas and related facilities in any unsold Units or Common Area and the Association Property within the Project as are necessary or reasonable, in the opinion of Declarant, for the sale or disposition of the Units; (ii) make reasonable use of the Common Area and the Association Property and facilities for the marketing of Units (including without limitation, granting rights of ingress and egress over the Association Property and the Common Areas to prospective purchasers and tenants in connection with such marketing activities; (iii) post signs, flags balloons, and banners and conduct such marketing activities as may be deemed necessary by Declarant for the marketing of the Condominiums; and (iv) conduct its business of disposing of Units by sale, lease or otherwise.

10.4.2  **Agreement for Extended Use**. If following the fifth (5th) anniversary of the original issuance of a Public Report, Declarant requires exclusive use of any portion of the Common Area and the Association Property for marketing purposes, Declarant may use the Common Area and the Association Property only if an agreement is entered into between Declarant and the Association. The agreement must specifically provide for a limited duration for such use and must provide for a specific reasonable rate of compensation to the Association by Declarant. Compensation shall be commensurate with the nature, extent and duration of the use proposed by Declarant. In no event, however, shall Declarant be denied the rights to use the Common Area and the Association Property and any Units owned by Declarant as an Owner.

16900

10.5   **TITLE RIGHTS**.   The rights of Declarant under this Declaration may be assigned to any successor(s) by an express assignment in a recorded instrument, including without limitation, a deed, option or lease.  This Declaration shall not be construed to limit the right of Declarant at any time prior to such an assignment to establish additional licenses, reservations and rights-of-way to itself, to utility companies, to the City, to the County, to the State, or to others as may be reasonably necessary to the proper development and disposal of property owned by Declarant.

10.6   **POWER OF ATTORNEY**.   Each Owner of a Condominium in the Project, by accepting a deed to a Condominium, shall be deemed to have constituted and irrevocably appointed Declarant, as his or her Attorney-in-Fact, for himself or herself and each of his or her Mortgagees, optionees, grantees, licensees, trustees, receivers, lessee, tenants, judgment creditors, heirs, legatees, devisees, administrators, executors, legal representatives, successors and assigns, whether voluntary or involuntary, and thereby to have conveyed a Power of Attorney coupled with an interest to Declarant as his or her Attorney-in-Fact to prepare, execute, acknowledge and record any Condominium Plan or amendment to the Condominium Plan for all or any portion of the Property regardless of whether Declarant owns any interest in the Property which is the subject of such Condominium Plan or amendment to such Condominium Plan. However, nothing set forth herein shall be deemed or construed as an agreement by Declarant that any Owner shall be entitled to any participation in or discretion over the preparation and recordation of a Condominium Plan or amendment to a Condominium Plan for all or any portion of the Property.  The acceptance or creation of any Mortgage or other encumbrance, whether or not voluntary, created in good faith, or given for value, shall be deemed to be accepted or created subject to each of the terms and conditions of the Power of Attorney described in this Section.

10.7   **AMENDMENT**.   The provisions of this Article may not be amended without the consent of Declarant until all of the Units in the Project owned by Declarant have been conveyed.

## ARTICLE 11
## INSURANCE

11.1   **LIABILITY INSURANCE**.   The Association shall obtain and maintain commercial general liability insurance (including coverage for medical payments) insuring the Association, the Board and the Architectural Committee, any manager, the Declarant and the Owners and occupants of Condominiums and their Invitees against any liability incident to the ownership or use of the Common Area and the Association Property and the performance by the Association if its duties under this Declaration.  Such policy shall include, if obtainable, a cross-liability or severability of interest endorsement insuring each insured against liability to each other insured.   The limits of such insurance shall not be less than Five Million Dollars ($5,000,000) and shall at all times be in conformance with the requirements of Section 1365.9 of the California Civil Code.  Such insurance shall cover all claims for death, personal injury and property damage arising out of a single occurrence.  Such insurance shall include coverage against water damage liability, property of others and any other liability or risk customarily covered with respect to projects similar in construction, location, and use.

**16901**

11.2   **PROPERTY INSURANCE.**  The Association shall keep (i) any Improvements within the Common Area and the Association Property to be maintained by the Association insured against loss by fire and the risks covered by a "Standard All-Risk of Loss or Perils" insurance policy under an extended coverage casualty policy in the amount of the maximum insurable replacement value thereof and (ii) all personal property owned by the Association insured with coverage in the maximum insurable fair market value of such personal property as determined annually by an insurance carrier selected by the Association.  Insurance proceeds for Improvements in the Common Area and the Association Property (excluding Units) and personal property owned by the Association shall be payable to the Association.  In the event of any loss, damage or destruction to the Common Area and the Association Property, the Association shall cause the same to be replaced, repaired or rebuilt in accordance with the provisions of this Declaration.

11.2.1   **Description of Policy Coverage.**  The policy shall cover the following real and personal property:

(a)   **Common Area and the Association Property.**  All Improvements within the Common Area, the Association Property and the Encroachment Areas including buildings and any additions or extensions thereto; all fixtures, machinery and equipment permanently affixed to the building and not located within a Residential Unit; lighting fixtures; exterior signs; personal property owned or maintained by the Association; but excluding land, foundations, excavations, and other items typically excluded from property insurance coverage;

(b)   **Residential Units.**  Interior walls and doors; ceiling, utility fixtures (including gas, electrical and plumbing); windows; cabinets; built-in appliances; heating and air-conditioning systems; water heaters, but excluding any personal property located in the Residential Unit or Exclusive Use Easement Area; and excluding any Improvements or upgrades to any of the foregoing installed by the Owner to the extent of any such Improvement or upgrade; and

(c)   **Landscaping.**  Lawn, trees, shrubs and plants located in the Common Area and the Association Property.

11.2.2   **Covered Cause of Loss.**  The policy shall provide coverage against losses caused by fire and all other hazards normally covered by a "special form" policy or its equivalent.

11.2.3   **Primary.**  The policy shall be primary and noncontributing with any other insurance policy covering the same loss.

11.2.4   **Endorsements.**  The policy shall contain the following endorsements or their equivalents:  agreed amount, boiler and machinery (to the extent applicable), inflation guard, ordinance or law, and replacement cost, and such other endorsements as the Board in its discretion shall elect.

11.2.5   **Waiver of Subrogation.**  Except as provided in **Section 7.3.10** of this Declaration, the Association waives all rights of subrogation between the Association and the

16902

Owners and their Invitees. All insurance policies obtained by the Association shall include a waiver of subrogation rights against any Owner and their Invitees; provided that a failure or inability of the Association to obtain such a waiver shall not defeat or impair the waiver of subrogation rights between the Association and the Owners and their Invitees set forth herein. Insurance proceeds for Improvements in the Common Area and Association Property and personalty owned by the Association shall be payable to the Association.

11.2.6 **Additional Insureds**. The policies shall name as insured the Association, the Owners, the Declarant, as long as Declarant is the Owner of any Condominium and/or has any rights under **Article 9** of this Declaration, the management company of the Association, if requested by the Association, and all Mortgagees as their respective interests may appear, and may contain a loss payable endorsement in favor of the Trustee (as defined below).

11.3 **INDIVIDUAL INSURANCE**. Each Owner shall maintain property insurance against losses to its Unit, personal property located within the Unit, Exclusive Use Common Areas, Assigned Parking Spaces and Assigned Storage Spaces and to any upgrades or Improvements located within the Unit and liability insurance against any liability resulting from the use or occupancy of the Owner's Unit, issued in the form of a California Condominium Owners policy of insurance typically issued to Owners in attached condominium communities with minimum limits of liability of One Million Dollars ($1,000,000.00). Such liability insurance shall cover all claims for death, personal injury and property damage arising out of a single occurrence. Such insurance shall include, to the extent available, coverage against water damage liability, property of others and any other liability or risks customarily covered by individual liability insurance. The Association shall have the right to require an Owner to provide evidence of such insurance coverage, and in such case, the Owner shall provide a certificate evidencing the insurance coverage from an insurer qualified to do business in the state of California within fifteen (15) days after request by the Association. The Association's insurance policies will not provide coverage against any of the foregoing. All Owners hereby waive all rights of subrogation against the Association, and any insurance maintained by an Owner must contain a waiver of subrogation rights by the insurer as to the Association provided, however, that a failure or inability of an Owner to obtain such a waiver shall not defeat or impair the waiver of subrogation rights between the Owners and the Association set forth herein. No Owner shall separately insure any property covered by the Association's property insurance policy as described above. If any Owner violates this provision and, as a result, there is a diminution in insurance proceeds otherwise payable to the Association, the Owner will be liable to the Association to the extent of the diminution. The Association may levy a reimbursement assessment against the Owner's Condominium to collect the amount of the diminution.

11.4 **FIDELITY BOND**. The Association shall maintain a fidelity bond in an amount equal to at least the estimated maximum of funds, including reserves, in the custody of the Association or a management agent at any given time during the term of the fidelity bond; provided, however, that the bond shall not be less than a sum equal to three (3) months aggregate of the Regular Assessments on all Units plus reserve funds of the annual assessments naming the Association as obligee and insuring against loss by reason of the acts of the Board, officers and employees of the Association, and any management agent and its employees, whether or not such persons are compensated for their services.

16903

11.5 **WORKER'S COMPENSATION INSURANCE**.   The Association shall maintain worker's compensation insurance to the extent necessary to comply with all applicable laws of the State of California or the regulations of any governmental body or authority having jurisdiction over the Project.

11.6 **DIRECTORS AND OFFICERS INSURANCE**.   The Association shall maintain a policy insuring the Association's officers and directors against liability for their negligent acts or omissions  while acting in their capacity as officers and directors. The limits of such insurance shall be not less than One Million Dollars ($1,000,000.00) for all claims arising out of a single occurrence or such other minimum amount which meets the requirements of California Civil Code Section 1365.7.

11.7 **OTHER INSURANCE**.  The Association shall maintain other types of insurance as the Board determines to be necessary to fully protect the interests of the Owners.

11.8 **COPIES OF POLICIES**.   Copies of all such insurance policies of the Association (or certificates thereof showing the premiums thereon to have been paid) shall be retained by the Association and open for inspection by Owners at reasonable times.  All such insurance policies shall (i) provide that they shall not be cancelable or substantially modified by the insurer without first giving at least ten (10) days' prior notice in writing to the Association, and (ii) contain a waiver of subrogation by the insurer(s) against the Association and First Mortgagees, Board and Owners. In addition to the foregoing, the Association shall provide such information regarding the insurance of the Association as may be required by applicable law or under the Bylaws.

11.9 **REVIEW OF INSURANCE**.   The Board shall review the adequacy of all insurance at least once every year.  The review shall include a replacement cost appraisal of all insurable Association Property Improvements without respect to depreciation.  The Board shall adjust and modify the policies to provide coverage and protection that is customarily carried by and reasonably available to prudent owners of similar property in the area in which the Project is situated.

11.10 **BOARD'S AUTHORITY TO REVISE INSURANCE COVERAGE**. Subject to the provisions of **Section 11.1** and the requirements regarding insurance set forth in the Bylaws, the Board shall have the power and right to deviate from the insurance requirements contained in this **Article 11** in any manner that the Board, in its reasonable business discretion, considers to be in the best interests of the Association.  If the Board elects to materially reduce the coverage from the coverage required in this **Article 11**, the Board shall make all reasonable efforts to notify the Members of the reduction in coverage and the reasons therefor at least thirty (30) days prior to the effective date of the reduction; provided, however, the Board shall not have the authority to reduce the amount of the liability insurance required under **Section 11.1** of this Declaration.  The Association, and its directors and officers, shall have no liability to any Owner or Mortgagee if, after a good faith effort, the Association is unable to obtain any insurance required hereunder because the insurance is no longer available, or, if available, the insurance can be obtained only at a cost that the Board, in its sole discretion, determines is unreasonable under the circumstances, or the Members fail to approve any assessment increase needed to fund the insurance premiums.

16904

11.11 **ADJUSTMENT OF LOSSES**. All insurance proceeds payable under **Sections 11.1** and **11.2**, subject to the rights of Mortgagees under **Article 14**, may be paid to a trustee (the "Trustee"), to be held and expended for the benefit of the Owners, Mortgagees and others, as their respective interests shall appear. The·Trustee shall be a commercial bank in the County that agrees in writing to accept such trust. If repair or reconstruction is authorized, the Board shall have the duty to contract for such work as provided for in this Declaration. The Board is appointed attorney-in-fact by each Owner, to negotiate and agree on the value and extent of any loss under any policy carried by the Association pursuant to **Sections 11.1** and **11.2**. The Board is granted full right and authority to compromise and settle any claim or enforce any claim by legal action or otherwise and to execute releases in favor of any insurer.

11.12 **DISTRIBUTION TO MORTGAGEES**. Any Mortgagee has the option to apply insurance proceeds payable directly to an Owner on account of a Condominium as provided in this Declaration in reduction of the obligation secured by the Mortgage of such Mortgagee.

11.13 **COMPLIANCE WITH FEDERAL REGULATIONS**. Notwithstanding any other provisions contained herein, the Association shall continuously maintain in effect such casualty, flood and liability insurance and a fidelity bond meeting the insurance and fidelity bond requirements for condominium projects established by the Federal National Mortgage Association ("FNMA"), the Government National Mortgage Association ("GNMA"), and the Federal Home Loan Mortgage Corporation ("FHLMC"), so long as any of the above is a Mortgagee or an Owner of a Condominium, except to the extent such coverage is not available or has been waived in writing by the FNMA, GNMA, and FHLMC as applicable. If the FNMA or FHLMC requirements conflict, the more stringent requirements shall be met.

## ARTICLE 12
## DESTRUCTION OF IMPROVEMENTS AND CONDEMNATION

12.1 **RESTORATION DEFINED**. As used in this **Article 12**, the term "restore" or "restoration" shall mean repairing, rebuilding or reconstructing damaged Improvements to substantially the same condition and appearance in which it existed prior to fire or other casualty damage.

12.2 **INSURED CASUALTY**. If any Improvement required to be maintained by the Association is damaged or destroyed from a risk covered by the insurance required to be maintained by the Association, then the Association shall, to the extent permitted under existing laws, restore the Improvement to the same condition as it was in immediately prior to the damage or destruction. The Association shall proceed with the filing and adjustment of all claims arising under the existing insurance policies. The insurance proceeds shall be paid to and held by the Association or an insurance trustee selected under the provisions of **Section 12.5**.

12.3 **RESTORATION PROCEEDS**.

12.3.1 **Sufficient Proceeds**. The costs of restoration of the damaged Improvement shall be paid first from any insurance proceeds paid to the Association under existing insurance policies. If the insurance proceeds exceed the costs of restoration, the excess

**16905**

proceeds shall be paid into reserves and held for the benefit of the Association. If the insurance proceeds are insufficient to restore the damaged Improvement, the Board shall then add to the insurance proceeds all reserve account funds designated for the repair or replacement of the damaged Improvement. If the total funds then available are sufficient to restore the damaged Improvement, the Improvement shall be restored. If the aggregate amount of insurance proceeds and such reserve account funds are insufficient to pay the total costs of restoration, a Special Assessment against all Owners shall be levied by the Board up to the maximum amount permitted without the approval of the Members in accordance with the limitations set forth in this Declaration and by law. If the total funds then available are sufficient to restore the damaged Improvement, the Improvement shall be restored.

12.3.2 **Insufficient Proceeds**. If the total funds available to the Association are still insufficient to restore the damaged Improvement, then the Board first shall attempt to impose an additional Special Assessment pursuant to Subsection (a) below; and second to use a plan of alternative reconstruction pursuant to Subsection (b) below. If the Members do not approve such actions, then the entire building of which the damaged Improvement is a part shall be sold pursuant to Subsection (c) below.

(a)     **Additional Special Assessment**. If the total funds available to restore the damaged Improvement as provided in **Section 12.3** are insufficient, then a meeting of the Members shall be called for the purpose of approving a Special Assessment to make up all or a part of the deficiency ("Additional Special Assessment"). If the amount of the additional Special Assessment approved by the Members and the amounts available pursuant to **Section 12.3.1** above, are insufficient to restore the damaged Improvement, or if no Additional Special Assessment is approved, the Association shall consider a plan of alternative reconstruction in accordance with Subsection (b).

(b)     **Alternative Reconstruction**. The Board shall consider and propose plans to reconstruct the damaged Improvement making use of whatever funds are available to it pursuant to **Section 12.3.2** and Subsection (a) above ("Alternative Reconstruction"). All proposals shall be presented to the Owners. If two-thirds of the Voting Power of the Owners whose Units were materially damaged, as determined by the Association ("Affected Owners") and a majority of the Voting Power of the Members, including the Affected Owners, agree to any plan of Alternative Reconstruction, then the Board shall contract for the reconstruction of the damaged Improvement in accordance with the plan of Alternative Reconstruction making use of whatever funds are then available to it. If no plan of Alternative Reconstruction is agreed to, then the provisions of Subsection (c) shall apply.

(c)     **Sale of Building**. If the damaged Improvement is part of a Building ("Damaged Building"), the damage renders one or more of the Condominiums uninhabitable, and the Improvements will not be restored in accordance with the provisions of Subsections (a), (b) and (c) above, the Board, as the attorney-in-fact for each Owner of a Condominium in the Damaged Building, shall be empowered to sell the Damaged Building, including all Units therein, in their then present condition, on terms to be determined by the Board, provided that the Board receives adequate assurances that the purchaser shall, and has the financial capability to:  (i) restore the Damaged Building (either by renovation or removal and rebuilding), (ii) remove the Damaged Building (including foundations), grade the Project, and

16906

appropriately landscape or otherwise improve the Project, or (iii) perform any combination of the foregoing. Any work to be performed by the purchaser with respect to any of the foregoing shall be subject to the provisions of **Article 12** and the provisions of this Declaration. In lieu of selling the Damaged Building to a third Person, the Association may purchase the Building on satisfaction of the following conditions:

        (i)     Members holding at least sixty-seven percent (67%) of the total Voting Power (including the votes allocated to the Condominiums within the Damaged Building) approve of the purchase;

        (ii)     the purchase price is the fair market value of the Damaged Building as of the date of sale as determined by an appraisal made by a qualified and independent real estate appraiser;

        (iii)     any special assessment needed to fund the purchase price shall be levied against all Condominiums, including the Condominiums within the Damaged Building;

        (iv)     the Association has an adequate source of funds to repair, renovate or rebuild all or a portion of the Damaged Building and/or to remove and appropriately landscape the remaining portions of the Project. For this purpose, no Condominium that is being purchased shall be subject to any assessment intended to be used as a source of such funds.

        (d)     **Distribution of Proceeds**. The proceeds from the sale, together with the insurance proceeds received and any reserve funds allocated to the Damaged Building, after deducting therefrom the Association's sale expenses, including commissions, title and recording fees, and legal costs, shall be distributed among the Owners of Condominiums in the Damaged Building and their respective Mortgagees, in proportion to the respective fair market values of these Condominiums immediately prior to the date of the event causing the damage as determined by an independent appraisal made by a qualified real estate appraiser selected by the Board.

        If a Damaged Building is removed and not restored so that the new building contains the same number of Condominiums as the removed building, the Board shall take appropriate steps to adjust the property interests of the remaining Condominium Owners and to effect such amendments as may be necessary to this Declaration, the Condominium Plan and the Final Map to reflect the revised property interests and other related changes.

        12.4    **REBUILDING CONTRACT**. If there is a determination to restore, the Board or its authorized representative shall obtain bids from at least two (2) licensed and reputable contractors and shall accept the restoration work from whomever the Board determines to be in the best interests of the Members. The Board shall have the authority to enter into a written contract with the contractor for such restoration, and the insurance proceeds shall be disbursed to the contractor according to the terms of the contract. The Board shall take all steps necessary to assure the commencement and completion of authorized restoration at the earliest possible date. Such construction shall be commenced no later than one hundred eighty (180) days after the event requiring restoration and shall thereafter be diligently prosecuted to completion. Such

**16907**

restoration shall return the Project to substantially the same condition and appearance in which it existed prior to the damage or destruction.

12.5 **AUTHORITY TO EFFECT CHANGES**. If any building or portion thereof containing Condominiums is damaged or destroyed or in need of renovation or rehabilitation and the building is repaired or reconstructed, the Building may be repaired or reconstructed in a manner that alters the boundaries of the Units or Common Area and Association Property provided the following conditions are satisfied.

(i)  the alteration has been approved by the Board, by Members holding a majority of the total Voting Power of the Association, by the holders of any First Mortgages to the extent required herein.

(ii)  the Board has determined that the alteration is necessary in order to comply with current building code requirements, to meet current building construction standards and procedures, or to improve the conditions and quality of the Building;

(iii)  the alteration does not materially change the location of any Unit or materially reduce the size of any Unit without the consent of the Owner and the holders of any First Mortgages thereon. For purposes herein, a material reduction in the size of the Unit shall mean any alteration that increases or decreases the square footage of the interior floor space of the Unit by more than 10% from the square footage as shown on the Condominium Plan;

(iv)  the Board has determined that any alteration that will relocate or reduce the Common Area and Association Property will not unreasonably interfere with the rights of the Owners and occupants to use and enjoy the Common Area and Association Property;

(v)  the Condominium Plan is amended to reflect the alteration to the Units or Common Area and Association Property.

Each Owner irrevocably appoints the Association as that Owner's attorney-in-fact and irrevocably grants to the Association the full power in the name of the Owner to effect any alteration to any Unit or Common Area and Association Property as authorized above, including, but not limited to, the execution, delivery and recordation of any Condominium Plan amendments, deeds or other instruments.

12.6 **MINOR REPAIR AND RECONSTRUCTION**. The Board shall have the duty to repair and reconstruct Improvements, without the consent of Members and irrespective of the amount of available insurance proceeds, in all cases of partial destruction when the estimated cost of repair and reconstruction does not exceed five (5%) percent of the annual budgeted gross expenses of the Association. The Board is expressly empowered to levy a Special Assessment for the cost of repairing and reconstructing improvements to the extent insurance proceeds are unavailable, such assessment to be levied as described above (but without the consent or approval of Members, despite any contrary provisions in this Declaration).

12.7 **DAMAGE OR DESTRUCTION TO A UNIT**. If there is damage or destruction to any Unit, the Owner thereof shall, at its own cost and expense, perform interior repair and restoration which shall be completed as promptly as practical and in a lawful and

16908

workmanlike manner, and, to the extent required under **Article 9** and the Architectural Guidelines, in accordance with plans approved by the Architectural Committee as provided in **Article 9** herein.

12.8 **CONDEMNATION OF COMMON AREA/ASSOCIATION PROPERTY**. If any portion of the Common Area and/or the Association Property is taken by condemnation, eminent domain or any proceeding in lieu thereof, then the Owners and their Mortgagees as their respective interests then appear, shall be entitled to receive a distribution from the award for such taking in the same proportion as insurance proceeds would be distributed pursuant to the provisions above; provided, however, that should it be determined to repair or rebuild any portion of the Common Area and/or the Association Property, such proceeds shall be paid to the Association for that purpose in the same manner and subject to the same terms, conditions and limitations as are set forth above in this Article for repairing damaged or destroyed portions of the Common Area and/or the Association Property. A decision to repair or rebuild shall be made in the same manner and subject to the same conditions and limitations as provided above in this Article for determining whether to rebuild or repair following damage or destruction.

12.9 **CONDEMNATION OF A UNIT**. In the event of any taking of a Condominium, the Owner (and such Owner's Mortgagees as their interests may appear) of the Condominium shall be entitled to receive the award for such taking and after acceptance thereof such Owner and such Owner's Mortgagee shall be divested of all further interest in the Condominium and membership in the Association if such Owner shall vacate such Owner's Unit as a result of such taking. In such event said Owner shall grant his remaining interest in the Common Area appurtenant to the Unit so taken, if any, to the other Owners owning a fractional interest in the same Common Area, such grant to be in proportion to the fractional interest in the Common Area then owned by each.

### ARTICLE 13
### PARTITION AND SEVERABILITY OF INTERESTS

13.1 **PARTITION**. Except as provided in this Declaration, there shall be no judicial partition of the Common Area, or any part thereof, for the term of the Project, nor shall Declarant, any Owner or any other person acquiring any interest in any Condominium in the Project seek any such judicial partition. The undivided interest in the Common Area described above may not be altered or changed as long as the prohibition against severability of interests in a Condominium remains in effect as provided in this Declaration.

13.2 **SUSPENSION**. The right of partition is suspended pursuant to California Civil Code Section 1359 as to the Project. Nothing in this Declaration shall prevent partition or division of interest between joint or common owners of any Condominium.

13.3 **PARTITION**. Notwithstanding the foregoing, judicial partition shall be permitted as set forth below.

13.3.1 **No Partition**. There shall be no termination of the Project and the Common Area of the Project shall remain undivided with no judicial partition thereof except:

**16909**

(a)      With the approval, after substantial destruction or condemnation of the Project occurs, of at least sixty-seven percent (67%) of the total Voting Power of the Association and approval by Eligible Holders who represent at least fifty-one percent (51%) of the Condominiums that are subject to Mortgages held by Eligible Holders; or

(b)      With the approval, for reasons other than substantial destruction or condemnation of the Project, of at least sixty-seven percent (67%) of the total Voting Power of the Association and approval by Eligible Holders who represent at least sixty-seven percent (67%) of the Condominiums that are subject to Mortgages held by Eligible Holders; or

(c)      As allowed by California law, including Civil Code Section 1359, as the same may be amended from time to time.

An Eligible Holder who receives a written request to give such approvals who does not deliver or mail the requesting party a negative response within thirty (30) days shall be deemed to have given such approval provided such written request was delivered by certified mail or registered mail with "return receipt" requested.

Nothing in this Section shall be deemed to prohibit partition of a cotenancy in a Condominium.

13.4   **DISTRIBUTION OF PROCEEDS**.   Proceeds or property resulting from a partition shall be distributed to and among the respective Owners and their Mortgagees as specified or apportioned in the judgment of partition, or if not so specified, as their interests appear in proportion to the fair market value of the Units at the date of the sale as determined by an independent appraisal conducted by a member of the American Institute of Real Estate Appraisers with the designation of a Member Appraisal Institute (M.A.I.) or if such institute no longer exists, an appraiser of comparable experience.

13.5   **POWER OF ATTORNEY**.   Each of the Owners irrevocably appoints the Association as attorney-in-fact and irrevocably grants to the Association full power in the name and stead of such Owner to sell the entire Project, and to execute deeds and conveyances to it, in one or more transactions, for the benefit of all Owners when partition of the Project may be had under California Civil Code Section 1359.  The power of attorney shall:

13.5.1   Be binding on all Owners, whether they assume the obligations under this Declaration or not;

13.5.2   Be exercisable by a majority of the Board acting on behalf of the Association, subject to obtaining the prior approval by vote or written consent of at least (a) seventy-five percent (75%) of the Owners, and (b) seventy-five percent (75%) of all Institutional Mortgagees; and

13.5.3   Be exercisable only after recordation with the County Recorder of a certificate executed by those who have power to exercise the power of attorney that the power of attorney is properly exercisable under the authority of this Declaration.  This certificate shall be conclusive evidence of proper exercise in favor of any person relying on it in good faith.

16910

13.6 __PROHIBITION AGAINST SEVERANCE__. An Owner shall not be entitled to sever such Owner's Unit from such Owner's membership in the Association, and shall not be entitled to sever such Owner's Unit and such Owner's membership from such Owner's undivided interest in the Common Area and Association Property for any purpose. None of the component interests in a Condominium can be severally sold, conveyed, encumbered, hypothecated or otherwise dealt with, and any violation or attempted violation of this provision shall be void. Similarly, no Owner can sever any exclusive easement appurtenant to such Owner's Unit over the Common Area and Association Property from such Owner's Condominium, and any attempt to do so shall be void. It is intended hereby to restrict severability pursuant to California Civil Code Section 1358. Notwithstanding the foregoing, the suspension of such right of severability contained herein shall not extend beyond the period set forth in **Section 13.2** in which the right to partition the Project is suspended thereunder.

13.7 __CONVEYANCES__. After the initial sales of the Condominiums, any conveyance of a Condominium by an Owner shall be presumed to convey the entire Condominium. However, nothing contained in this Section shall preclude the Owner of any Condominium from creating an estate for life or years, cotenancy or joint tenancy in the ownership of the Condominium with any other person or persons.

## ARTICLE 14
## RIGHTS OF MORTGAGEES

14.1 __CONFLICT__. Notwithstanding any contrary provision contained elsewhere in the Governing Documents, the provisions of this Article shall control with respect to the rights and obligations of Mortgagees as specified herein.

14.2 __LIABILITY FOR UNPAID ASSESSMENTS__. Any Institutional Mortgagee who obtains title to a Condominium pursuant to the remedies provided in the First Mortgage (except upon a voluntary conveyance to the Institutional Mortgagee) or by foreclosure of the First Mortgage shall take the property free of any claims for unpaid assessments or charges against the Condominium which accrue prior to the acquisition of title to the Condominium by the Institutional Mortgagee.

14.3 __PAYMENT OF TAXES AND INSURANCE__. All taxes, assessments and charges that may become a lien prior to the lien of any First Mortgagee shall be levied only to the individual condominium and not the Project as a whole. Institutional Mortgagees may, jointly or singly, pay taxes or other charges that are in default and that may or have become a charge against any Common Area or Association Property or Improvements situated thereon and may pay overdue premiums on hazard insurance policies or secure new hazard insurance coverage on the lapse of a policy for such Common Area or Association Property. Institutional Mortgagees making such payments shall be owed immediate reimbursement for such expenditures from the Association and, on demand, the Association shall execute an agreement in favor of all Institutional Mortgagees reflecting entitlement to reimbursement.

14.4 __NOTICE TO ELIGIBLE HOLDERS__. An Eligible Holder is entitled to timely written notice of the following events:

14.4.1  Any condemnation loss or casualty loss that affects either a material portion of the Project or the Condominium on which the Eligible Holder holds a First Mortgage;

14.4.2  Any delinquency in the payment of assessments or charges owed by the Owner of a Condominium that is subject to a First Mortgage held by the Eligible Holder if the delinquency is not cured within sixty (60) days after its due date;

14.4.3  Any lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association;

14.4.4  Any proposal to take any action specified in this Article or in the Article hereof entitled "Destruction of Improvements and Condemnation;"

14.4.5  Any default by the Owner-Mortgagor of a Condominium that is subject to a First Mortgage held by the Eligible Holder in the performance of his or her obligations under this Declaration or the Bylaws which is not cured within sixty (60) days; or

14.4.6  Any proposed action that requires the consent of a specified percentage of the Eligible Holders.

14.5  **RESERVE FUND**.  The Association shall maintain as a reserve fund a reserve account fund sufficient to pay for maintenance, repair and periodic replacement of the Common Area and Association Property Improvements that the Association is obligated to maintain.  In no event may the reserve fund be used to fund any legal expenses or expert witness fees for any litigation without the consent of ninety percent (90%) of the Owners and their First Mortgagees. This reserve fund shall be funded by Regular Assessments of Owners that are payable in installments rather than by Special Assessment; provided, however, that this provision shall not be deemed to limit the power of the Association to levy any other type of assessment or charge authorized by this Declaration.  Notwithstanding anything to the contrary set forth herein, funds from the reserve account fund shall not be used to pay for costs associated with the initiation, defense, settlement or intervention in mediation, arbitration, judicial or administrative proceedings or any other type of legal action.

14.6  **INSPECTION OF BOOKS AND RECORDS**.  Upon request, any Owner or First Mortgagee shall be entitled to inspect the books, records and financial statements of the Association, the Governing Documents and any amendments thereto during normal business hours or under other reasonable circumstances.

14.7  **FINANCIAL STATEMENTS**.  The Association, at its expense, shall prepare an audited financial statement for the immediately preceding Fiscal Year and furnish the same within one hundred twenty (120) days after written request from any Institutional Mortgagee.

14.8  **VOTING RIGHTS OF MORTGAGEES**.  For purpose of this Section, a Mortgagee shall be entitled to one (1) vote for each First Mortgage owned.

14.9  **ACTIONS REQUIRING ELIGIBLE HOLDER APPROVAL**.  Unless at least sixty-seven percent (67%) of the Eligible Holders and sixty-seven percent (67%) of the Owners

16912

other than Declarant have given their prior written approval, the Association shall not be entitled to:

     (a)    By act or omission, seek to abandon or terminate the Project;

     (b)    By act or omission abandon, partition, subdivide, encumber, sell or transfer any property or improvements owned, directly or indirectly, by the Association for the benefit of the Condominiums and the Owners. (The granting of easements for public utilities or for other public purposes consistent with the intended use of the Project by the Association and Owners shall not be deemed a transfer within the meaning of this Section);

     (c)    By act or omission change, waive or abandon any scheme of regulations, or enforcement thereof, pertaining to architectural design or exterior appearance of Units, the exterior maintenance of Units, or the upkeep of lawns, plantings or other landscaping in the Project;

     (d)    By act or omission change the method of determining the obligations, assessments, dues or other charges that may be levied against an Owner;

     (e)    Partition or subdivide a Condominium;

     (f)    Fail to maintain fire and extended coverage insurance on insurable portions of the Common Area or Association Property on a current replacement cost basis in an amount not less than one hundred percent (100%) of the insurable value based on current replacement cost; and

     (g)    Use hazard insurance proceeds for losses to any property or Improvements owned by the Association other than for the repair, replacement or reconstruction of such property and Improvements.

    14.10  **VOTES FOR TERMINATION OF PROJECT**.  Any election to terminate the legal status of the Project as a Condominium project shall require:

     14.10.1 The approval of a majority of the Eligible Holders and at least sixty-seven percent (67%) of the total Voting Power of the Association if the election to terminate the legal status is a result of substantial destruction or a substantial taking in condemnation of the property within the Project; or

     14.10.2 The approval of at least sixty-seven percent (67%) of the total Voting Power of the Association and at least sixty-seven percent (67%) of the Eligible Holders, if **Section 14.10.1** is not applicable.

    14.11  **CONDEMNATION OR DESTRUCTION**.  In the event a portion of the Project is either condemned or destroyed or damaged by a hazard that is insured against, restoration or repair shall be performed substantially in accordance with the provisions of this Declaration and the original plans and specifications for the Project unless at least a majority of the Eligible Holders approve the taking of other action by the Association.

16913

14.12 **SELF-MANAGEMENT**.  The vote or approval by written ballot of at least sixty-seven percent (67%) of the total Voting Power of the Association and at least fifty-one percent (51%) of the Eligible Holders shall be required to assume self-management of the Project if professional management of the Project has been required by an Eligible Holder at any time.

14.13 **MORTGAGEE PROTECTION**.  A breach of any of the conditions contained in this Declaration shall not defeat nor render invalid the lien of any First Mortgage made in good faith and for value as to any Condominium in the Project; provided, however, that the conditions contained in this Declaration shall be binding upon and effective against any Owner of a Condominium if the Condominium is acquired by foreclosure, trustee's sale or otherwise.

14.14 **SUBORDINATION**.  The lien of the assessments, including interest, costs (including attorneys' fees), and late charges subject to the limitations of California Civil Code Section 1367, provided for herein shall be subordinate to the lien of any First Mortgage with respect to any Condominiums.  Sale or transfer of any Condominiums shall not effect the assessment lien.

14.15 **DISTRIBUTION OF INSURANCE AND CONDEMNATION PROCEEDS**.  No Owner, or any other party, shall have priority over any right of Institutional Mortgagees of Condominiums pursuant to their Mortgages in case of a distribution to Owners of insurance proceeds or condemnation awards for losses to or a taking of Condominiums or Common Area or Association Property.  Any provision to the contrary in this Declaration or in the Bylaws or other documents relating to the Project is to such extent void.  All applicable fire and all physical loss or extended coverage insurance policies shall contain loss payable clauses acceptable to the affected Institutional Mortgagees naming the Mortgagees, as their interests may appear.

14.16 **VOTING RIGHTS ON DEFAULT**.  In case of default by any Owner in any payment due under the terms of any Institutional Mortgage encumbering such Owner's Condominium, or the promissory note secured by the Mortgage, the Mortgagee or his representative, on giving written notice to such defaulting Owner or Owners, and placing of record a notice of default, is hereby granted a proxy and can exercise the voting rights of such defaulting Owner attributable to such Condominium at any regular or special meeting of the Members held during such time as such default may continue.

14.17 **FORECLOSURE**.  If any Condominium is encumbered by a First Mortgage made in good faith and for value, the foreclosure of any lien created by any provision set forth in this Declaration for assessments, or installments of assessments, shall not affect or impair the lien of the First Mortgage.  On foreclosure of the Mortgage, the lien for assessments, or installments, that has accrued up to the time of foreclosure shall be subordinate to the lien of the Mortgage, with the foreclosure-purchaser taking title to the Condominium free of the lien for assessments, or installments, that has accrued up to the time of the foreclosure sale.  On taking title to the Condominium the foreclosure-purchaser shall only be obligated to pay assessments or other charges levied or assessed by the Association after the foreclosure-purchaser acquired title to the Condominium.  The subsequently accrued assessments or other charges may include previously unpaid assessments provided all Owners, including the foreclosure-purchaser, and his successors and assigns are required to pay their proportionate share as provided in this Section.

16914

14.18 **NON-CURABLE BREACH**.  Any Mortgagee who acquires title to a Condominium by foreclosure or by deed in lieu of foreclosure or assignment-in-lieu of foreclosure shall not be obligated to cure any breach of this Declaration that is non-curable or that is not practical or feasible to cure.

14.19 **LOAN TO FACILITATE**.  Any Mortgage given to secure a loan to facilitate the resale of a Condominium after acquisition by foreclosure or by a deed-in-lieu of foreclosure or by an assignment-in-lieu of foreclosure shall be deemed to be a loan made in good faith and for value and entitled to all of the rights and protections of this Article.

14.20 **APPEARANCE AT MEETINGS**.  Because of its financial interest in the Project, any Mortgagee may appear (but cannot vote except as may be provided for herein) at meetings of the Members and the Board to draw attention to violations of this Declaration that have not been corrected or made the subject of remedial proceedings or assessments.

14.21 **RIGHT TO FURNISH INFORMATION**.  Any Mortgagee can furnish information to the Board concerning the status of any Mortgage.

14.22 **INAPPLICABILITY OF RIGHT OF FIRST REFUSAL TO MORTGAGEE**. No right of first refusal or similar restriction on the right of an Owner to sell, transfer or otherwise convey the Owner's Condominium shall be granted to the Association without the written consent of any Mortgagee of the Condominium.  Any right of first refusal or option to purchase a Condominium that may be granted to the Association (or other person, firm or entity) shall not apply to any conveyance or transfer of title to such Condominium, whether voluntary or involuntary, to a Mortgagee that acquires title to or Ownership of the Condominium pursuant to the remedies provided in its Mortgage or by reason of foreclosure of the Mortgage or deed or assignment in lieu of foreclosure.

14.23 **MULTIPLE MORTGAGES**.  To the extent any voting rights under this **Article 14** are granted to any Mortgagees and such Mortgagee holds multiple Mortgages, then such Mortgagee shall have a vote for each Condominium received by the Mortgagee.

**ARTICLE 15**
**AMENDMENTS**

Except as otherwise set forth in this **Article 15**, this Article shall not be amended, modified or rescinded until Declarant has conveyed the last Condominium within the Project without (i) the prior written consent of Declarant and (ii) the recording of said written consent in the Office of the County Recorder.

15.1 **AMENDMENT BEFORE THE CLOSE OF FIRST SALE**.  Before the close of the first sale of a Unit to a purchaser other than Declarant, this Declaration and any amendments to it may be amended in any respect or revoked by the execution by Declarant and any Mortgagee of record of an instrument amending or revoking this Declaration. The amending or revoking instrument shall make appropriate reference to this Declaration and its amendments and shall be acknowledged and recorded in the Office of the County Recorder.

16915

15.2  **AMENDMENTS AFTER THE CLOSE OF FIRST SALE.**  Except as may otherwise be stated in this Declaration, after the close of the first sale of a Unit in the Project to an Owner other than Declarant and during the period of time prior to conversion of the Class B membership in the Association to Class A membership, this Declaration may be amended at any time and from time to time provided that the vote or approval by written ballot of a majority of the Voting Power of each class of Members of the Association has been obtained.  After conversion of the Class B membership in the Association to Class A membership, this Declaration may be amended at any time and from time to time, provided that the vote or approval by written ballot of (a) a majority of the total Voting Power of the Association and (b) a majority of the Voting Power of the Members of the Association, other than Declarant, has been obtained.  Such amendment shall become effective upon the recording of a Certificate of Amendment signed and acknowledged by the President or Vice President of the Association and the Secretary or Assistant Secretary of the Association certifying that such votes or approval by written ballot have been obtained.  For the purposes of recording the Certificate of Amendment, the President or Vice-President and Secretary or Assistant Secretary of the Association are hereby granted an irrevocable power of attorney to act for and on behalf of each and every Owner in certifying and executing and recording said amendment with the Office of the County Recorder.  Notwithstanding anything herein to the contrary, no amendments to this Declaration which impose further restrictions on a Commercial Condominium (including but not limited to the use restrictions set forth in **Article 7**) or modify a provision specifically relating to a Commercial Condominium shall be effective unless the Owner of the two (2) Commercial Condominiums have given their written consent to such amendment.  In addition to the foregoing, in the case of any Material Amendment, as defined below, the vote of at least a majority of the Eligible Holders (based on one vote for each Mortgage owned) and at least sixty-seven percent (67%) of the Voting Power of each class of Members (or sixty-seven percent (67%) of the Owners) shall also be required.  "Material Amendment" shall mean, for the purposes of this **Section 15.2,** any amendments to provisions of this Declaration governing any of the following subjects:

15.2.1 The fundamental purpose for which the Project was created (such as a change from residential use to a different use);

15.2.2 Assessments, collection of assessments, assessment liens and subordination thereof;

15.2.3 The reserve for repair and replacement of the Common Area and Association Property;

15.2.4 Property maintenance obligations;

15.2.5 Casualty and liability insurance or fidelity bond requirements;

15.2.6 Reconstruction in the event of damage or destruction;

15.2.7 Rights to use the Common Area and the Association Property;

15.2.8 Reallocation of any interests in the Common Area;

16916

15.2.9 Voting;

15.2.10 Any provision that, by its terms, is specifically for the benefit of Eligible Holders, or specifically confers rights on Eligible Holders;

15.2.11 Expansion or contraction of the Project or the addition or withdrawal of property to or from the Project, the redefinition of Unit boundaries or the conversion of a Unit or Units into Association Property; and

15.2.12 Imposition of any restriction on any Owner's right to lease, sell or transfer his Unit.

Anything herein stated to the contrary notwithstanding, no amendment to provisions contained in **Sections 15.2.1, 15.2.2, 15.2.3, 15.2.4, 15.2.5, 15.2.6, 15.2.7, 15.2.8, 15.2.9, 15.2.10, 15.2.11** and **15.2.12** may be made to this Declaration without the prior written consent of at least sixty-seven percent (67%) or more of the Eligible Holders (based upon (1) vote for each such Eligible Holder). . Any Eligible Holder who receives written request to consent to additions or amendments requiring consent under this provision who does not deliver to the requesting party a negative response within thirty (30) days after receipt of a notice delivered by certified or registered mail, return receipt requested, shall be deemed to have consented to such request. If any provision of this Declaration requires a greater or lesser percentage of the voting rights of any class of Members in order to take affirmative or negative action under such provision, the same percentage of such class or classes of Members shall be required to amend or revoke such provision. Also, if the consent or approval of any governmental authority, Mortgagee or other person, firm, agency or entity is required under this Declaration with respect to any amendment or revocation of any provision of this Declaration, no such amendment or revocation shall become effective unless such consent or approval is obtained. Any amendment or revocation subsequent to the close of such first sale shall be evidenced by an instrument certified by the Secretary or other duly authorized officer of the Association and shall make appropriate reference to this Declaration and its amendments and shall be acknowledged and recorded in the office of the County Recorder.

15.3   **FURTHER APPROVALS REGARDING AMENDMENTS**. Notwithstanding anything to the contrary contained in this Declaration, **Sections 4.3.16, 4.4.5, 4.4.12, 5.2, 8.1.4, 8.3.4, 8.6** and **17.4** of this Declaration shall not be amended without the vote or approval by written ballot of at least (a) ninety percent (90%) of the Voting Power of the Members of the Association other than Declarant, and (b) ninety percent (90%) of the Mortgagees.

15.4   **AMENDMENT RELATING TO COMMERCIAL CONDOMINIUMS**. Notwithstanding anything to the contrary contained in this Declaration, **Sections 3.1, 3.4.4, 3.4.6, 3.4.12, 4.2, 4.3.7, 4.3.11, 5.2.4(b), 5.2.4(c), 6.5, 7.2, 7.3** and **9.7** as they apply to the Commercial Condominiums, shall not be amended without the approval of all of the Commercial Owners.

15.5   **CONFLICT WITH ARTICLE 14 OR OTHER PROVISIONS OF THIS DECLARATION**. To the extent any provisions of this Article conflict with the provisions of

16917

Article 14 or any other provision of this Declaration except those contained in **Section 15.2** and **15.3**, the provisions of **Article 14** or the other provisions shall control.

15.6   **BUSINESS   AND   PROFESSIONS   CODE   SECTION 11018.7.**   All amendments or revocations of this Declaration shall comply with the provisions of California Business and Professions Code Section 11018.7 to the extent such Section is applicable.

15.7   **RELIANCE ON AMENDMENTS.**   Any amendments made in accordance with the terms of this Declaration shall be presumed valid by anyone relying on them in good faith.

## ARTICLE 16
## SUPPLEMENTARY DECLARATION

16.1   **SUPPLEMENTARY DECLARATION.**   A Supplementary Declaration may be recorded by Declarant, without the consent of any Owner to (a) identify the Additional Condominiums and impose restrictions on the Additional Condominiums prior to the conveyance to an Owner, (b) identify areas referenced in this Declaration to be maintained by the Association, (c) impose additional covenants and restrictions on the Units prior to conveyance to an Owner, and/or (d) make corrections to the provisions of this Declaration or any previously recorded Supplementary Declaration(s).

16.2   **SUPPLEMENTARY CONDOMINIUM PLANS.**   Declarant may record, without the consent of any Owner, Supplementary Condominium Plans to reflect the "as built" conditions of the Project or for any of the other purposes for which a Supplementary Condominium Plan may be recorded.

## ARTICLE 17
## ENFORCEMENT

17.1   **TERM.**   The covenants, conditions and restrictions of this Declaration shall run with and bind the Property and shall inure to the benefit of and be enforceable by the Association or any Member, their respective legal representatives, heirs, successors and assigns, for a term of sixty (60) years from the date this Declaration is recorded, after which time said covenants, conditions and restrictions shall be automatically extended for successive periods of ten (10) years each, unless an instrument, signed by at least sixty-seven percent (67%) of the then Members has been recorded, at least one (1) year prior to the end of any such period in the manner required for a conveyance of real property, in which it is agreed that this Declaration shall terminate at the end of the then applicable term.

17.2   **ENFORCEMENT AND NONWAIVER.**

17.2.1   **Rights of Enforcement of Governing Documents.**   The Association or any Owner shall have a right of action against any Owner, and any Owner shall have a right of action against the Association, to enforce by proceedings at law or in equity, all covenants, conditions and restrictions, now or hereafter imposed by the provisions of the Governing Documents or any amendment thereto, including the right to prevent the violation of such covenants, conditions and restrictions and the right to recover damages or other dues for such violation except that Owners shall not have any right of enforcement concerning Assessment

16918

Liens. The Association shall have the exclusive right to the enforcement of provisions relating to architectural control and the Project Handbook, unless the Association refuses or is unable to effectuate such enforcement, in which case any Owner who otherwise has standing shall have the right to undertake such enforcement. Failure of the Association, Declarant or any Owner to enforce any covenants or restrictions herein contained shall in no event be deemed a waiver of the right to do so thereafter.

17.2.2 **Procedure for Enforcement**. Notwithstanding anything to the contrary set forth in **Section 17.2.1**, in enforcing any action under the Governing Documents for injunctive relief, declaratory relief and/or monetary damages, the parties shall comply with the provisions of California Civil Code Section 1354. The Board shall annually provide to the Members a summary of the provisions of California Civil Code Section 1354, which shall include the language required and shall be delivered in the manner provided in California Civil Code Section 1365. The exception for disputes related to Association assessments set forth in Section 1354 shall not apply to disputes between an Member and the Association regarding assessments imposed by the Association, if the Member chooses to pay in full the Association all of the assessments as specified in California Civil Code Section 1366.3.

17.3 **NOTICE OF ACTIONS AGAINST DECLARANT**. Subject to the provisions of **Section 17.4** hereof, the Association shall comply with the provisions of California Civil Code Section 1368.4, California Civil Code Sections 910 through 938 prior to the filing of any civil action by the Association against the Declarant or other developer of the Project for either alleged damage to the Association Property or other property within the Project that the Association is obligated to maintain or repair, or alleged damage to any other portion of the Project that arises out of, or is integrally related to, such damage to the Association Property or other property within the Project that the Association is obligated to maintain or repair. Such notice shall specify all of the matters set forth in Section 1368.4 and/or California Civil Code Sections 910 through 938, as applicable.

17.4 **ALTERNATIVE DISPUTE RESOLUTION**. The purpose of this **Section 17.4** is to provide an expedited means of resolving any claims, disputes and disagreements which may arise between Owner and the Association and Declarant after the close of escrow or other conveyance of any portion of the Property by Declarant concerning the Property and/or the Fit and Finish Warranty that are not resolved pursuant to any applicable statutory dispute resolution procedures (individually referenced to herein as "Dispute" and collectively as "Disputes"). Initially, Declarant will attempt to resolve any Dispute asserted by an Owner or the Association of which it is given notice. If the Dispute cannot be resolved between the parties in this manner, the parties will proceed to mediation, according to the procedures set forth below. If the matter is not resolved by the mediation process, it will be decided through the arbitration procedure as set forth below. Alternatively, Declarant, an Owner or the Association may elect to resolve such Disputes through a small claims court proceeding. **THIS PROCESS INVOLVES WAIVER OF THE RIGHT TO A JURY TRIAL. BY EXECUTING THIS DECLARATION AND BY ACCEPTING A DEED TO ANY PORTION OF THE PROPERTY, RESPECTIVELY, DECLARANT, EACH OWNER AND THE ASSOCIATION, AGREE TO BE BOUND BY THE PROVISIONS OF THIS SECTION 17.4.**

16919

17.4.1 **Mediation**.  Subject to the provisions of **Section 17.4.2(h)** below, and except for actions in small claims court or Disputes that have already been mediated, Owner, Association and Declarant agree to submit any and all disputes to non-binding mediation before commencing arbitration.  The cost of mediation shall be paid by the Declarant.  Each party to the mediation shall bear its own attorneys' fees and costs in connection with such mediation.

17.4.2 **Arbitration**.

(a)   **Agreement to Arbitrate**.  The Association, each Owner and Declarant shall resolve any Dispute not resolved as provided above exclusively through binding arbitration in the county in which the Property is located.  This arbitration provision shall apply to Disputes of any kind or nature regardless of when the Dispute first arose or the nature of the relief sought.

(b)   **Waiver of Trial by Judge or Jury**.  By agreeing to resolve all Disputes through binding arbitration, the Association, each Owner and Declarant each give up the right to have their respective claims and defenses decided by a judge or a jury.  All Disputes shall instead be decided by the arbitrator.

(c)   **Rules Applicable to All Cases**.  The arbitration will be conducted by Judicial Arbitration and Mediation Services ("JAMS") in accordance with the rules of JAMS in effect as of the initiation of the arbitration ("JAMS Rules"), as supplemented by this Declaration.  The following supplemental rules shall apply to all arbitration proceedings and shall govern in the event of a conflict between the rules set forth below and the JAMS Rules.

(d)   **Qualifications of Arbitrators**.  The arbitrator shall be neutral and impartial and either a retired judge or a member or former member of the California State Bar with at least fifteen (15) years experience as a practicing lawyer and with a strong emphasis on the laws governing real estate matters, especially those dealing with residential real estate development and construction.

(e)   **Appointment of Arbitrator**.  The arbitrator to preside over the Dispute shall be selected in accordance with the JAMS Rules, but no later than sixty (60) days after a notice of claim is filed.

(f)   **Expenses**.  All fees charged by JAMS and the arbitrator shall be advanced by the Declarant.  If the Declarant is the prevailing party in the arbitration, the arbitrator may, in his or her discretion and only to the extent permitted by law and the JAMS Minimum Standards of Procedural Fairness, direct the Owner or Association to reimburse the Declarant for Owner's or the Association's, as applicable, pro rata share of the JAMS fee and arbitrator's fee advanced by the Declarant.  Each party shall bear its own attorneys' fees and costs.

(g)   **Venue**.  The venue of the arbitration shall be in the County where the Project is located unless the parties agree in writing to another location.

(h)   **Preliminary Procedures**.  If state or federal law requires the Association or an Owner or Declarant to take steps or procedures before commencing an action

16920

in court, then the Owner or Declarant must take such steps or follow such procedures, as the case may be, before commencing the arbitration.  For example, any claims or Disputes pursuant to California Civil Code Section 895 et. seq. as hereafter amended may be subject to the non-adversarial procedures set forth in California Civil Code Section 910 through 938, prior to the initiation of any arbitration or small claims court proceeding against Declarant.  In addition, nothing contained herein shall be deemed a waiver or limitation of the provisions of California Civil Code Sections 1368.4, 1375, 1375.05 or 1375.1.

(i)  **Participation by Other Parties**.  The Association, an Owner and Declarant, to the extent any such party is defending a claim in the arbitration, may, if it chooses, have all necessary and appropriate parties included as parties to the arbitration.

(j)  **Rules of Law**.  The arbitrator must follow California substantive law (including statutes of limitations) but strict conformity with the rules of evidence is not required, except that the arbitrator shall apply applicable law relating to privilege and work product.  The arbitrator shall be authorized to provide all recognized remedies available at law or equity for any cause of action.

(k)  **Attorneys' Fees and Costs**.  Each party shall bear its own attorneys fees and costs (including expert witness costs) in the arbitration.

17.4.3  **Additional Rules Applicable To Certain Cases**.  In any arbitration in which a claim of Owner, the Association or Declarant exceeds Two Hundred Fifty Thousand Dollars ($250,000) in value, the following additional rules will supplement the JAMS Rules and govern in the event of a conflict between the following rules and the rules set forth above, the JAMS Rules, or both.

(a)  **Qualifications of Arbitrator**.  In addition to the requirements of **Section 17.4.2(d)** above, the arbitrator shall be a retired judge of the California Superior Court, a California Court of Appeal, or the California Supreme Court.

(b)  **Rules of Law**.  The California Evidence Code shall apply.

(c)  **Written Decision**.  Within thirty (30) days after the hearing is closed, the arbitrator must issue a written decision.  If either Owner or Declarant requests it, the arbitrator must issue a reasoned award.

17.4.4  **Procedure for Appeal of Certain Cases**.  In any arbitration in which a claim or arbitration award of Owner or Declarant exceeds Five Hundred Thousand ($500,000) in value, Owner and Declarant hereby adopt and agree to the JAMS Optional Appeal Procedure.  The following additional rules will supplement the JAMS Optional Appeal Procedure and govern in the event of a conflict between the following rules and the JAMS Optional Appeal Procedure.

(a)  **Right of Appeal**.  There shall be no right to appeal unless the oral evidence received by the arbitrator was preserved in a manner such that it can be converted to an accurate and reliable written transcript.

16921

(b)     **Appellate Panel**.  An appeal shall be decided by one (1) neutral appeal arbitrator unless either party, within the time permitted for the appointment of the appeal arbitrator, elects to have the appeal decided by a panel of three (3) appeal arbitrators.  Any party who elects to have an appeal decided by a panel of three (3) appeal arbitrators agrees to be solely responsible for the cost of having two (2) additional appeal arbitrators.  The sole appeal arbitrator, or at least one member of any panel of three (3) arbitrators, shall have prior experience as a member of an appellate panel of the California Court of Appeal.

(c)     **Issues on Appeal**.  The only issues that may be considered on appeal are: (1) the award of money was excessive; (2) the award of money was insufficient; (3) the arbitrator awarded non-monetary relief that was inappropriate; (4) a party who received non-monetary relief should have received other or additional relief.  A majority of the appeal arbitrators may affirm the arbitration award or make any alternative award they find to be just, but they must not reject the arbitrator's decisions (a) that a particular party is entitled to relief of some nature or amount or (b) that a particular party is responsible to provide relief of some nature or amount.

(d)     **Expenses and Costs on Appeal**.  The fees charged by JAMS and the appeal arbitrator(s) shall be advanced by the Declarant, except as provided in **Section 17.4.4(b)** above.  The party who files the appeal must, at its sole expense, provide JAMS and all non-appealing parties with a certified copy of the hearing transcript, and must provide JAMS with copies of all documentary evidence and all other tangible evidence received by the arbitrator.  If more than one party appeals, the appealing parties must share equally the cost of the transcript and copies of all other documentary and tangible evidence received by the arbitrator.  The appeal arbitrators may, within thirty (30) days of their determination award costs of the nature provided in the Federal Rules of Appellate Procedure.  If the Declarant is the prevailing party on appeal, the appeal arbitrator(s) may, in his, her or their discretion and only to the extent permitted by law and JAMS Minimum Standards Of Procedural Fairness, include the non-prevailing party(ies) pro rata share of the JAMS fee and arbitrator's fee advanced by the Declarant in the award of costs on appeal.

(e)     **New Evidence**.  The appeal arbitrators must not receive new evidence.  The appeal arbitrators must make their decision based only on the evidence that was presented to the arbitrator, except that the appeal arbitrators may visit any site involved in the Dispute.

17.4.5 **Federal Arbitration Act**.  Because many of the materials and products incorporated into the home are manufactured in other states, the development and conveyance of the Property evidences a transaction involving interstate commerce and the Federal Arbitration Act (9 U.S.C. §1, et seq.) now in effect and as it may be hereafter amended will govern the interpretation and enforcement of the arbitration provisions of this Declaration.

17.4.6 **AGREEMENT TO ARBITRATE**.   EACH OWNER AND THE ASSOCIATION AGREE TO HAVE ANY DISPUTE DECIDED BY NEUTRAL ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT, AND

16922

ASSOCIATION OWNER AND DECLARANT ARE GIVING UP ANY RIGHTS DECLARANT, OWNER AND THE ASSOCIATION MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL.  DECLARANT, OWNER AND ASSOCIATION ARE GIVING UP THEIR RESPECTIVE JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THIS **SECTION 17.4**.  IF DECLARANT, ANY OWNER OR THE ASSOCIATION REFUSED TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, SUCH PARTY MAY BE COMPELLED TO ARBITRATE UNDER THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT.

17.4.7 **Final and Binding Award**.  The decision of the arbitrator or, if an appeal is heard, the decision of the appeal arbitrators, shall be final and binding.  A petition to confirm, vacate, modify or correct an award may be filed in any court of competent jurisdiction in the county in which the Property is located, but the award may be vacated, modified or corrected only as permitted by the Federal Arbitration Act.

17.4.8 **Severability**.  In addition to and without limiting the effect of any general severability provisions of this Declaration, if the arbitrator or any court determines that any provision of this **Section 17.4** is unenforceable for any reason, that provision shall be severed, and proceedings agreed to in this **Section 17.4** shall be conducted under the remaining enforceable terms of this **Section 17.4**.

17.4.9 **Application of Award**.  Any proceeds awarded to the Association arising from any Dispute by settlement, award or otherwise shall be applied in accordance with the provisions of **Section 4.4.11** of this Declaration.

## ARTICLE 18
## GENERAL PROVISIONS

18.1 **HEADINGS**.  The headings used in this Declaration are for convenience only and are not to be used to interpret the meaning of any of the provisions of this Declaration.

18.2 **SEVERABILITY**.  The provisions of this Declaration shall be deemed independent and severable, and the invalidity or partial invalidity or unenforceability of any provision or provisions of it shall not invalidate any other provisions.  In the event that any phrase, clause, sentence, paragraph, section, article or other portion of this Declaration shall other portion of this Declaration shall become illegal, null, void, against public policy, or otherwise unenforceable, for any reason, the remaining portion of this Declaration shall not be affected thereby and shall remain in force and effect to the fullest extent permissible by law.

18.3 **CUMULATIVE REMEDIES**.  Each remedy provided for in this Declaration shall be cumulative and not exclusive.  Failure to exercise any remedy provided for in this Declaration shall not, under any circumstances, be construed as a waiver.

18.4 **VIOLATIONS AS NUISANCE**.  Every act or omission in violation of the provisions of this Declaration shall constitute a nuisance and, in addition to all other remedies

16923

herein set forth, may be abated or enjoined by any Owner, any Member of the Board, the manager, or the Association.

18.5 **NO RACIAL RESTRICTION**. No Owner shall execute or cause to be recorded any instrument which imposes a restriction upon the sale, leasing or occupancy of his Unit on the basis of race, sex, color or creed.

18.6 **ACCESS TO BOOKS**. Declarant may, at any reasonable time and upon reasonable notice to the Board or manager at his or her own expense, cause an audit or inspection to be made of the books and financial records of the Association.

18.7 **LIBERAL CONSTRUCTION**. The provisions of this Declaration shall be liberally construed to effectuate its purpose. Failure to enforce any provision hereof shall not constitute a waiver of the right to enforce said provision thereafter.

18.8 **NOTIFICATION OF SALE OF CONDOMINIUM**. Concurrently with the consummation of the sale of any Condominium under circumstances whereby the transferee becomes an Owner thereof, or within five (5) business days thereafter, the transferee shall notify the Board in writing of such sale. Such notification shall set forth the name of the transferee and his or her Mortgagee and transferor, the common address of the Condominium purchased by the transferee, the transferee's and the Mortgagee's mailing address, and the date of sale. Prior to the receipt of such notification, any and all communications required or permitted to be given by the Association, the Board or the manager shall be deemed to be duly made and given to the transferee if duly and timely made and given to said transferee's transferor. Mailing addresses may be changed at any time upon written notification to the Board. Notices shall be deemed received forty-eight (48) hours after mailing if mailed to the transferee, or to his or her transferor if the Board has received no notice of transfer as above provided, by certified mail return receipt requested, at the mailing address above specified. Notices shall also be deemed received on the next business day after being sent by overnight courier or upon delivery if delivered personally to any occupant of a Condominium over the age of twelve (12) years.

18.9 **NUMBER, GENDER**. The singular shall include the plural and the plural the singular unless the context requires the contrary, and the masculine, feminine and neuter shall each include the masculine, feminine or neuter, as the context requires.

18.10 **EXHIBITS**. All exhibits referred to in this Declaration are attached to this Declaration and incorporated by reference.

18.11 **BINDING EFFECT**. This Declaration shall inure to the benefit of and be binding on the successors and assigns of the Declarant, and the heirs, personal representatives, grantees, tenants, successors and assigns of the Owners.

18.12 **EASEMENTS RESERVED AND GRANTED**. Any easements referred to in this Declaration shall be deemed reserved or granted, or both reserved and granted, by reference to this Declaration in the first deed by Declarant to any Condominium.

18.13 **STATUTORY REFERENCES**. All references in this Declaration to various statutes, codes, regulations, ordinances and other laws shall be deemed to include those laws in

16924

effect as of the date of this Declaration and any successor laws as may be amended from time to time.

[Remainder of Page Intentionally Left Blank]

16925

IN WITNESS WHEREOF, Declarant has executed this instrument as of the date first above written.

DECLARANT:

BOSA DEVELOPMENT CALIFORNIA II, INC.,
a California corporation

By: _____
Eric Martin, Its Corporate Secretary

16926

STATE OF CALIFORNIA      )
                              ) ss.
COUNTY OF SAN DIEGO     )

On October 26, 2005 before me, Trang M. Van, personally appeared Eric Martin personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name(s) are/is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____         (SEAL)



Bosa / The Electra
CC&Rs
26343-00027 / 1911970.6

16927

## SUBORDINATION AGREEMENT

The undersigned ("Beneficiary") holds the beneficial interest in that certain Deed of Trust recorded in the Office of the County Recorder of San Diego County on March 24, 2005 as Instrument No. 2005-0253518, which Deed of Trust encumbers all or a portion of the real property covered by the Declaration of Covenants, Conditions and Restrictions of The Electra ("Declaration").   Beneficiary now subordinates the Deed of Trust and its beneficial interest thereunder to (a) the foregoing Declaration, (b) any Supplemental Declaration which is recorded pursuant to the Declaration (c) any amendment or restatement of any Supplementary Declaration and (d) all easements to be conveyed to The Electra Owners Association in accordance with any Supplementary Declaration.

Dated: _9/14/05_

BANK OF AMERICA, N.A., a national banking association

By: _____

Name: _Jour P Webster_

Title: _Senior Vi. Prsit_

16928

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF *San Diego*    )

On *Sept. 14*, 200 *5* before me, *Peggy J. French, Notary Public*
personally appeared *Jack P. Webster*
personally known to me (~~or proved to me on the basis of satisfactory evidence~~) to be the person
whose name(s) ~~are~~/is subscribed to the within instrument and acknowledged to me that
he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity, and that by his/~~her/their~~
signature(s) on the instrument the person(~~s~~), or the entity upon behalf of which the
person(~~s~~) acted, executed the instrument.

WITNESS my hand and official seal.

Signature *Peggy J. French*      (SEAL)



PEGGY J. FRENCH
Commission # 1389660
Notary Public - California
San Diego County
My Comm. Expires Jan 8, 2007

Bosa / The Electra
CC&Rs
26343-00027 / 1911970.6

16929

**EXHIBIT "A"**

Legal Description

PROPERTY:

PARCEL 1 OF PARCEL MAP NO. 19658, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON FEBRUARY 17, 2005.

ASSOCIATION PROPERTY:

PARCEL 1 OF PARCEL MAP NO. 19658, N THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON FEBRUARY 17, 2005, EXCLUDING THEREFROM THE COMMERCIAL MODULE AND RESIDENTIAL MODULE AS SHOWN ON THAT CERTAIN CONDOMINIUM PLAN FOR THE ELECTRA FILED IN THE OFFICE OF THE SAN DIEGO COUNTY RECORDER ON _December 1_, 2005 AS DOCUMENT NO. _2005-1036053_

**EXHIBIT "A"**

16930

## EXHIBIT "B"

### Maintenance Responsibility Chart

Each Owner is responsible for the maintenance, repair and replacement of all elements of the Unit, except as otherwise set forth below or in the Governing Documents. The Association is responsible for all of the maintenance, repair and replacement of the Association Property and the Common Area. Notwithstanding the foregoing, in the event of a casualty, the Association shall repair and replace all items covered by the Association's insurance. The Warranty and Maintenance Manual and the Association Maintenance Manual may also expand on the scope of the maintenance responsibilities set forth below.

| IMPROVEMENT | MAINTENANCE OBLIGATION & RESPONSIBLE PARTY | | | | | | |
|---|---|---|---|---|---|---|---|
| | Clean | Maintain | Repair | Replace | Paint | Resurface | Repave |
| The interior of the Unit including, without limitation, all appliances, cabinets, plumbing fixtures and all other items within the Unit whether free-standing or built in | O | O | O | O | O | O (if applicable) | N/A |
| Utility Facilities and equipment which exclusively service the Unit whether located in the Unit, the Common Area or the Association Property | N/A | O | O | O | N/A | N/A | N/A |
| Windows enclosing a Unit, including metal frames, tracks and exterior screens of glass doors and windows | O (except as provided below) | O | O | O | N/A | N/A | N/A |
| Exterior of windows enclosing a Residential Unit which are not located within an Exclusive Use Deck, Patio or Balcony Area | A | O | O | O | N/A | N/A | N/A |
| Interior of doors on the exterior boundaries of a Unit | O | O | A | A | O | N/A | N/A |
| Exterior of doors on the exterior boundaries of a Unit | A | A | A | A | A | N/A | N/A |
| The Exclusive Use Deck, Balcony and Patio Areas | O | A | A | A | A | A | N/A |
| Exterior lighting fixtures not servicing the Exclusive Use Patio, Deck or Balcony Areas | A | A | A | A | A | N/A | N/A |

"O" indicates an obligation of the Owner.
"A" indicates an obligation of the Association.
"N/A" indicates an obligation that is "not applicable."

### EXHIBIT "B"

16931

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Exterior fixtures including light fixtures, photocells and light bulbs servicing the Exclusive Use Deck, Patio or Balcony Areas | O | O | O | O | O | N/A | N/A |
| The interior and the lock of the Storage Spaces | O | O | O | A | A | N/A | N/A |
| Exterior door of the Storage Space | A | A | A | A | A | N/A | N/A |
| Established system of drainage within the Owner's Exclusive Use Common Areas | O | A | A | A | N/A | N/A | N/A |
| All Common Area including without limitation, roof, structural components, bearing walls, foundations, except for any Exclusive Use Common Areas as provided herein | A | A | A | A | A | A | A |
| Association Property such as the parking garage, recreational facilities, lobby, concierge office, lounge, multi-purpose center, landscaping, the Parking Spaces situated within the Association Property | A | A | A | A | A | A | A |
| All Utility Facilities serving two or more Condominiums, and all private Utility Facilities whether located in the Association Property or Common Area | N/A | A | A | A | N/A | N/A | N/A |
| Plate, glass and windows bordering any Commercial Unit | O | O | O | O | N/A | N/A | N/A |

"O" indicates an obligation of the Owner.
"A" indicates an obligation of the Association.
"N/A" indicates an obligation that is "not applicable."

EXHIBIT "B"

*104*

*16932*

## EXHIBIT "C"

### Percentage Share of Variable Expenses

| UNIT PLAN* | % Share of Variable Expenses |
|---|---|
| A | 0.21% |
| B | 0.29% |
| C | 0.34% |
| D | 0.36% |
| E | 0.40% |
| F | 0.43% |
| G | 0.45% |
| H | 0.50% |
| I | 0.54% |
| J | 0.73% |
| Commercial Unit A | 0.50% |
| Commercial Unit B | 0.50% |

*The Unit Plans are shown on the Condominium Plan.

EXHIBIT "C"

RECORDED REQUEST OF
**First American Title**
SUBDIVISION MAPPING DEPT.

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

Luce, Forward, Hamilton & Scripps LLP
600 West Broadway, Suite 2600
San Diego, CA 92101-3372
Attn: Nancy T. Scull, Esq.

*accom-6*

DOC # 2009-0253568



MAY 13, 2009      3:22 PM

**OFFICIAL RECORDS**
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:      24.00

**PAGES:      6**

7057

SPACE ABOVE RESERVED FOR FILING STAMP

## SECOND AMENDED AND RESTATED
## SUPPLEMENTARY DECLARATION
## FOR
## THE ELECTRA

This SECOND AMENDED AND RESTATED SUPPLEMENTARY DECLARATION FOR THE ELECTRA ("**Supplementary Declaration**") is made and entered into this *12th* day of May, 2009, by Bosa Development California II, Inc., a California corporation ("**Declarant**"), with reference to the facts set forth below.

### RECITALS

A.      This Supplementary Declaration amends, restates and supersedes in its entirety that certain Amended and Restated Supplementary Declaration for The Electra recorded in the Office of the County Recorder of San Diego County on February 4, 2009 as Document No. 2009-0053324, which encumbers that certain real property located in the City of San Diego, County of San Diego, State of California, more particularly described below.

PARCEL 1 OF PARCEL MAP NO. 19658, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY ON FEBRUARY 17, 2005.

B.      Declarant caused to be filed for record that certain Declaration of Covenants, Conditions and Restrictions of The Electra on December 1, 2005 in the Office of the County Recorder of San Diego County, California, as Document No. 2005-1036054, and any amendments or supplements thereto ("**Declaration**").

C.      Under Section 16.1 of the Declaration, the Declarant may record a Supplementary Declaration without the consent of any Owner to make corrections to the provisions of the Declaration or any previously recorded Supplementary Declaration.

D.      Declarant desires to make corrections to the provisions of the Declaration to (i) include the percentage share of variable expense for the Residential Condominiums set forth in the Residential Budget, which was originally intended to be listed in the Declaration and (ii)

101157432.1
Bosa-The Electra / 26343-27
Second Corrective Supplementary Declaration

1

7058

correctly label the percentage share of variable expense for the Residential Condominiums and Commercial Condominiums set forth in the General Budget.

NOW THEREFORE, Declarant declares as follows:

1.1 **Defined Terms.** Except as the context otherwise requires, all terms contained herein shall have the same meaning as set forth in the Declaration.

1.2 **Exhibit "C."** Exhibit "C" attached to the recorded Declaration is hereby deleted in its entirety and replaced with Exhibit "C attached hereto.

1.3 **Affirmation.** Upon recordation of this Supplementary Declaration, the Declaration remains in full force and effect.

IN WITNESS WHEREOF, Declarant has executed this instrument as of the date set forth above.

"DECLARANT"

Bosa Development California II, Inc., a California corporation

By:
Name:
Its:

7059

# EXHIBIT "C"

## PERCENTAGE SHARE OF VARIABLE EXPENSES

| Group Type (see Group Type Table Attached) | Residential % share of Variable Expense | Common(General) % share of Variable Expense |
|---|---|---|
| A | 0.302% | 0.226% |
| B | 0.383% | 0.287% |
| C | 0.449% | 0.337% |
| D | 0.480% | 0.360% |
| E | 0.532% | 0.399% |
| F | 0.576% | 0.432% |
| G | 0.604% | 0.453% |
| H | 0.661% | 0.496% |
| I | 0.716% | 0.537% |
| J | 0.928% | 0.696% |
| C-1 | | 0.378% |
| C-2 | | 0.457% |

7060

## GROUP TYPE TABLE

| Group Type Table | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Unit | Group | Unit Type | Unit | Group | Unit Type | Unit | Group | Unit Type |
| 101 | D | TH-1 | 705 | C | E | 1602 | D | B |
| 102 | D | TH-1 | 706 | G | F | 1603 | E | C |
| 103 | D | TH-1 | 801 | F | A | 1604 | F | D |
| 104 | D | TH-1 | 802 | D | B | 1605 | C | E |
| 105 | D | TH-1 | 803 | E | C | 1606 | G | F |
| 106 | D | TH-1 | 804 | F | D | 1701 | F | A |
| 107 | D | TH-2 | 805 | C | E | 1702 | D | B |
| 201 | J | TH-3 | 806 | G | F | 1703 | E | C |
| 202 | J | TH-4 | 901 | F | A | 1704 | F | D |
| 301 | B | TH-5 | 902 | D | B | 1705 | C | E |
| 302 | B | TH-5 | 903 | E | C | 1706 | G | F |
| 303 | B | TH-5 | 904 | F | D | 1801 | F | A |
| 304 | B | TH-5 | 905 | C | E | 1802 | D | B |
| 305 | B | TH-5 | 906 | G | F | 1803 | E | C |
| 306 | F | TH-6 | 1001 | F | A | 1804 | F | D |
| 401 | C | TH-7 | 1002 | D | B | 1805 | C | E |
| 402 | B | TH-8 | 1003 | E | C | 1806 | G | F |
| 403 | A | TH-9 | 1004 | F | D | 1901 | F | A |
| 404 | A | TH-9 | 1005 | C | E | 1902 | D | B |
| 405 | C | TH-10 | 1006 | G | F | 1903 | E | C |
| 501 | D | B | 1101 | F | A | 1904 | F | D |
| 502 | E | C | 1102 | D | B | 1905 | C | E |
| 503 | F | D | 1103 | E | C | 1906 | G | F |
| 504 | C | E | 1104 | F | D | 2001 | F | A |
| 505 | D | F | 1105 | C | E | 2002 | D | B |
| 506 | A | TH-11 | 1106 | G | F | 2003 | E | C |
| 507 | E | TH-12 | 1201 | F | A | 2004 | F | D |
| 508 | E | TH-13 | 1202 | D | B | 2005 | C | E |
| 509 | E | TH-13 | 1203 | E | C | 2006 | G | F |
| 510 | E | TH-13 | 1204 | F | D | 2101 | F | A |
| 511 | C | TH-14 | 1205 | C | E | 2102 | D | B |
| 512 | C | TH-15 | 1206 | G | F | 2103 | E | C |
| 513 | C | TH-16 | 1301 | F | A | 2104 | F | D |
| 514 | F | TH-17 | 1302 | D | B | 2105 | C | E |
| 515 | F | TH-17 | 1303 | E | C | 2106 | G | F |
| 516 | F | TH-17 | 1304 | F | D | 2201 | F | A |
| 517 | F | TH-17 | 1305 | C | E | 2202 | D | B |
| 518 | F | TH-17 | 1306 | G | F | 2203 | E | C |
| 519 | G | TH-17 | 1401 | F | A | 2204 | F | ● |
| 520 | G | TH-18 | 1402 | D | B | 2205 | C | E |
| 521 | G | TH-19 | 1403 | E | C | 2206 | G | F |
| 601 | F | A | 1404 | F | D | 2301 | F | A |
| 602 | D | B | 1405 | C | E | 2302 | D | B |
| 603 | E | C | 1406 | G | F | 2303 | E | C |
| 604 | F | D | 1501 | F | A | 2304 | F | D |
| 605 | C | E | 1502 | D | B | 2305 | C | E |
| 606 | G | F | 1503 | E | C | 2306 | G | F |
| 701 | F | A | 1504 | F | D | 2401 | F | A |
| 702 | D | B | 1505 | C | E | 2402 | D | B |
| 703 | E | C | 1506 | G | F | 2403 | E | C |
| 704 | F | D | 1601 | F | A | 2404 | F | D |

101157432.1
Bosa-The Electra / 26343-27
Second Corrective Supplementary Declaration

## GROUP TYPE TABLE
## (CONTINUED)

7061

| Unit | Group | Unit Type | Unit | Group | Unit Type |
|------|-------|-----------|------|-------|-----------|
| 2405 | C | E | 3302 | F | S |
| 2406 | G | F | 3303 | E | N |
| 2501 | F | A | 3304 | B | P |
| 2502 | D | B | 3305 | D | Q |
| 2503 | E | C | 3401 | G | R |
| 2504 | F | D | 3402 | F | S |
| 2505 | C | E | 3403 | E | N |
| 2506 | G | F | 3404 | B | P |
| 2601 | F | A | 3405 | D | Q |
| 2602 | D | B | 3501 | G | R |
| 2603 | E | C | 3502 | F | S |
| 2604 | F | D | 3503 | E | N |
| 2605 | C | E | 3504 | B | P |
| 2606 | G | F | 3505 | D | Q |
| 2701 | F | A | 3601 | G | R |
| 2702 | D | B | 3602 | F | S |
| 2703 | E | C | 3603 | E | N |
| 2704 | F | D | 3604 | B | P |
| 2705 | C | E | 3605 | D | Q |
| 2706 | G | F | 3701 | G | R |
| 2801 | F | A | 3702 | F | S |
| 2802 | D | B | 3703 | E | N |
| 2803 | E | C | 3704 | B | P |
| 2804 | F | D | 3705 | D | Q |
| 2805 | C | E | 3801 | G | R |
| 2806 | G | F | 3802 | F | S |
| 2901 | F | G | 3803 | E | N |
| 2902 | D | B | 3804 | B | P |
| 2903 | E | H | 3805 | D | Q |
| 2904 | F | J | 3901 | G | R |
| 2905 | C | E | 3902 | F | S |
| 2906 | G | K | 3903 | E | N |
| 3001 | F | G | 3904 | B | P |
| 3002 | D | B | 3905 | D | Q |
| 3003 | E | H | 4001 | I | T |
| 3004 | F | J | 4002 | H | U |
| 3005 | C | E | 4003 | F | V |
| 3006 | G | K | 4101 | I | T |
| 3101 | H | L | 4102 | H | U(m) |
| 3102 | G | M | 4103 | G | V(m) |
| 3103 | E | N | 4201 | I | T |
| 3104 | B | P | 4202 | H | U(m) |
| 3105 | D | Q | 4203 | G | V(m) |
| 3201 | G | R | 4301 | I | T |
| 3202 | F | S | 4302 | H | U(m) |
| 3203 | E | N | 4303 | G | V(m) |
| 3204 | B | P | Commercial 1 | C-1 | |
| 3205 | D | Q | Commercial 2 | C-2 | |
| 3301 | G | R | | | |

7062

State of California          )
County of SAN DIEGO         )

On MAY 12, 2009         , before me,    JANA BOISVERT, NOTARY PUBLIC        ,
personally appeared           ERIC MARTIN

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature    Jann Boisvert    .          (Seal)

JANA BOISVERT
Commission # 1737835
Notary Public - California
San Diego County
My Comm. Expires May 6, 2011

Hiba Enayat
2700 Glengarry Drive
Lake Havasu City
AZ, 86404
(415) 940-0723
hiba.enayat@gmail.com

PLAINTIFF IN PRO SE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER ENAYAT, AN INDIVIDUAL, <br><br>       PLAINTIFF, <br><br> v. <br><br> THE ELECTRA OWNERS ASSOCIATION, A DOMESTIC NON-PROFIT CORPORATION; AND DOES 1 THROUGH 10, <br><br>       DEFENDANTS. | CASE NO.: 3:21-CV-00634 <br><br> PROOF OF SERVICE |

I, Matthew Hardy, declare that:
(1) At the time of service, I was over 18 years of age and not a party to this legal action.
(2) My address is 2700 Glengarry Dr, Lake Havasu City, AZ, 86404.
(4) On 9/29/21, I mailed SECOND AMMENDED COMPLAINT ("Papers") on the following person at the following addresses:

Christie B. Swiss, Esq. (State Bar No. 245151)
Michael I. Hopkins, Esq. (State Bar No. 332769)
COLLINS + COLLINS LLP
790 E. Colorado Boulevard, Suite 600+
Pasadena, CA, 91101
(760) 274-2110 – FAX (760) 274-2111

(5) The Papers were served from Lake Havasu City, AZ

      I declare under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct.

Dated: September 29, 2021,

By: _Matt Hardy_
Matthew Hardy